# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE PLX TECHNOLOGY INC. STOCKHOLDERS LITIGATION | ) ) | CONSOLIDATED C.A. No. 9880-VCL |

## MEMORANDUM OPINION

Date Submitted: July 18, 2018
Date Decided: October 16, 2018

R. Bruce McNew, COOCH AND TAYLOR, P.A., Wilmington, Delaware; Randall J. Baron, David A. Knotts, Maxwell R. Huffman, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Kent Bronson, MILBERG TADLER PHILLIPS GROSSMAN LLP, New York, New York; *Attorneys for Plaintiffs*.

Patricia L. Enerio, Jamie L. Brown, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Lori Marks-Esterman, Renee M. Zaytsev, OLSHAN FROME WOLOSKY LLP, New York, New York; *Attorneys for Defendant*.

**LASTER, V.C.**

In January 2013, defendant Potomac Capital Partners II, L.P. ("Potomac") launched an activist campaign to pressure PLX Technology Inc. ("PLX" or the "Company") into a sale. Eric Singer, Potomac's co-managing member, led the activist campaign. Singer's investment thesis was simple. PLX had agreed to sell itself to Integrated Device Technology, Inc. ("IDT"), but PLX and IDT terminated their deal in December 2012 after the Federal Trade Commission challenged it on antitrust grounds. During the go-shop period, another bidder had expressed interest in buying PLX. After the IDT deal failed, PLX's stock plummeted. Singer bought shares at depressed prices, believing that Potomac could achieve short-term profits if PLX was sold to the other bidder.

Singer issued a series of highly critical public letters in which he demanded that the Company's board of directors (the "Board") conduct a sale process. During meetings with members of the Board and PLX management, he insisted that they sell PLX. In March 2013, Potomac nominated five candidates, including Singer, to replace a majority of the Board. In November 2013, Potomac conducted a proxy contest but sought to replace only three of the incumbent directors. At PLX's annual meeting in December 2013, Potomac's nominees prevailed. At Singer's request, the Board made him chair of the Strategic Alternatives Special Committee, which was charged with exploring strategic alternatives for the Company.

Shortly after the annual meeting, a senior executive from Avago Technologies Wireless (U.S.A.) Manufacturing Inc. ("Avago") contacted Deutsche Bank Securities Inc., who was serving as PLX's financial advisor. Conveniently, Deutsche Bank was also advising Avago on its acquisition of LSI Corporation, one of PLX's competitors.

1

Avago had been the other bidder who had approached PLX during the go-shop period for the IDT deal. Subsequently, in February 2013, Avago had proposed to acquire PLX for $6.00 per share. The Board had rejected Avago's offer, telling Avago that the price needed to "start with a 7." Since then, PLX's business had grown stronger.

The Avago executive told Deutsche Bank that he "saw the PLX BoD transition" but that because of the LSI acquisition, Avago would be in the "penalty box" until that deal closed. He said that once the LSI transaction was complete, Avago would be "open for business on all topics," including an acquisition of PLX, which he described as a "$300M deal." With 45.9 million shares outstanding, this figure equated to $6.53 per share.

Deutsche Bank shared the information with Singer. Deutsche Bank and Singer did not share the information with PLX's management team or with the other members of the Board. As a result of the tip from Avago, Singer and Deutsche Bank knew when Avago was likely to bid (after the LSI acquisition closed) and how much Avago wanted to pay ($300 million).

Over the next four months, Singer bided his time. In May 2014, Avago closed the LSI transaction and approached PLX, just as it said it would. The same senior executive from Avago asked to meet personally with Singer. The two discussed the pricing for a sale of PLX. The next day, Avago proposed to acquire PLX for $6.25 per share. Nine days later, PLX had agreed in principle to a deal at $6.50 per share—just what Avago said it wanted to pay when it approached Deutsche Bank in December 2013.

During those nine days, as Chair of the Special Committee, Singer worked with Deutsche Bank to manage the process and lead the Board to a deal at $6.50. One major

2

problem was management's business plan, which had been prepared in December 2013, approved by the Board, and used by the Board when making decisions in the ordinary course of business. A discounted cash flow analysis based on the five-year projections in that plan (the "December 2013 Projections") generated a valuation range well above the Avago deal price. The Special Committee and Deutsche Bank had management prepare a new and materially lower set of projections, which management described as a "sensitivity case" (the "June 2014 Projections"). After presenting the two sets of projections to the Board, the directors asked for an explanation of the changes. Without ever receiving it, the Board signed off on Deutsche Bank's use of the June 2014 Projections for its valuation work. Deutsche Bank called the June 2014 Projections its "Base Case" and the December 2013 Projections its "Upside Case." When Avago received the June 2014 Projections, it correctly labeled them as a "downside case" and continued to treat the December 2013 Projections as its base case.

On June 23, 2014, Avago and PLX formally announced their transaction, which was structured as a medium-form merger under Section 251(h) of the Delaware General Corporation Law (the "Merger"). In the recommendation statement that the Board sent to stockholders, the Board did not disclose Avago's December 2013 contact with Deutsche Bank and claimed that the June 2014 Projections had been prepared in the ordinary course of business. On August 12, the Merger closed. Each publicly held share of PLX common stock was converted into the right to receive $6.50 in cash.

The plaintiffs sued the directors, contending that they breached their fiduciary duties when approving the Merger. They also argued that the directors breached their duty of

3

disclosure when recommending the Merger to stockholders. The plaintiffs sued Potomac, Deutsche Bank, and Avago for aiding and abetting the directors' breaches of duty.

The claims against Avago and two of the directors were dismissed at the pleading stage. After discovery, the remaining directors and Deutsche Bank settled. The plaintiffs proceeded to trial against Potomac.

This post-trial decision finds that the plaintiffs proved all but one of the elements of their claim against Potomac. The plaintiffs proved that the directors breached their fiduciary duties by engaging in a sale process without knowing critical information about Avago's communications with Deutsche Bank in December 2013. The directors other than Singer should not be blamed for this oversight in any morally culpable sense; Singer and Deutsche Bank withheld the information from them. In terms of fulfilling their fiduciary duties to stockholders, however, the directors fell short. The plaintiffs also proved that the directors breached their duty of disclosure when recommending that stockholders tender, both by failing to disclose Avago's communications with Deutsche Bank in December 2013 and by depicting the June 2014 Projections as having been prepared in the ordinary course of business.

The plaintiffs proved that Potomac, through Singer, knowingly participated in the directors' breaches of duty. Singer knew about the tip from Avago in December 2013 and failed to disclose the information to his fellow directors. Once Avago engaged, he worked to engineer the sale that Potomac had sought to achieve from the outset. Singer was the co-managing member of Potomac and directed the activist campaign on its behalf. His

4

knowledge and actions are therefore imputed to Potomac for purposes of the knowing participation element of a claim for aiding and abetting.

The plaintiffs did not prove any causally related damages. The plaintiffs theorized that the Company should have remained a standalone entity and maintained that its value in that configuration was $9.86 per share. The plaintiffs failed to prove that valuation, which was more than 50% higher than the Merger consideration. Instead, the record shows that the Merger consideration exceeded the standalone value of the Company. Judgment is therefore entered in favor of Potomac.

## I.  FACTUAL BACKGROUND

Trial took place over three days. The parties submitted 505 exhibits and lodged fourteen depositions. Only one fact witness—Singer—testified live. Two expert witnesses testified at trial on damages issues. The parties proved the following facts by a preponderance of the evidence.

### A.  PLX

PLX was a Delaware corporation that developed and sold specialized integrated circuits used in connectivity applications.[1] The Company went public in 1999, and its shares traded on the NASDAQ Stock Market.[2]

---

[1] PTO ¶ 21. Citations in this format refer to stipulated facts in the pre-trial order. Dkt. 370. Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX ⸺ at ⸺" refer to trial exhibits using the JX-based page numbers generated for trial.

[2] PTO ¶ 36.

In 2008, PLX suffered major losses.[3] In an attempt to gain scale, management made two significant acquisitions, one in 2009 and the other in 2010.[4] Both were disasters.[5]

By 2011, PLX faced an uncertain future.[6] To turn things around, the Company began developing a new product called ExpressFabric.[7] The Board also began considering strategic alternatives.[8]

## B.     IDT, Avago, And Balch Hill

In April 2011, PLX discussed a potential transaction with IDT.[9] On June 17, 2011, IDT proposed to acquire PLX for $5 per share, payable 50% in cash and 50% in IDT stock.[10] The Board rejected the offer, stating that it "wanted to continue to execute on its long-term business plan."[11] When IDT followed up, PLX told IDT that any proposal "would have to be at a significantly higher price."[12]

---

[3] JX 35 at 2–3.

[4] PTO ¶¶ 40–41; *see also* JX 2 at 4; JX 4 at 8; Raun Dep. 337–38; Salameh Dep. 169–71; Schmitt Dep. 85–87.

[5] PTO ¶¶ 42–43; *see also* Singer Tr. 5–6, 332–40; Riordan Dep. 126, 140.

[6] JX 35 at 4.

[7] *Id.* at 4.

[8] *See* JX 6 at 5.

[9] PTO ¶ 44; JX 33 at 15.

[10] PTO ¶ 45; JX 33 at 15.

[11] JX 33 at 16.

[12] *Id.*

6

In October 2011, PLX engaged in discussions with Avago about a potential transaction. On October 31, 2011, the parties entered into a non-disclosure agreement.[13]

In February 2012, an activist hedge fund called Balch Hill Partners L.P. disclosed a 9.7% stake in the Company's equity.[14] Balch Hill asserted that "management should seek a buyer . . . to take advantage of the tremendous market interest in . . . PCI Express switches."[15] The Board disagreed and announced publicly that the Company's stockholders "would be best served by continuing to pursue the strategic projects underway" rather than "affirmatively pursu[ing] a sale."[16]

On March 7, 2012, Balch Hill submitted a slate of nominees to run against the incumbent directors.[17] Facing a proxy contest, the Board began consulting with Deutsche Bank about strategic alternatives.[18]

---

[13] PTO ¶ 47; *see also* JX 551 at 18.

[14] JX 9 at 2; *see also* PTO ¶ 48; JX 33 at 16.

[15] JX 9 at 6; *see also* JX 33 at 16; Schmitt Dep. 98–100. *Cf.* JX 2 at 27. "PCI Express" is a connectivity standard for integrated circuits. "PCI" stands for "Peripheral Component Interconnect." *See* PTO ¶¶ 38-39; JX 35 at 2. The plaintiffs objected to JX 35 as containing hearsay and lacking a proper foundation. During their depositions, Schmitt and Raun authenticated the document and confirmed the accuracy of the statements it contained. *See* Schmitt Dep. 89–98; Raun Dep. 321–29.

[16] JX 11 at 1; *see also* JX 33 at 16.

[17] JX 14 (Balch Hill letter to stockholders); *see also* JX 15 (first amendment to Schedule 13D); JX 16 (Schedule 14A); JX 17 (PLX Form 10-K Annual Report); JX 33 at 17.

[18] JX 33 at 18–19.

7

## C. The Failed IDT Merger

In March 2012, IDT indicated that it could increase its proposal to between $6.75 and $7.00 per share.[19] The Board thought the range was attractive, but wanted IDT to commit to a specific figure and a meaningful post-signing market check.[20]

On March 31, 2012, IDT offered to acquire PLX for $7.00 per share, payable 50% in cash and 50% in stock, and agreed to a post-signing go-shop period.[21] The Board accepted the proposal, and the parties began due diligence.[22] The parties signed a formal merger agreement on April 30, 2012.[23]

During the next thirty days, Deutsche Bank contacted thirty-seven parties.[24] Avago and three others expressed interest.[25] Only Avago submitted a proposal: an all-cash deal at $5.75 per share.[26] The Board declined to pursue it.[27] As IDT and PLX moved towards

---

[19] *See* PTO ¶ 50; JX 33 at 18.

[20] *See* PTO ¶ 51; JX 33 at 18.

[21] *See* PTO ¶ 53; JX 33 at 20.

[22] JX 23 at 1; JX 33 at 20.

[23] PTO ¶ 56; JX 30 at 1; JX 33 at 22.

[24] PTO ¶ 58; JX 551 at 19; *see* JX 32 at 1.

[25] PTO ¶ 58; JX 551 at 19.

[26] PTO ¶ 59–60; JX 36 at 2–3; JX 40 at 1; JX 551 at 20; *see* JX 41 at 2; Krause Dep. 83. *Cf.* JX 37 (Avago's analysis of the proposal prepared by Barclays).

[27] PTO ¶ 59; JX 551 at 20.

closing, Avago made two more attempts to submit a competing bid. Each time, the Board declined to engage.[28]

In May 2012, Balch Hill announced that it supported the IDT transaction and had sold much of its position. The firm waited until October to withdraw its nominees.[29]

## D. The IDT-PLX Deal Falls Through.

On December 18, 2012, the Federal Trade Commission moved to block the IDT-PLX merger on antitrust grounds.[30] The parties abandoned the deal the next day.[31]

After the termination of the IDT deal, PLX's stock price "declined precipitously."[32] The Board decided that PLX needed a couple of quarters to stabilize before restarting a sale process in the second half of 2013.[33]

To lead the recovery, the Board hired David Raun as the Company's CEO.[34] Management told the markets that "[d]espite the turmoil of the last nine months, we are now a stronger and more resilient company."[35] Management noted that PLX had made a

---

[28] JX 551 at 20.

[29] JX 33 at 22; JX 551 at 20.

[30] PTO ¶ 62; JX 55.

[31] *See* PTO ¶ 63; JX 56 at 1; JX 57 at 1.

[32] Singer Dep. 40.

[33] Salameh Dep. 15-16; *see also* JX 59 ("the current plan is for the company to 'recover' from the long process of the IDT acquisition").

[34] JX 58 at 1–2.

[35] JX 1006 at 1.

significant, well-received divestiture and was starting 2013 with its "highest-ever PCI Express market share" of nearly 70%.[36]

### E. Singer Becomes Interested In PLX.

The Company's floundering stock price after the failed IDT transaction caught the attention of Eric Singer, who managed Potomac. His investment thesis was simple: "When the IDT deal fell apart, the stock declined precipitously, and in the company's [proxy], it indicated there was a competitive bidder for PLX."[37] Because "the Board already made a decision to sell the company," he felt that "they should go back to the other party in the bidding process" and follow through on a transaction.[38]

On January 25, 2013, Potomac disclosed its ownership of 5.1% of the Company's common stock.[39] Potomac had acquired its position at prices ranging from $3.46 to $4.55 per share.[40] If Potomac could convince PLX to sell in the near term at something close to what IDT had offered, then Potomac would generate a healthy rate of return.[41]

---

[36] *Id.* at 2.

[37] Singer Dep. 40.

[38] *Id.* at 41.

[39] PTO ¶ 64.

[40] *See* JX 65 at 10–11.

[41] *Cf.* Riordan Dep. 80 (testifying that Singer only cared about getting "whatever premium he could get based on whatever he bought the stock at and whatever he could currently sell it at").

To induce PLX to sell, Potomac sent a strongly worded letter to the Board that it also released publicly. Potomac "**d[id] not believe that PLX should remain an independent public company**" and called on PLX to "**immediately commence a process of a thorough review of all strategic alternatives available to the Company.**"[42] Potomac urged that "action must be taken urgently and decisively" and that "[i]t is imperative that the Board and management translate this interest into a value-maximizing transaction."[43]

Singer made clear that he wanted PLX to talk to the other bidder who had come forward during the go-shop process: "**One interested party submitted a formal competing offer to the Company proposing a potential all-cash acquisition of PLX.**"[44] Potomac insisted that "it is time for the Board and management of the Company to give this competing proposal some serious consideration."[45] He added that "**it is imperative and urgent that the Board and management immediately engage a nationally recognized investment bank and commence a robust process of exploration and evaluation of all available strategic options and value-maximizing opportunities.**"[46]

---

[42] JX 63 at 1; *see also* Schmitt Dep. 37–39.

[43] JX 63 at 1.

[44] JX 63 at 2.

[45] *Id.*

[46] *Id.*

11

Singer followed up this letter by leaving Raun a voice message and sending him an email requesting a call.[47] Raun and Singer eventually spoke over the phone on January 30, 2013, and Singer reiterated the views expressed in Potomac's letter.[48]

The Board correctly perceived that Singer wanted PLX sold. As the directors saw it, "Eric Singer's position was that we should sell the company, and that was . . . his one and only agenda."[49] But the directors did not agree that an immediate sale was in the Company's best interest.[50]

On February 13, 2013, Potomac sent another public letter to the Board.[51] Potomac again demanded that the Board "immediately commence a process of thorough review of all strategic alternatives available to PLX," stressing that "[a]ction must be taken decisively and urgently."[52] Potomac argued that "shareholder value can best be created by capitalizing on the historic interest in PLX from potential acquirers, while leveraging the improved

---

[47] JX 70 at 1.

[48] *Id.*

[49] Riordan Dep. 53; *see also id.* at 76 (Singer's "clear intentions, what he told us, was that . . . we should sell the company"); Raun Dep. 217 ("I believe most of the time [Singer] was only interested in the sale of PLX in 2013"); Whipple Dep. 22 (describing Singer as the type of activist "who think they can achieve shareholder value by forcing the sale of the company" rather than the type who "join the board because they think they can make the operations better").

[50] *See* JX 74 at 2.

[51] PTO ¶ 64; JX 77.

[52] JX 77 at 2.

operating model of the Company."[53] Potomac added that "the Company's strong fundamentals make it an attractive target of strategic interest."[54] Potomac concluded by calling for new directors who would "break the current Board's historic complacency and reactive practices and ensure objective analysis of value enhancing opportunities."[55]

After Potomac's second letter, PLX arranged a meeting.[56] On February 26, 2013, Singer met with Company's two senior executives, Raun and Art Whipple, the Company's Chief Financial Officer, and two of its outside directors, co-founder Michael Salameh, who had served as CEO until 2008, and Tom Riordan.[57] Singer took affront, expressing disappointment that PLX did not also send James Guzy, the Chairman of the Board, and Ralph Schmitt, Raun's predecessor as CEO.[58]

The PLX attendees did not have a good impression of Singer. Riordan reported that it was "not possible to have a constructive conversation with [Singer] because he doesn't care one whit about the company or its employees or its contribution."[59] Whipple described

---

[53] *Id.*

[54] *Id.* at 3.

[55] *Id.*

[56] *See* JX 74; *see also* JX 70 at 1–2; JX 71 at 1; JX 73 at 1.

[57] *See* JX 81 at 1; JX 89 at 1; Riordan Dep. 50, 52.

[58]JX 82 at 1; JX 86 at 1.

[59] JX 88 at 1; *see also* Riordan Dep. 47–55; *id.* at 63 ("Q. So did Singer make any operational suggestions about what the company could do differently? A. Other than for all the board to resign, no.").

13

Singer's "apparent knowledge of PLX [as] broad but shallow. We asked him several times what he thought we could do differently that would deliver shareholder value. He was blank."[60]

## F. Avago Reappears.

Like Singer, Avago saw the failed IDT deal as an opportunity and began accumulating PLX shares. By January 22, 2013, Avago had accumulated a 3.1% stake.[61] With the assistance of Barclays Capital, Inc.,[62] Avago examined strategies for completing an acquisition, including via hostile bid.[63]

---

[60] JX 89 at 1; *accord* Riordan Dep. at 17; JX 102 at 2. At trial, Singer disagreed with the directors' accounts. *See* Singer Tr. 81–83, 85–88. On this issue and on others, Singer was not a credible witness. *Compare, e.g.*, Whipple Dep. at 53 (testifying that Singer "routinely threatened management and board members that he was going to sue them individually . . . if they didn't do what he wanted them to do"), *and* Riordan Dep. 68–69 ("Q. But he threatened to sue you? A. Yeah, he did that all the time, right. That was his standard."), *and* Schmitt Dep. 30 (testifying that Singer "threatened . . . lawsuits all the time. That was his mode of operation at that point."), *with* Singer Tr. 79–80, 83 ("Q. But they were right that you were planning to threaten people and be a bully. Right? A. I don't believe so."; "I don't believe Mr. Whipple—look, this is a sound bite of 30 seconds. I never threatened a director if they were not doing what I wanted them to do. . . . For him to make a statement that I routinely threatened people if they didn't do what I wanted, I believe that's a categorically false statement"; "I don't believe that that's an accurate statement"; "I think that's completely . . . incorrect.")

[61] *See* JX 61 at 2.

[62] *See* JX 60–61; Krause Dep. 36–37.

[63] JX 61 at 13.

On February 25, 2013, the night before the PLX representatives met with Singer, Guzy and Raun had dinner with Avago's CEO, Hock Tan.[64] The next day, Avago proposed to acquire PLX for $6.00 per share in cash.[65]

During a meeting on February 27, 2013, the Board received updates on Avago and Potomac. The directors decided to seek an improved offer from Avago.[66] They instructed Whipple "to provide a three-year business plan for review by the Board and to approach one or more investment bankers for valuation estimates on a no-fee basis."[67] Anticipating that Singer would launch a proxy contest, they retained MacKenzie Partners, Inc. as their proxy advisor.[68]

On March 1, 2013, Schmitt spoke with Tan. Tan said that Avago could "go higher" but that PLX would need "to make the case."[69] After some back and forth, they agreed that "$6 is a good starting point and $7 may be too high."[70] Tan argued that his board "would

---

[64] JX 75.

[65] JX 87 at 1; *see also* Krause Dep. 88–89.

[66] JX 92 at 1.

[67] *Id.*

[68] PTO ¶ 67.

[69] JX 94 at 1.

[70] *Id.*

15

not understand" if he offered the same price as IDT, because IDT had to propose "a higher premium due to structure and need to keep their position in the market."[71]

## G. Potomac Nominates A Slate of Directors.

On March 6, 2013, Potomac nominated its slate of candidates.[72] In addition to Singer, the nominees were:

- Martin Colombatto, "a director of ClariPhy Communications, Inc., a leading developer of highly integrated single chip optical transceivers . . . , and Luxtera Corp., a world leader in silicon photonics solutions."[73]

- Stephen Domenik, "a general partner with Sevin Rosen Funds, a venture capital firm."[74]

- Mark Schwartz, "a director of Pepex Biomedical, Inc., a medical device company," and "PurchasePoint Design, a company specializing in point of purchase display and product design."[75]

- Arthur Swift, the CEO "of CUPP Computing AS, a supplier of security solutions for mobile devices."[76]

Colombatto and Schwartz had served as nominees for Balch Hill.[77]

The Board met that same day . It reviewed the revised three-year plan that Whipple had prepared and instructed Deutsche Bank to "prepare an analysis of the Company based

---

[71] *Id.*

[72] JX 98.

[73] *Id.* at 3.

[74] *Id.*

[75] *Id.* at 4.

[76] *Id.*

[77] *Compare* JX 14 at 3–4, *with* JX 98 at 3–4.

16

on the updated plan and current market conditions."[78] The Board directed Raun to tell Avago that PLX's value was "substantially above" $6.00 per share. On Potomac, the Board directed management "to take no action at this time" other than to "determine whether the nomination letter . . . was in good form."[79]

The next day, Raun told Singer that "publicly threatening us with a proxy contest" was not a productive step.[80] Raun also expressed his disappointment that Singer still had not provided any suggestions for operational improvements or strategic initiatives.[81] Singer stayed on message, responding that "the Company should open up discussions again with the competing bidders . . . from last year's sales process."[82]

On March 15, 2013, the Board met again.[83] Using management's projections as a base case, Deutsche Bank presented a valuation range for the Company of $5.25 to $7.78 per share, with a midpoint of $6.41.[84] The downside case ranged from $4.06 to $5.89, with

---

[78] JX 99 at 2.

[79] *Id*.

[80] JX 100.

[81] *Id*.

[82] JX 101 at 1.

[83] JX 111 at 1.

[84] JX 108 at 3; *see* Raun Dep. 222–24.

17

a midpoint of $4.91.[85] Deutsche Bank reported that it had received four "unsolicited inquiries" about the Company.[86]

On March 19, 2013, Raun met with Singer at a conference and offered to provide additional information subject to a non-disclosure agreement. Singer declined.[87]

On March 20, 2013, Singer offered to settle the proxy contest for two board seats, to be filled by Domenik and himself.[88] He also wanted the Board to "form[] a strategic committee of five members to explore all strategic alternatives and appoint[] Eric Singer and Steven Domenik to this committee."[89] After the Board rejected his proposal,[90] Singer told Raun that "Potomac will not hesitate to take all necessary action to protect its investment, including to take our ideas directly to our fellow stockholders and ask them to support the election of our nominees."[91]

---

[85] JX 108 at 3.

[86] *Id.* at 13. In April 2013, Cowen and Company provided Whipple with its thoughts on the Company's value. Cowen's base case valued PLX at $4.92 to $6.51 per share, with a midpoint of $5.66; its upside case valued PLX at $6.66 to $9.01 per share, with a midpoint of $7.75. JX 136 at 9, 14–15.

[87] JX 120 at 1. *Cf.* Singer Tr. 60–61, 92–94; Whipple Dep. 67 ("He was offered, in many cases, the opportunity to come in and be an observer on the board, and he declined any participation to do that.").

[88] JX 117.

[89] *Id.*

[90] *See* JX 120 at 1; JX 121 at 1–2.

[91] JX 126.

By April 19, 2013, Potomac had increased its stake to 7.0% of the Company.[92] During a call on April 19, Singer told Salameh that he might "take it upon himself to contact prospective acquirers to solicit their interest in PLX and may also seek to involve an investment banker."[93]

## H.    Further Discussions With Avago

While Potomac pushed for a sale, PLX engaged in further discussions with Avago.[94] On April 25, 2013, the Board decided to formally reject Avago's $6.00 offer, concluding that the proposal "did not adequately reflect full and fair value to the Company's shareholders."[95] In a letter dated April 29, 2013, PLX informed Avago of this decision and asked Avago for its best and final offer.[96] Instead of offering a higher price, Avago "inquir[ed] about next steps to advance discussions between the companies" and "confirmed . . . that they had a stock position" in PLX.[97]

---

[92] PTO ¶ 70.

[93] JX 245 at 15. At trial, Singer could not recall his threats to put the Company in play. *See* Singer Tr. 89-92 ("I don't recall that." "I don't recall it . . . ." "There's no record of that conversation." "Just to clarify, I have no recollection of saying this.").

[94] *See* JX 139 at 2; JX 146 at 2–3.

[95] JX 150 at 2; *see also* Riordan Dep. 87–90 (testifying that his view "was based on the potential for PCI-Express to significantly increase in revenue based on it being successful in one of the two businesses, either the ExpressFabric business or the solid state disk business").

[96] JX 153 at 2; *see also* JX 150 at 2; JX 152 at 1.

[97] JX 158 at 1.

19

On May 3, 2013, the Board decided to break off discussions with Avago.[98] The Board instructed Salameh to inform Avago "that the $6.00/share proposal does not reflect full value for the Company and that 'the price should start with a 7.'"[99] That afternoon, Salameh conveyed the message to Thomas Krause, Avago's Vice President for Corporate Development.[100] Krause responded that "$6 is the right price" and that Avago could not go higher.[101] He also indicated that Avago was prepared to launch a hostile tender offer if PLX did not agree to a deal."[102] Salameh reiterated "that an offer should start with a 7."[103]

On May 9, 2013, Avago's bankers at Barclays followed up with Salameh, noted that there was an "activist shareholder in the background," and again mentioned "the potential of a tender offer or a public letter from Avago."[104] Salameh reiterated that the price "should start with a 7."[105] Avago went silent.[106]

---

[98] *Id.* at 2.

[99] *Id.*

[100] JX 161 at 1.

[101] *Id.*

[102] *Id.* at 2.

[103] *Id.*

[104] JX 165.

[105] *Id.*

[106] *See* JX 181 at 2; Krause Dep. 97–98.

## I. Potomac Continues To Apply Pressure.

By June 27, 2013, Potomac had increased its stake to 9.4% of the Company's shares.[107] Singer wanted "the board to be reconstituted" and suggested that the directors agree to a "graceful transition."[108] That same day, Potomac served a demand for books and records on the Company. In the demand, Potomac asserted that the directors had "a fiduciary duty to stockholders to explore all strategic alternatives for the Company."[109] The demand sought books and records regarding:

> (i) "any alternative acquisition proposal presented or considered by the Board during the Company's 'go-shop' period";
>
> (ii) "any potential acquisition, sale, merger or business combination including, but not limited to, indications of interest or rejected offers";
>
> (iii) "any strategic alternatives being considered by the Company including advice, reports or recommendations from the Company's investment bankers"; and
>
> (iv) "any communications with third-parties, including potential acquirors or acquirees, regarding any potential acquisition, sale, merger or business combination."[110]

On July 5, the Company rejected the demand as resting on "bare accusations" and seeking documents that were not "essential and sufficient to discharge the stated purposes."[111]

---

[107] PTO ¶ 73; JX 176 at 16.

[108] JX 177 at 1.

[109] JX 178 at 2.

[110] *Id.* at 3.

[111] JX 179 at 1.

On July 25, 2013, Salameh and Riordan met with Singer.[112] Singer accused the directors of being "incompetent" and said they "had run the company into the ground."[113] "[H]e threatened to hold [Riordan] personally liable for the failures of the company."[114] He asserted that the directors "should all be replaced and they should just sell the company."[115]

After the meeting, Singer sent Riordan an antagonistic letter.[116] Singer reiterated that his "primary interest is to encourage management and the Board to take immediate steps to enhance stockholder value."[117] He concluded by threatening that "[w]e will not

---

[112] JX 184 at 1.

[113] JX 185 at 1; *see also* Riordan Dep. 82 (testifying Singer made this accusation "every time [PLX directors] talked to him"); Whipple Dep. 52 (according to Singer "[e]verything that anybody does is horrible or wonderful; and as far as he's concerned, nothing that PLX had managed to do was wonderful").

[114] JX 185 at 1; *see also* Riordan Dep. 68-69 ("Q. But he threatened to sue you? A. Yeah, he did that all the time, right. That was his standard."); Schmitt Dep. 30 (testifying that Singer "threatened . . . lawsuits all the time. That was his mode of operation at that point."); Whipple Dep. 53 (testifying Singer "routinely threatened management and board members that he was going to sue them individually . . . if they didn't do what he wanted them to do").

[115] Riordan Dep. 53; *see also id.* at 80 (testifying Singer only cared about getting "whatever premium he could get based on whatever he bought the stock at and whatever he could currently sell it at"); *id.* at 47 ("You don't have to be a mind reader. As we've talked about for hours now, that's what he said he wanted done. He wanted the company sold. He made no—he made no [a]llusions to anything other than that. [']I want you to sell the company.[']").

[116] JX 187.

[117] *Id.*

hesitate to hold you and the rest of the Board personally liable for any failure to fully and faithfully discharge such obligations."[118]

Salameh responded and expressed "strong[] disagree[ment]" with Singer's position.[119] He noted that "[w]hile we can appreciate that, as an activist hedge fund with a relatively short-term horizon, you would like to be able to force an event that would allow you to profitably liquidate the position you have been accumulating," the Board had a fiduciary obligation to "consider the interests of the holders of PLX stock that you do not represent, particularly the holders that may have a longer time horizon than Potomac Capital."[120]

## J.    The Fall 2013 Market Check

During a meeting on August 6, 2013, the Board discussed what other action to take in response to Potomac's campaign.[121] Deutsche Bank advised that nearly 60% of activist campaigns in the semiconductor sector had resulted in sales, with another 35% still ongoing.[122] Deutsche Bank saw three options: engage in a proxy fight, settle with Potomac,

---

[118] *Id.*

[119] JX 189 at 1.

[120] *Id.* at 2; *see also* Salameh Dep. 32–35.

[121] PTO ¶ 74.

[122] JX 190 at 9.

or sell the company.[123] Deutsche Bank believed that selling in the near term could "leave[] value on the table."[124]

After excusing Deutsch Bank, the directors revisited their desire to wait for "a few quarters" after the failed IDT merger before re-starting a sale process so that the Company could "realize the improved value of . . . structural changes [and the] PCIe Gen3 designs."[125] Despite this plan, the directors concluded that the Company had done enough and that "the timing seemed optimal" for "pursuing . . . an affirmative process."[126] The Board made this decision to head off Potomac's proxy contest; without Potomac's presence, the Board would not have been so quick to start a process.[127]

---

[123] JX 190 at 20–21; *see also* Schmitt Dep. 47–52.

[124] JX 190 at 16.

[125] JX 195 at 1.

[126] *Id.* at 2.

[127] *See* Schmitt Dep at 52 ("In a normal business environment, we did not believe it was best to sell the company. Given the situation, that may have caused us to look at things a little differently."); Raun Dep. 339–43 (recalling the Company reinitiated a market check because "we had some ongoing interest in the company at different points in time and it made sense to maybe formalize a process and do a market check to see if there was a party that was in the best interest of the company" and suggesting a price of $7 at that time "was obtainable"); Riordan Dep. 188–89 ("[T]his is putting ourselves in the shoes of the activist shareholder an saying, you know, what does the activist shareholder want us to do, therefore we should get out in front of that and see what . . . the market says and not be driven by the activist shareholder.").

24

On August 15, 2013, the Board resolved to create a Special Committee "to select advisors and run an affirmative process to consider the sale of the Company."[128] On August 17, the Board gave the Special Committee the following more detailed charge:

> (i) solicit and evaluate strategic alternatives available to the Company for maximizing stockholder value; (ii) evaluate and make recommendations to the Board with respect to any strategic alternatives, solicited or unsolicited, that may be proposed by parties interested in entering into a strategic transaction with the Company; (iii) take all necessary action, as the Special Committee shall determine necessary or appropriate to defend the Company with respect to any proxy contest or other activist campaign initiated or threatened by any person or entity against the Company; and (iv) report all conclusions and recommendations to the Board for its information and consideration of any binding action.[129]

The members of the committee were Salameh, Schmitt, John Hart, and Robert Smith.[130]

With Deutsche Bank's help, the Special Committee decided to approach a list of potential bidders without making a public announcement.[131] By September 5, 2013, Deutsche Bank had arranged three meetings, including one with Avago, and identified six to eight interested prospects.[132]

---

[128] JX 201 at 1; *see also* PTO ¶ 75; JX 203 at 2.

[129] JX 203 at 2; *see also id.* at 4; PTO ¶ 76; Hart Dep. 19-24 (describing the Special Committee's charge as considering "should we go it alone or should we . . . continue to . . . pursue getting purchased, and are there any good buyers out there"); Riordan Dep. 106–07 (agreeing "that the authorization of the Special Committee was prompted by Potomac's interaction").

[130] JX 201 at 1; JX 203 at 1; Raun Dep. 67–70.

[131] JX 205 at 1–2.

[132] JX 208 at 1.

Management presentations began in mid-September. The presentation materials cited the Company's strengths, including its status as a "leading provider of PCI express connectivity products with more than 70% market share,"[133] the potential for ExpressFabric to "double [the] served market,"[134] and the Company's projected year-over-year growth of 33.9% by 2017, resulting in gross profit of $156 million.[135] During the presentations, management explained that PLX would "grow at least 25% per year based on conservative assumptions, and pointed out many realistic opportunities for substantial upside."[136]

On September 25, 2013, Deutsche Bank reported to the Special Committee that it had contacted fifteen potential bidders, and nine had executed non-disclosure agreements.[137] All nine expressed significant interest, and Avago expressed a willingness to "increase [its] offer above $6/share."[138] Other bidders expressed "concern with the current stock market valuation of the Company."[139]

---

[133] JX 206 at 7.

[134] *Id.*

[135] *Id.* at 9.

[136] JX 211 at 1.

[137] PTO ¶ 78; JX 215 at 5–6; JX 217 at 1; Cho Dep. 195–96.

[138] JX 215 at 5; *see also* JX 217 at 1 (suggesting "that Avago appears to remain interested in exploring a transaction with the Company but is not willing to participate in a competitive sales process").

[139] JX 217 at 1.

Deutsche Bank also presented the Special Committee with an updated valuation.[140] Using a discounted cash flow methodology, Deutsche Bank's base case valued the company at between $8.31 and $11.06 per share, with a midpoint of $9.59.[141] Its downside case valued the Company at between $4.83 and $6.27 per share, with a midpoint of $5.50.[142]

On October 1, 2013, Cypress Semiconductor Corporation submitted an indication of interest in a cash deal at a "price per share in the range of $6.50 to $7.50" and requested two weeks of exclusivity.[143] Deutsche Bank thought there were three other bidders who had serious interest—Inphi Corporation, LSI Corporation, and Avago—and advised against exclusivity.[144] The Special Committee agreed.[145] All four parties ultimately declined to bid.[146]

---

[140] *Id.*

[141] JX 215 at 16.

[142] *Id.*

[143] JX 219 at 1; *see also* PTO ¶ 79; Cho Dep. 197–99.

[144] JX 220 at 1–2.

[145] JX 221 at 1.

[146] PTO ¶¶ 79, 82; *see also* JX 225 at 1; JX 236 at 1; JX 239 at 1; JX 243; JX 253 at 1; Raun Dep. 344–52.

## K. The Proxy Contest

On November 8, 2013, Potomac filed a definitive proxy statement that sought to elect Singer, Domenik, and Colombatto as replacements for Riordan, Smith, and Guzy.[147] During the ensuing proxy contest, Potomac criticized the incumbent directors for their long tenure and lack of significant stock ownership. Potomac stressed that the Board should "immediately commence a thorough review of all strategic alternatives available to the Company."[148] Although Potomac acknowledged recent improvements, Potomac argued that these successes should be "translated into a value-maximizing transaction."[149] As Potomac's campaign mounted, other activist investors bought shares and voiced their support for Potomac's slate.[150]

The directors' proxy materials stressed that they were "open to selling the company."[151] They argued that stockholders would be best served "by the current Board and our program to strengthen the company while remaining open to value-maximizing transactions."[152] They criticized Potomac for having "consistently expressed its desire to

---

[147] PTO ¶ 85; JX 255 at 19–20; *see also* JX 270 at 45–48. *Cf.* JX 2018 at 2; Singer Tr. 84, 309–12, 321.

[148] JX 245 at 4; *see also* JX 241 at 1.

[149] JX 245 at 11; *see also* JX 260 at 1-2 (Potomac asserting that its slate would "maximize stockholder value for all"); PTO ¶ 86.

[150] *See* JX 258 at 1; JX 262 at 1.

[151] JX 246 at 1. *Cf.* JX 257; JX 259; JX 282.

[152] JX 246 at 1.

have the Company sold immediately."[153] They described Potomac's agenda as "self-serving and transparent – its primary goal is to force a quick sale of the Company in order to realize a short-term gain on its investment, to fulfill the demands of its own investors, and to transition capital to its next target, without regard for the best interests of all PLX Technology stockholders."[154]

The directors maintained that the Company was "executing well."[155] They cited its market share of "70 percent . . . and growing," "three consecutive profitable quarters," "the highest year-to-date profits in the Company's 27-year history," and the Company's plan "to quadruple the size of the addressable market by 2017."[156]

As in many proxy contests, the outcome turned on the recommendation of Institutional Shareholder Services Inc. ("ISS"), and both sides worked on presentations that would convince ISS to support their nominees. Potomac's internal communications show that Singer had no meaningful ideas other than selling the Company. Potomac struggled to come up with "specific ideas on what we will do differently" because "the company is taking all the right steps."[157] Singer personally could not come up with anything, so his

---

[153] JX 257 at 3.

[154] JX 282 at 3; *see also id.* at 33, 36; *accord* Whipple Dep. 73–75; Raun Dep. 284–85; Hart Dep. 24–29.

[155] JX 257 at 3.

[156] *Id.* at 3–4 (emphasis omitted); *see also* JX 259 at 5. *Cf.* PTO ¶ 86; Schmitt Dep. 55–60; Riordan Dep. 13–21; Salameh Dep. 279–81.

[157] JX 265 at 1.

proxy advisor offered some generic ideas that "[h]istorically . . . have worked" at other companies.[158] Potomac's presentation ultimately focused on the Company's historical losses, its failed acquisitions in 2009 and 2010, and its failure to meet revenue forecasts in 2012, 2013, and 2014.[159] As its "plan," Potomac incorporated nearly verbatim its proxy advisor's generic list of ideas.[160]

PLX's presentation was detailed and substantive.[161] It emphasized the incumbent directors' willingness to sell the Company if warranted, as evidenced by the IDT transaction.[162] It also emphasized the Company's improving product pipeline[163] and rapidly growing market share.[164] PLX described Potomac as "a self-interested activist investor that is focused on short-term gains at the expense of other PLX Technology stockholders."[165]

---

[158] JX 266 at 2.

[159] JX 270 at 29–30.

[160] *Compare id.* at 40, *with* JX 266 at 2; *see* Singer Tr. 122–24; *see also* JX 282 at 65 (describing Potomac's plan as "a summary of the same plan PLX ha[d] been executing under the current Board for a year, and ha[d] been described by PLX in investor presentations throughout the year"). At trial, Singer testified that Potomac presented numerous ways to improve PLX's operations. Singer Tr. 114–19. That testimony was not accurate.

[161] *Cf.* JX 276.

[162] JX 276 at 7; *see also* JX 282 at 58.

[163] *See* JX 282 at 19 (explaining that the "[d]esign activity pipe (which measures our future potential annual revenue)" had more than tripled since 2009).

[164] JX 282 at 20 (noting the "improved competitive landscape").

[165] JX 277 at 55 (emphasis omitted); *see also* JX 282 at 36 ("Potomac has not engaged constructively and has been disruptive to the business of PLX as your Board continues to enhance shareholder value."); *id.* at 3 ("Potomac Capital's agenda appears

On December 6, 2013, ISS endorsed Potomac's slate. ISS noted that PLX's share price had outperformed its peers, but posited that the stock had been "bid up by the prospect of a future transaction, and large positional swings of the dissident and other large shareholders, rather than shareholder's belief in core improvement in operating fundamentals."[166] ISS also expressed concern about the incumbent directors' long tenure.[167]

After ISS issued its endorsement, PLX management began preparing for a Potomac victory and the arrival of three new directors.[168] Riordan felt that once the Potomac nominees joined the Board, selling the Company was "a done deal" and a "*fait accompli*."[169]

---

self-serving and transparent—its primary goal is to force a quick sale of the Company in order to realize a short-term gain on its investment, to fulfill the demands of its own investors, and to transition capital to its next target, without regard for the best interests of all PLX Technology stockholders."); Hart Dep. 24–29; Raun Dep. 284–85.

[166] JX 288 at 15.

[167] *Id.* at 16–17.

[168] *See* JX 308 (preparing for onboarding of three new directors); JX 322 at 1 (reorganizing committees immediately prior to annual stockholder meeting in light of anticipated arrival of new directors).

[169] Riordan Dep. 110–12 (emphasis added); *accord* Whipple Dep. 76 (explaining that after ISS endorsed Potomac's nominees, he believed a sale of the Company was "virtually assured").

**L.** **The December 2013 Projections**

In late November and early December 2013, Whipple began the process of preparing the next update of the Company's business plan.[170] The Company historically prepared a three-year plan and treated the first year as its annual operating plan.[171] For 2013, Raun directed Whipple and his financial team to prepare a five year plan.[172] Consistent with its standard practice, the team obtained information about year-one revenue from the sales organization.[173] For subsequent years, the team generated revenue estimates based on their internal views about PLX's products and pipeline as well as external industry reports about market trends.[174] Once the revenue targets were established, the individual business units developed spending plans to support those targets.[175] Senior management debated the resulting figures and made adjustments "to get what . . . the company believes is the right number."[176]

---

[170] *See* JX 285 at 1; *see also* JX 286 at 1.

[171] Whipple Dep. 94–95 ("[E]very year around Thanksgiving, we sat down as a group and we did a three—typically a three-year plan, which—the first year of which became our budget for the following year.").

[172] JX 285 at 1; *see* JX 286 at 1; Whipple Dep. 96.

[173] Whipple Dep. 94–95.

[174] *See* JX 307; Quintero Tr. 593–95; Whipple Dep. 95.

[175] Whipple Dep. 95; *see also* JX 296.

[176] Whipple Dep. 106; *see also* JX 295.

On December 10, 2013, management provided the directors with its proposed five-year plan.[177] In small print, at the bottom of a summary page, management described the assumptions on which the plan was based:

> *5 year plan summary updated December 2013 for 2014 BOD AOP Meeting. Assumes continued investments in R&D and SG&A to support growth past 2018 unlike plan for market check where projected expense growth was to support products in plan but not products beyond plan. Headcount is end of year headcount with many positions filled in 2nd half and dependent on financial performance up to that point in time. 2014 and future require higher PCIe growth than seen recently. Although this is an aggressive plan compared to the past couple years performance and where we stand today in a market with soft demand, management believes we should drive internally for this number as the plan. The key will be getting our strong Gen 3 design pipeline into production, a stable economy and a return of federal spending with our end customers.[178]*

This language has the look and feel of a customary disclaimer paragraph, yet the six-word introductory phrase that begins the penultimate sentence—"[a]lthough this is an aggressive plan"—took on disproportionate importance later in the sale process when it became clear that the projections supported standalone valuations for the Company that exceeded Avago's bid. During this litigation, the concept of an "aggressive plan" became a mantra for the defense witnesses, most of whom were named defendants who had not yet settled when they testified by deposition. They repeated those words frequently and volunteered them gratuitously as if they had been instructed to mention them as often as possible. Their

---

[177] PTO ¶ 91.

[178] JX 293 at 8. *Cf.* JX 298 at 7.

coordinated, redundant, and excessively emphatic performances undermined their credibility.

During a Board meeting on December 12, 2013, management discussed the plan with the Board.[179] The directors suggested minor changes, but otherwise endorsed the projections.[180] The next day, Raun distributed an updated plan "based on the conversation yesterday at the Board meeting and further review with the management team."[181] The revised plan included minor reductions to 2014 revenue and spending and "slight" reductions to revenues in the projected years.[182] At a meeting on December 13, the Board approved the plan.[183] This decision refers to the resulting plan as the "December 2013 Projections."

During subsequent months, the Company used the plan in the ordinary course of business as if the Board and management believed it represented the Company's best estimates of its future performance. In April 2014, the Board signed off on a proposal for D&O insurance based on the December 2013 Projections.[184] The Board also signed off on

---

[179] *See* PTO ¶ 92; JX 298; JX 303; Raun Dep. 137–44.

[180] *See* Raun Dep. 137–42.

[181] JX 304 at 1; *see also* JX 305 at 1; JX 307 at 1; Raun Dep. 372–78; Whipple Dep. 126–30.

[182] JX 304 at 1.

[183] JX 306 at 2; *see* PTO ¶ 93. *Cf.* JX 309.

[184] *See* JX 383 at 32; JX 398 at 1; *see also* JX 396 at 4–5.

an executive compensation program based on the December 2013 Projections.[185] It was only after Avago's bid that PLX began backing away from these figures, and only during this litigation that its witnesses derided the numbers as unreliably aggressive.

## M.    The Potomac Nominees Join The Board.

On December 18, 2013, PLX held its regular annual stockholder meeting.[186]  The stockholders elected Colombatto, Domenik, and Singer.[187] Led by Salameh, the incumbent directors made a genuine effort to welcome the new directors to the Board.[188]

---

[185] *See* JX 385 at 20, 61; JX 398 at 2.

[186] PTO ¶ 94.

[187] *Id.*; JX 328.

[188] *See, e.g.*, JX 317 at 1 (Salameh welcoming the new directors to the Board); JX 321 at 1 (Salameh telling Singer that "[i]n the discussion we had this morning, I got a much better idea of the experience, contacts and perspective the three of you have. It[']s going to help our efforts to maximize shareholder value immensely. Marty [Colambatto's] background at Broadcom and LSI I am sure is going to be a huge asset."); JX 333 at 1 (Salameh emailing Colambatto, "Marty, thanks for diving in. Your questions point to the key strategic decisions for PLX and provide a good structure for a follow-up session. Your background in building the Ethernet business at Broadcom is extremely relevant and will add a fresh perspective. It[']s important for all the new board members to understand the business in some depth before we make any big decisions, and these informal sessions are a good way to build that knowledge."); JX 335 at 1 (Schmitt observing that Singer had "commented on how impressed he is with [Raun] and how dedicated [he is] to getting a good result. That it could be [through] a transaction or not."); JX 354 at 1 (Raun emailing Schmitt and Salameh that he "had a good discussion with Eric [Singer] last night in New York."); Salameh Dep. 220 ("I was pleased by all three directors . . . . I was very impressed with . . . Marty Colombatto's knowledge and his attitude. Steve Domenik was also a very experienced executive who had a very balanced view. Eric [Singer] was approaching it in a very professional manner. So I was very happy with how things changed after the annual meeting."); Schmitt Dep. 158 ("My perception of how he looked at [the Company] was, he was more impressed with the company than he was . . . from an overall perspective, people[,] process, than he was being on the outside, looking in, having now seen . . . all the detail work . . . and things that have been going on.").

35

Immediately after the annual meeting, Salameh met with Singer and Domenik and briefed them about the Company and its sale process.[189] In a private email to Singer, Domenik expressed his view that "the strategic effort needs more energy."[190] Singer responded that the Board was "crazy for turning down $6+ from [A]vago [a] few months ago."[191] After the meeting with Salameh, management sent Singer the materials that the Company was using with potential buyers.[192] PLX also set up a meeting with Deutsche Bank so the new directors could get their views on the Company's prospects.[193]

On December 19, 2013, a development occurred that mitigated any need for Singer to push hard for a near-term sale: Krause contacted Adam Howell, a managing director at Deutsche Bank who was advising PLX. A few days earlier, Avago had announced an agreement to acquire LSI, one of PLX's competitors that had shown interest in the Company during its earlier quiet shopping process. A different team from Deutsche Bank had represented Avago on its acquisition of LSI.[194]

---

[189] JX 317.

[190] JX 315 at 1.

[191] *Id.*

[192] *See* JX 319.

[193] *See* JX 317 at 1.

[194] *See* JX 311.

Krause explained to Howell that he "saw the PLX BoD transition" but that because of the LSI acquisition, Avago would be in the "penalty box" until that deal closed.[195] Once the LSI transaction was complete, Avago would be "open for business on all topics," including an acquisition of PLX.[196] Krause described buying PLX as "an interesting little deal but only at the right price."[197] He also called the PLX acquisition a "$300M deal."[198] With 45.9 million shares outstanding, this figure equated to $6.53 per share.[199]

Singer spoke with Deutsche Bank later that day. Singer asked about Avago, and Deutsche Bank "gave him the color" on the conversation with Krause.[200] Based on this

---

[195] JX 1032 at 2.

[196] *Id.*

[197] *Id.*

[198] *Id.* Potomac objected to the admission of JX 1026–32 as untimely. The plaintiffs introduced these exhibits to impeach Singer's trial testimony about his interactions with Deutsche Bank and its interactions with Avago. The pre-trial order permitted the parties "in good faith to supplement the Joint Exhibit List with additional documents through the end of trial." PTO ¶ 150. Both sides submitted additional evidence during trial. The challenged documents were produced during discovery and fairly responded to Singer's testimony. Furthermore, the plaintiffs sought to recall Singer to question him about the documents, which would have enabled him to explain them, but Potomac objected, and I sustained the objection. *See* Tr. 571-74. The documents are properly admitted. Potomac could have had Singer address them but chose not to subject him to further examination.

[199] *See* JX 551 at 4.

[200] *See* JX 1031 at 1 ("[Singer] asked if I thought Avago would do anything now and I gave him the color from my Krause email."). That evening, Singer e-mailed Howell and his colleague, Thomas Cho, to introduce them to Domenik. Singer suggested that "all of you should get to together when schedules permit to bring Steve [Domenik] up to speed in person" and indicated that Domenik's "deep involvement is essential for a successful outcome at PLX." JX 325. It seems likely that Deutsche Bank also shared Krause's tip with Domenik and that he was part of the conspiracy of silence. Based on the allegations in the complaint, I dismissed the claims against Domenik at the pleadings stage. The

call, Singer knew about (i) Avago's interest in a deal for PLX at $300 million and (ii) Avago's temporary inability to engage because of the LSI acquisition. Singer already knew that Avago was the most likely bidder for PLX. As a result of Krause's conversation with Deutsche Bank, Singer knew when Avago would be able to bid and how much Avago wanted to pay.

On December 20, 2013, PLX held an informal meeting to bring Singer and his fellow new directors up to speed on the Company and its sale process.[201] When reporting on the status of various contacts in its "Process Summary," Deutsche Bank provided the following information about Avago:

- Interested and potentially willing to increase offer above $6/share

- Not willing to discuss price until confirmation of being able to move quickly and likely in exclusivity

- Willing to wait until process is finished at which point they can decide if price is right.[202]

---

plaintiffs have not sought to modify that interlocutory ruling, and they focused their attacks at trial on Singer, not on Domenik. This decision therefore speaks in terms of Singer having known about the tip and not sharing it with the other directors, even though that charge likely could be leveled at Domenik as well.

[201] *See* JX 329; *see also* JX 323 (Deutsche Bank presentation); JX 1000 (management presentations).

[202] *See* JX 323 at 4.

There is no evidence that Singer or Deutsche Bank reported on Krause's call, shared Avago's plan to return to PLX after completing the LSI acquisition, or mentioned the valuation of $300 million that Avago was contemplating.[203]

## N.     The Four-Month Quiet Period

From January until April 2014, knowing that Avago was digesting the LSI acquisition, Singer did not push hard for a sale. He could afford to be more subtle.

On January 23, 2014, the Board held its first formal meeting with the new directors.[204] Management reported on the Company's disappointing fourth quarter.[205] Although the Company met its public guidance for both net revenues and gross margins, the results fell below the annual operating plan.[206] Despite the soft quarter, 2013 had not been bad overall. Revenues came in 3.3% below the annual operating plan, and gross margins were just 0.7% below it.[207]

During the meeting, the Board assigned the new directors to committees.[208] Before the meeting, Singer asked to chair the Compensation, Nominating, and Special

---

[203] Deutsche Bank did reach out to Raun, Schmidt, and Salameh to tell them about Avago's agreement to acquire LSI, but that call occurred *before* Krause contacted Deutsche Bank. *See* JX 311.

[204] *See* JX 360 at 1.

[205] *See id.*

[206] JX 355 at 4–6, 11.

[207] *Id.* at 6.

[208] *See* JX 360 at 2–3.

Committees, noting that he was "most interested in the Special Committee and Comp[ensation] [C]omittee."[209] The Board made him chair of the Special Committee and the Nominating Committee and a member of the Compensation Committee.[210] Colombatto also joined the Compensation Committee, and Domenik joined the Audit Committee.[211] The Board reconstituted the Special Committee as the "Strategic Alternatives Special Committee."[212] In addition to Singer, Salameh and Schmitt rounded out its members.[213]

The reconstituted Special Committee held its first meeting on February 7, 2014.[214] Raun reported on a meeting with Cypress, which said it was "too leveraged" to complete a transaction at the Company's current valuation.[215] The committee instructed management to "proactively reach out to" other prospects but decided "not to take any action with respect to Avago at this time."[216] Singer did not mention the information he had received from Deutsche Bank about Avago's interest, and Raun's update on strategic alternatives suggests no knowledge of Avago's situation.[217] After the meeting, Raun engaged with

---

[209] JX 330 at 1.

[210] JX 360 at 2–3.

[211] *Id.* at 2.

[212] *Id.* at 3.

[213] *See* PTO ¶ 96; JX 360 at 3.

[214] PTO ¶ 97.

[215] JX 374 at 1; *see also* JX 372 at 2; JX 395 at 14.

[216] JX 374 at 1–2.

[217] *See* JX 372 at 3; *see also* JX 388 at 2.

40

Cypress, Inphi, Exar Corporation, and Semtech Corporation.[218] Avago remained silent, as Singer and Deutsche Bank knew it would.[219]

For the next three months, Singer did not agitate for a sale, but it remained on his mind. He expressed concern to Schmitt that there was a "closing window" in which to sell PLX because of larger economic trends that would negatively affect valuations.[220] He instructed Raun that whatever the "prior policy" might have been at PLX, it was "essential [that] the Board and or [*sic*] Strategic Committee is immediately informed of any indication of interest in any piece of PLX regardless of valuation."[221] As a member of the Compensation Committee, he became a vocal advocate for more equity compensation that would align management's interests with stockholders.[222] While this is certainly a legitimate concept, from Singer's standpoint it would help ensure that management would not resist a sale. Not coincidentally, Singer and Colombotto analyzed the Company's

---

[218] JX 380 at 2–3.

[219] *Id.*

[220] *See* JX 335 at 1.

[221] JX 362; *see also* JX 361 at 2 (Singer instructing Salameh that he required "full access to all such information [about PLX's earlier sale process] to fulfill my fiduciary duties and best contribute to maximizing stockholder value.").

[222] *See*, *e.g.*, JX 330; JX 338. Singer also weighed in on other compensation issues, such as his desire to make cash bonuses harder to achieve. *See* JX 359 at 1 ("[I]t is unheard of for e-staff (certainly the ceo) to receive nearly 100% target amount when you miss the revenue and gross margin numbers. Maybe getting to [annual operating plan] gets you 50% but to get 100% you need to exceed by demonstrable margins. Not get nearly 100% for just doing your job."); JX 367 at 2 ("I do not think any exec should receive nearly 90% of bonus for missing 2 important measuring points.").

41

change-in-control agreements.[223] Singer also resisted new hires and suggested other steps that made Salameh think the Company was "perhaps operating too far in a short term dress the company up for sale mode."[224]

In April 2014, Singer revealed his true focus when Salameh suggested that there might no longer be any need for the Special Committee. The Company was preparing its Form 10-K for FY 2013, and Singer submitted a proposed description of the Special Committee's role that made it sound to Salameh "like the special committee is very active and acting independently to shop the company or actively communicating with shareholders."[225] Salameh felt the description was "not accurate and could lead to misperceptions by shareholders, potential acquirers, employees and customers."[226] Salameh toned down the language and proposed (i) not mentioning the committee at all, (ii) terminating the committee because "the board works well together on these issues and we get good input and contributions from other board members," or (iii) terminating the committee with the understanding that it would be re-formed as needed.[227] Singer accepted Salameh's edits but rejected the alternatives.[228] He viewed it as "essential" that the

---

[223] *See* JX 389; JX 390.

[224] JX 400 at 1.

[225] JX 406 at 1.

[226] *Id.*

[227] *Id.*

[228] JX 405 at 1.

committee was both "maintained and mentioned."[229] Two days later, PLX filed its Form 10-K and publicly disclosed, for the first time, the Special Committee's existence and Singer's role as Chairman.[230]

## O.    Avago Re-engages.

On May 9, 2014, Thomas Cho of Deutsche Bank emailed Singer about a call he received from Barclays.[231] The Barclays banker told Cho that they were advising Avago on a potential bid for PLX and would meet with Krause the following week to discuss next steps. Cho understood that Avago was "starting to put this in motion."[232] Cho also perceived that Barclays was "very motivated to get this through" and would "play a role in pushing" Krause.[233] Deutsche Bank also reported on these calls to Raun, who updated the other directors.[234]

---

[229] *Id.*; *see also* Salameh Dep. 157–59.

[230] JX 408 at 7, 9.

[231] JX 413 at 1; *see also* PTO ¶ 102.

[232] JX 413 at 1.

[233] *Id.*

[234] *See* JX 414 at 2.

From May 9–17, 2013, Deutsche Bank had a number of calls with Barclays and Avago.[235] Through these calls, Deutsche Bank learned that Krause wanted to move forward with a bid for PLX and submit an offer "by the 23rd [of May]."[236]

Singer responded enthusiastically. On Saturday, May 10, 2014, he told Raun that it was "essential we move on legal in the most expeditious time frame possible since the Avago download may result in near-term activity."[237] On Sunday, Singer followed up with Raun to confirm that he received the email.[238] When Raun had not formally engaged a legal team by Sunday evening, Singer told Raun that he would "take care of it from a board level."[239]

On May 17, 2014, the Special Committee convened.[240] Deutsche Bank reported that Avago had asked "to meet with Mr. Singer and to receive an update from Mr. Raun regarding the status of the business."[241] The Special Committee "directed [Deutsche Bank] to continue to engage Avago to explore its interest in the Company."[242]

---

[235] *See id.*; *see also* JX 422 (Salameh reporting that "[Deutsche Bank] had a number of conversations with Avago and Barclay's over the last 8 or 9 days").

[236] JX 416 at 1; *see also* Krause Dep. 100–03.

[237] JX 418.

[238] *Id.*

[239] JX 419 at 1; *see also* Schmitt Dep. 79–82.

[240] PTO ¶ 103.

[241] JX 423 at 1.

[242] *Id.*; *see also* Salameh Dep. 241–51; Schmitt Dep. 169–70.

44

## P. The May 21 Meetings

The bankers set up a meeting between the PLX and Avago management teams for 8:00 a.m. on the morning of May 21, 2014, followed by a dinner that evening between Singer and Krause.[243] During the management meeting, Raun gave Avago an updated presentation about PLX's business that included the December 2013 Projections.[244] Whipple confirmed that PLX presented these figures because they represented management's "best view of what the future held."[245] They were "attainable" and "the basis for the performance and the variable compensation that was awarded to the executive officers."[246]

Between the management meeting and dinner, the Special Committee received an update from Raun and Whipple.[247] According to the minutes, Raun "noted that he had indicated to Avago that the plan was aggressive, needed to be updated and might need further changes."[248] The minutes also claimed that Singer "provided the Committee an

---

[243] *See* JX 424–25; Krause Dep. 64.

[244] JX 427 at 7–9; *see also* JX 430 (Raun forwarding Singer follow-up email sent to Avago management following meeting).

[245] Whipple Dep. 88.

[246] *Id.* at 89–95. PLX also provided the December 2013 Projections to Semtech in a due diligence presentation on May 6, 2014. *See* JX 1002 at 7–9.

[247] JX 431 at 1.

[248] *Id.*; *see also* Raun Dep. 158, 398.

update on his discussions with a representative of Avago the prior evening."[249] According to the minutes, Singer "noted that the representative indicated, among other things, that Avago believed the then-current PLX stock price already included a takeover premium as a result of Potomac Capital's actions."[250] Singer also reported that if Avago submitted a proposal, "the representative of Avago with whom he had met would want to have further discussions with him."[251] The Special Committee directed Singer "to meet, or have further discussions, with such person to discuss a possible acquisition of the Company by Avago."[252]

The minutes' description of Singer's meeting with an unidentified Avago "representative" contradicts other evidence in the record. The definitive proxy statement for the Merger did not identify any conversation between Singer and Avago that took place on May 20, 2014.[253] The defendants argued initially that the minutes referred to the dinner that had been scheduled between Singer and Krause, but all of the remaining documentary evidence establishes that the dinner took place on May 21, after the Special Committee meeting.[254] Accepting that the dinner occurred on May 21, the Special Committee's

---

[249] JX 431 at 1.

[250] *Id.*; *see also* Cho Dep. 58–61.

[251] JX 431 at 1.

[252] *Id.*

[253] *See* JX 551 at 26.

[254] *See, e.g.*, JX 424–25; JX 551 at 26; JX 1026 at 1; JX 1028.

46

mandate for Singer to have further discussions with Avago becomes odd, because it fails to take into account that he was already scheduled to have dinner with Krause just a few hours later.

The parties devoted significant resources at trial and in their briefing to attempting to resolve these discrepancies.[255] Based on the record evidence, I think this is an example of lawyers drafting minutes after the fact in an effort to paper a good process, but not getting the details right.

The minutes of the May 21 meeting also mark the first appearance in the record of the theme that the December 2013 Projections were "aggressive." No one provided any credible reason why Raun would have said this gratuitously to Avago or why he subsequently went out of this way to mention his comment to the Special Committee. Further calling into question the credibility of the supposed comment, the presentation to Avago retained much of the small-print disclaimer language on the executive summary slide, but omitted the phrase describing the projections as "aggressive."[256] I suspect the triggering event for characterizing the December 2013 Projections as "aggressive" was Deutsche Bank's preparation of a "PLX Valuation Update" on May 16, 2014.[257] Unlike Deutsche Bank's prior and subsequent valuation presentations, this version did not contain

---

[255] *See, e.g.*, Singer Tr. 219–21, 236–38, 247–53, 463, 468–74, 519–25.

[256] *Compare* 427 at 8, *with* JX 293 at 8, *and* JX 298 at 7.

[257] *See* JX 420.

47

a discounted cash flow analysis; it only looked at trading multiples and premiums.[258] It seems likely that Deutsche Bank knew from its earlier valuation work that a valuation based on the December 2013 Projections would exceed the $300 million bid that Avago was contemplating. As a sophisticated M&A player, Deutsche Bank would not have wanted to create incremental deal or litigation risk by injecting that type of analysis into the record unless necessary. The safer course would have been to flag the issue to confirm whether or not those projections were still the ones that the bankers should use. Flagging the issue likely led in turn to an off-the-record decision to walk back the projections, using their ostensible aggressiveness as the justification. When the lawyers documented the deal process, they started building the case for the subsequently lowered projections in the minutes for the May 21 meeting.

That evening, Singer and Krause had dinner in Palo Alto. Krause told Singer that he had been "very frustrated" by the Company's valuation demands during prior negotiations.[259] Krause told Singer that there was a "window in time" for Avago to acquire PLX before moving on to "other initiatives," but that Avago had "no interest in acquiring the company at any valuation near th[e] level" of $7.00 per share.[260] At trial, it became

---

[258] *See id.*

[259] Krause Dep. 105; *see* Singer Dep. 107.

[260] Singer Dep. 107–08.

apparent that Krause signaled to Singer that Avago would propose acquiring PLX for approximately $6.25 per share.[261]

## Q.   A Very Busy Nine Days: May 22-31, 2014

Over the next nine days, Avago and PLX engaged in a brief back and forth that resulted in a transaction at $6.50 per share, roughly the same valuation of $300 million that Krause mentioned to Deutsche Bank in December 2013.

### 1.   Day 1: May 22, 2014

On the afternoon of May 22, 2014, Barclays told Deutsche Bank that a bid from Avago was coming and that Avago "want[ed] to move quickly and efficiently."[262] When Deutsche Bank reported the information to Singer, Salameh, Schmitt, and Raun, Singer emailed back privately, asking "do u htink [sic] they come in initial 6.20 ish?" Deutsch Bank replied: "feels like 6.25. said [Krause] relayed to you last night."[263] Singer subsequently set up a private call with Deutsch Bank to discuss the proposal.[264]

---

[261] *See* Singer Tr. 236–44; *see also* JX 433 at 1; JX 1026 at 1.

[262] JX 433 at 1.

[263] *Id.*

[264] *See* JX 1026 (e-mail from Singer to Cho stating "k i land in 20 mnts talk later"); JX 1029 (e-mail from Singer to Howell and Cho, stating: "lets try for a call at 6 pm ET if i can break from this board meeting"). At trial, Singer maintained that he never had "off-line conversations" with Deutsche Bank. Singer Tr. 526. The contemporaneous record demonstrates otherwise. *See, e.g.*, JX 413; JX 433; JX 1026; JX 1029–31.

Shortly thereafter, Krause sent Raun and Singer a proposal to acquire PLX "at a price of $6.25 per share."[265] The proposal contemplated "enter[ing] into a definitive agreement with PLX on substantially the same terms" as the IDT merger agreement, but without "the 'go shop' provisions."[266]

Either Raun or Singer sent the proposal to Salameh, who circulated it to the full Board. He also reported that the Special Committee was discussing the offer with Deutsche Bank.[267] No minutes exist for that meeting. There is a set of minutes from a meeting of the Special Committee on May 22, 2014, but it occurred before Avago submitted its proposal, and the only topic of discussion was the engagement of Pillsbury Winthrop Shaw Pittman LLP as transaction counsel.[268]

That evening, Deutsche Bank prepared a draft response to Avago that countered at $6.75 per share.[269] Deutsche Bank also spoke with Barclays and "gave them a heads up that [PLX] would be coming back with a written counter either tomorrow or Saturday."[270]

---

[265] JX 432 at 2.

[266] *Id.*

[267] JX 437 at 1; *see* JX 436 at 2 (update to directors from Raun dated Friday, May 23, 2014, referring to "Thursday: PLX received proposal. Mike forwarded to Board. Special committee discussing response.").

[268] *See* JX 438.

[269] JX 434 at 2–3; Cho Dep. 61–63.

[270] JX 434 at 1.

The Barclays banker said that Avago expected PLX "to do a quick market check with a few parties," to be followed by "an exclusivity period to start in the next week or so."[271]

My impression is that Deutsche Bank took these steps after having the private call with Singer.[272] During the call, Singer also asked Deutsche Bank to prepare some pages of valuation analysis to support a counteroffer at $6.75 per share.[273]

### 2. Day 2: May 23, 2014

At 10:30 a.m. on May 23, 2014, the Special Committee met to discuss Avago's offer.[274] At 10:40 a.m., Deutsche Bank circulated the market-based analysis that Singer had requested, which highlighted a price of $6.75 per share.[275]

The Special Committee began by formally approving the engagement of Pillsbury Winthrop as transaction counsel.[276] Deutsche Bank then presented the market-based analysis that Singer had requested.[277] Deutsche Bank noted that the Company's stock had outperformed "similar large and small cap companies" and advised that the performance

---

[271] *Id.*

[272] *See* JX 1026 at 1.

[273] *See* JX 1030 at 1 (email from Cho to Deutsche Bank colleague at 7:58 AM on May 23, 2014: "Eric [Singer] wants us to pull together a couple of pages to show how 6.75 compares against comps, etc").

[274] PTO ¶ 106; JX 459 at 1.

[275] JX 443 at 3–9.

[276] JX 459 at 1; *see also* JX 448 at 3.

[277] JX 459 at 1–3. *Cf.* JX 443.

reflected "the takeover premium built into the Company's share price following Potomac Capital's proxy contest."[278]

The Special Committee asked Deutsche Bank to prepare a revised valuation presentation that included a discounted cash flow analysis.[279] According to the minutes, the committee members debated what projections to use and discussed that the December 2013 Projections "reflected aggressive revenue goals set by the Company's management team."[280] According to the minutes, the committee members asked for a discounted cash flow analysis based on the December 2013 Projections "as well as a separate DCF Analysis based on revised and more updated revenue projections, reflecting management's current thinking about what would be a reasonable forecast."[281] The minutes do not discuss, and the Special Committee's materials do not identify, any new information that would have necessitated adjustments to the December 2013 Projections.

Deutsche Bank then reviewed "the market checks done in the last two years," including the go-shop during the IDT transaction, the market check during the fall of 2013, and an additional market check that the Special Committee had asked Deutsche Bank to conduct in light of Avago's interest.[282] Deutsche Bank reported that it had contacted three

---

[278] JX 459 at 2.

[279] *Id.* at 3.

[280] *Id.*

[281] *Id.*; *see also* Schmitt Dep. 177–79.

[282] JX 459 at 3.

52

companies: Inphi, Semtech, and Cypress.[283] Inphi and Semtech declined to proceed.[284] Cypress had "indicated possible interest," but was "concerned about price" and "had not taken any further steps to pursue a transaction."[285] The Special Committee decided that this limited market check process "appeared sufficient" since "the two prior market checks had only resulted in an offer from Avago and that the terminated IDT transaction had already put potential buyers on alert."[286]

Towards the end of the meeting, the Special Committee discussed how to respond to Avago. The members decided that achieving a possible transaction "would require a counter offer of less than $7.00 per share and that such a counter offer would be in the best interest of the Company's stockholders."[287] According to the minutes, it was only then that the Special Committee "agreed to recommend to the Board that the Company prepare a counter proposal of $6.75 per share."[288] This was the same price that Deutsche Bank had

---

[283] *See id.* Although the minutes use pseudonyms for the participants, other documents suggest Cypress was the remaining interested party. *See* JX 436 at 2; JX 448 at 2. *Cf.* Cho Dep. 47, 56–57 (identifying pseudonyms of companies within the Recommendation Statement); Raun Dep. 57 (identifying pseudonym of Cypress within the Recommendation Statement).

[284] *See* JX 459 at 3.

[285] *Id.* The minutes recite that the Special Committee instructed Deutsche Bank to continue to engage with Cypress. In an email sent the day before, however, Raun instructed a colleague not to purse Cypress further, saying: "They can contact us if interested. We should not contact them anymore." JX 457.

[286] JX 459 at 4.

[287] *Id.*

[288] *Id.*

included in the draft response it had prepared the night before and highlighted in the valuation materials that Singer had requested.[289] Schmitt testified that the counteroffer of $6.75 per share "came from guidance from Eric."[290]

When it made the decision to counter at $6.75, the Special Committee had not received any valuation of the Company on a standalone basis. According to Schmitt, by selecting $6.75, the Special Committee was engaging in the "art of the possible."[291] Singer testified that the Special Committee was focused on maintaining "deal momentum."[292]

While the Special Committee was meeting, Raun learned that Broadcom wanted to meet with management.[293] Recognizing that he had to move quickly, he "offered up Monday, Tuesday morning and Thursday."[294] The parties were unable to schedule a meeting in that time frame.[295]

After the meeting, Deutsche Bank signaled to Barclays that a deal was likely.[296] Deutsche Bank framed its message by saying that PLX was working on a response with "a

---

[289] *Cf.* JX 434 at 2–3; JX 443; 1026 at 1.

[290] Schmitt Dep. 172.

[291] *Id.*

[292] Singer Tr. 254–55.

[293] JX 449 at 1.

[294] *Id.*

[295] *See* JX 470; JX 473 at 1.

[296] JX 447 at 1.

more constructive tone" and reporting Singer had "found his dinner with [Krause] to be positive and [Avago's] letter in keeping with that positive tone."[297]

Deutsche Bank also contacted Raun and Whipple after the meeting to develop a revised set of projections.[298] In tension with the minutes of the Special Committee meeting, which had already characterized the December 2013 Projections as "aggressive," Deutsche Bank asked Raun and Whipple, "How would [you] classify [the December 2013] plan (aggressive, conservative)?"[299] Raun and Whipple responded in writing that the December 2013 Projections were "positioned as aggressive at the [Board] meeting when presented in December 2013" and "stated as aggressive when presented to Avago."[300]

Deutsche Bank also inquired if there had been "[a]ny major changes to the business model in the out years that are different than what we have discussed in the past?"[301] Management responded: "No. Still includes similar assumptions like a system level product component, continued use of PCIe, [and] success with the ExpressFabric

---

[297] *Id.*

[298] PTO ¶ 107; JX 445 at 1; JX 453 at 1.

[299] JX 441.

[300] JX 446 at 2; *see also* Whipple Dep. 143–45.

[301] JX 446 at 2.

devices."[302] Whipple subsequently sent Deutsche Bank the worksheets underlying the December 2013 Projections.[303]

Also on May 23, 2018, Singer agreed to amend Deutsche Bank's engagement letter. The new terms increased Deutsche Bank's base fee from 1% of transaction value to 1.35% and remove a 1.5% cap on Deutsche Bank's total compensation.[304] Singer executed the amendment as Chair of the Special Committee.[305]

### 3. Day 3: May 24, 2014

On the morning of May 24, 2014, the Board met to consider Avago's proposal.[306] Deutsche Bank circulated a revised presentation that summarized the Company's three market checks. The materials noted that each time, Avago was the only party who bid. The materials also noted that Avago's offers had slowly increased from $5.75 during the IDT go-shop, to $6.00 during the fall 2013 market check, and now to $6.25.[307] Deutsche Bank

---

[302] *Id.*

[303] *See* JX 451.

[304] JX 439 at 1; *see* JX 440 at 1 (Raun informing Schmitt that the revised engagement letter was "something that the Special Committee agreed to not me."); *see also* Raun Dep. 110–19.

[305] JX 439 at 3; *see also* JX 440; JX 444; JX 450 at 1.

[306] PTO ¶ 108; JX 465 at 1; *see* JX 462 at 1.

[307] JX 462 at 5.

noted that after receiving Avago's offer, the Company had contacted Inphi, Cypress, and Semtech.[308] Deutsch Bank opined that the market check "had been thorough."[309]

Deutsche Bank's presentation next provided the discounted cash flow analyses that the Special Committee had requested.[310] Using the December 2013 Projections, Deutsche Bank's model yielded a range of $6.90 to $9.78 per share, with $8.27 at the midpoint.[311] This was the first time that Deutsche Bank had provided the directors with a valuation based on the December 2013 Projections. The low-end of the range exceeded Avago's bid and the Special Committee's recommended counteroffer.

In describing Deutsche Bank's valuation analyses, the minutes went out of their way to characterize the December 2013 Projections as "aggressive."[312]

> In particular, management noted that the December 2013 Plan forecast growth rates and profit margins far in excess of what the Company and the majority of similar semiconductor companies had experienced in the past and entailed creating a sizeable systems business in which the Company had no market experience, and was therefore characterized as aggressive.[313]

The minutes also recited that "members of the Board and management commented on various events and trends since the projections in the December 2013 Plan were prepared

---

[308] *See* JX 465 at 2. *Cf.* JX 459 at 2.

[309] JX 465 at 2.

[310] *Id.* at 2–3.

[311] JX 462 at 13.

[312] JX 465 at 4.

[313] *Id.*

57

that had already affected or might in the future affect the achievement of the projections contained therein, particularly those for fiscal years after 2014."[314]

Deutsche Bank's materials included a second discounted cash flow valuation that used what Deutsche Bank had labeled the "Preliminary Management sensitivity case" (the "Preliminary Sensitivity Case").[315] According to the minutes, Deutsche Bank reported that the Preliminary Sensitivity Case was "intended to reflect events and trends since the December 2013 Plan was prepared" and "reflected lower spending in response to the projected reduction in revenue during these periods."[316] In reality, this case decreased all of the revenue projections in the December 2013 Projections by 10% and cut the annual increase in operating expense by half.[317] Using the resulting numbers, Deutsche Bank's model yielded a range of $5.48 to $7.67 per share, with $6.52 at the midpoint.[318] The new projections generated a valuation result that perfectly framed the anticipated transaction value of $300 million.

According to the minutes, "management stated that the revenue and operating expense projections were reasonable based on the current thinking of the Company's

---

[314] *Id.*

[315] JX 462 at 14; *see* JX 465 at 4; Cho Dep. 67–73.

[316] JX 465 at 4.

[317] JX 462 at 14.

[318] *Id.*

58

management but a more detailed analysis needed to be completed."[319] The record does not support this description. Raun testified that the "10 percent, as I recall, was just a quick, you know, kind of what if 10 percent. Oh, yeah, looks good."[320]

At this point, the Special Committee recommended that the Company counter at $6.75 per share.[321] The Board unanimously agreed and gave the Special Committee authority to accept any price of $6.50 or higher.[322] The Board also signed off on not asking for a reverse break-up fee or a go-shop period.[323]

Deutsche Bank and the Special Committee promptly finalized a response.[324] Raun sent it that evening.[325]

---

[319] JX 465 at 4; *see also* Raun Dep. 146–57; Schmitt Dep. 180–82; Whipple Dep. 110–14.

[320] Raun Dep. 408.

[321] JX 465 at 5.

[322] *Id.*

[323] *Id.*

[324] JX 466–67.

[325] PTO ¶ 109.

### 4. Days Six through Nine: May 27-30, 2014

On May 27, 2014, Deutsche Bank reported that Avago was willing to increase its bid to $6.50 per share.[326] The Special Committee instructed Singer to speak with Krause and agree to proceed with due diligence on those terms.[327]

On May 28, 2014, Singer spoke with Krause.[328] That evening, Avago sent over its "best and final proposal" of $6.50 per share.[329]

On May 29, 2014, the Special Committee convened to consider the proposal.[330] Deutsche Bank provided an update on its current market check, advised that Cypress and Broadcom had declined to bid, and reported that although Semtech had not formally declined to bid, they did not seem genuinely interested.[331] The Special Committee reviewed and approved draft confidentiality and exclusivity agreements and resolved to recommend that the Board authorize the Company to enter into them.[332]

On May 30, 2018, the full Board met, received an update from the Special Committee, and adopted the Special Committee's recommendation.[333] The Board did not

---

[326] JX 472 at 1; *see also* PTO ¶ 110.

[327] JX 472 at 1.

[328] JX 475 at 1; *see also* Singer Tr. 502–03; Krause Dep. 65.

[329] JX 476 at 1–2; *see also* PTO ¶ 111.

[330] PTO ¶ 112.

[331] JX 480 at 1–2.

[332] *Id.* at 2–3.

[333] JX 482 at 1–2.

receive any additional financial analysis or further input from management on the Company's projections.

On June 2, 2014, PLX and Avago formally executed an exclusivity agreement lasting twenty-one days.[334] The agreement precluded PLX from soliciting additional offers, furnishing information to other parties, engaging in negotiations, or otherwise cooperating with a potential competitive bidder.[335] The exclusivity agreement did not contain any outs.

## R.    The June 2014 Projections

After the parties had agreed on price and entered into exclusive negotiations, Raun and Whipple began preparing the "new haircut 5 year plan for [Deutsche Bank]" that the Special Committee and Board had requested.[336] On June 7, 2014, Gene Schaeffer, PLX's Vice President for Sales, circulated the raw data underlying the December 2013 Projections to the sales managers for "a deeper dive into our funnel and revenue projections."[337] He noted that "[w]e clearly have enough wins and momentum to drive the 2014-2018 numbers in the 5 year plan" but nonetheless asked for revised "inputs . . . no later than **Tuesday 6/10**."[338]

---

[334] *See* JX 484; JX 485 at 1.

[335] JX 484 at 1–2.

[336] JX 486 at 1; *see also* JX 487 (coordinating due diligence meetings); JX 490 (summarizing diligence as of June 6, 2014); JX 493 (due diligence questions).

[337] JX 491 at 1.

[338] *Id.*; *see also* Singer Tr. 278–80; Raun Dep. 177–78 (confirming that "the June five-year analysis [was] very similar" to the analysis in December 2013 "for the outlying years"); Salameh Dep. 164, 273 (testifying management "did a detailed, bottoms-up . . . , customer, product by product" review for 2014–2016 and also a "top-down, just a reality

61

On June 9, 2014, Whipple circulated a single page PDF reflecting an "[u]pdated plan" to Deutsche Bank.[339] This decision refers to these figures as the "Initial June Projections."

The Initial June Projections reflected nominally increased sales compared to the Preliminary Sensitivity Case that Deutsche Bank had used on May 24, 2013.[340] The Preliminary Sensitivity Case had projected revenue growing to $244.3 million by 2018.[341] The Initial June Projections forecasted that revenue would reach $248.6 million by 2018.[342]

On the morning of June 11, 2014, Whipple and Deutsche Bank spoke about the Initial June Projections.[343] The next day, Whipple sent Deutsche Bank a revised set of projections—again as a single page PDF. These were the final projections that Deutsche Bank used in its fairness opinion, so this decision calls them the "June 2014 Projections."[344]

---

check"); Whipple Dep. 149 (discussing preparation of "the revenue forecast by product, by year" as well as development of "the expense forecast by year and . . . the out year balance sheets and statements of cash flow").

[339] JX 492.

[340] *Compare* JX 492 at 2, *with* JX 464 at 14.

[341] JX 464 at 14.

[342] JX 492 at 2.

[343] JX 494.

[344] JX 503.

The June 2014 Projections slashed PLX revenue to $208.4 million in 2018.[345] The primary driver for the reductions was significantly decreased sales during the out years for the Company's system-level products.[346] The following chart shows the differences between the December 2013 Projections and the June 2014 Projections:

| | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| December 2013 Projections[347] | $117.5 | $139.4 | $166.9 | $211.5 | $271.5 |
| June 2014 Projections[348] | $114.7 | $130.1 | $149.4 | $174.9 | $208.4 |
| Change | ($2.8) | ($9.3) | ($17.5) | ($36.6) | ($63.1) |

As soon as Deutsche Bank received the June 2014 Projections, the bankers ran them through their discounted cash flow model. The result made the Avago deal look more attractive: "With these numbers the new range is $4.81-$6.79, as opposed to $5.16-$7.40 using [the Initial June Projections]."[349] The Deutsche Bank analysts who ran the model noted that they had "not been provided with updated CAPEX, working capital or depreciation figures" to support the June 2014 Projections.[350]

---

[345] *Id.* at 2.

[346] Raun Dep. 445–46; Beaton Dep. 38–39; *see also* JX 521A (showing customer-by-customer, product-by-product revenue estimates for 2014–2016).

[347] JX 429 at 8 (in millions).

[348] JX 529 at 19 (in millions).

[349] JX 499 at 1.

[350] *Id.*

On the morning of June 13, 2014, Whipple had a call with Deutsche Bank to discuss what he described as the "sensitivity case."[351] Whipple then circulated the final June 2014 Projections to the Deutsche Bank team, labeling it the "5 year sensitivity case."[352] Deutsche Bank sent the figures on to Barclays, who immediately labeled them the "Management Downside Case."[353] Barclays referred to the December 2013 Projections as the "Management Case."[354]

Deutsche Bank took a different view on what to call the June 2014 Projections. In internal communications, one banker noted that Deutsche Bank had been referring to the December 2013 Projections as "the Base case."[355] He wondered if the December 2013 Projections should now be "upside case."[356] Alternatively, he suggested calling the June 2013 Projections the "downside case."[357] Cho instructed the team to "re-label as Upside Case (original) and Base Case (new #s)."[358]

---

[351] JX 502 at 1.

[352] JX 510 at 1; *see also* PTO ¶ 114.

[353] JX 532 at 20; *see also* JX 511 at 1.

[354] JX 532 at 19.

[355] JX 514 at 2.

[356] *Id.*

[357] *Id.*

[358] *Id.* at 1.

The parties have debated at length about the amount of work that went into the June 2013 Projections, the extent and reliability of the data that supported them, and the legitimacy of the process. My impression is that both sides have made exaggerated claims. Significant work went into preparing the June 2014 Projections, but the bulk of it took place over six calendar days from June 7–12, 2014. The June 2014 Projections were not a slapdash effort, but they also did not result from the same rigorous process used to develop the December 2013 Projections. They were prepared for purposes of Deutsche Bank's valuation analysis in the shadow of the pending deal.

## S.    Singer Continues To Lead The Process.

From June 15–19, 2014, the Special Committee met almost daily to finalize details in anticipation of a signing on June 20. During this process, Singer took a leading role and discussed various issues directly with Avago's management.[359] During a meeting on June 19, Deutsche Bank asked the Special Committee to sign off on the firm's conflicts.[360] The bankers mentioned their work for Avago on the LSI acquisition, but represented that the team advising Avago had been walled off from the team advising PLX.[361] Deutsche Bank

---

[359] *See, e.g.*, JX 512 at 1 (Singer to Krause: "Let me know if you have 5 minutes to talk this afternoon or over next few days."); JX 518 at 2 (Singer reporting that Avago wanted tender and support agreements as a condition to the transaction); JX 524 at 2 ("It was agreed that Mr. Singer would reach out to the representative of Avago to discuss the overall transaction, and then meet again the following day to discuss transaction status at that time."); Singer Tr. 288–89; Krause Dep. 65–68.

[360] *See* JX 527 at 2. *See generally* Raun Dep. 120–29.

[361] JX 527 at 2; *see* Salameh Dep. 61–79. Avago financed the acquisition with cash on hand and did not require any debt financing. Deutsche Bank had a $90 million position in Avago's undrawn revolving credit facility and a $159 million position in a term loan

stated that it anticipated "generally seek[ing] to continue working with Avago, but that there was no specific project that they were currently working on with Avago."[362]

On June 20, 2014, the full Board met to receive a report on the status of the deal.[363] During the meeting, Deutsche Bank gave a presentation that compared the December 2013 Projections and the June 2014 Projections,[364] treating the December 2013 Projections as an upside case and the June 2014 Projections as the base case.[365] The materials showed that the June 2014 Projections resulted in substantial reductions from the December 2013 Projections.[366] Deutsche Bank's materials stated that PLX's operating plan "has been meaningfully reduced since the IDT transaction."[367] In reality, the plan was meaningfully reduced in May 2014 at Deutsche Bank's request.

Deutsche Bank's materials included two discounted cash flow analyses. The analysis based on the December 2013 Projections yielded a range of $6.39 to $8.98 per share, with $7.62 at the midpoint.[368] The analysis based on the June 2014 Projections

---

extended to Avago. Deutsche Bank earned just over $30 million for its role in the LSI acquisition. *See* JX 489.

[362] JX 527 at 2.

[363] PTO ¶ 116.

[364] *See* JX 529 at 9.

[365] *See id.*

[366] *See id.*

[367] *Id.*

[368] *Id.* at 20.

yielded a range of $5.07 to $6.99 per share, with $5.98 at the midpoint.[369] During the presentation, an attorney from Pillsbury Winthrop made a point of noting that "the forecast prepared in December 2013 contained a legend describing it as an aggressive plan."[370]

After the presentation, Schmitt asked for "an explanation of the assumptions used in calculating the June 2014 forecast and the differences between those assumptions and the ones used in the December 2013 plan."[371] The Board directed Raun to provide the explanation at the next meeting.[372] Without having the benefit of the explanation, the Board "instructed [Deutsche Bank] to rely on the Base Case as the primary basis of its analysis.[373]

The next day, Whipple sent Raun an explanation for the June 2014 Projections:

> While we had detailed operating cost forecasts for 2014, our 2015 through 2018 forecasts were based on quarterly growth rates. As we calculated the out years in the [December 2013 Projections] we initially had relatively low growth rates for OPEX that gave what appeared to be unreasonable growth in profitability. We increased R&D and to a lesser extent SG&A spending in the final aggressive AOP forecast [*i.e.*, the December 2013 Projections]. Based on the revised revenue growth in the sensitivity plan [*i.e.*, the Preliminary Sensitivity Case], I reduced the OPEX in the out years to maintain ratios of R&D and SG&A spending to revenue and growth to reflect the lower need to support revenue growth. While R&D and SG&A spending continue to expand, they decrease slowly as a percentage of revenues. In my judgment, PLX management would limit growth in spending to be commensurate with revenue growth to continue to expand profitability and

---

[369] *Id.* at 19.

[370] JX 525 at 5.

[371] *Id.*

[372] *Id.*

[373] *Id.*

to take advantage of the leverage we believe is inherent in our business at this time.[374]

There is no credible evidence that would support a finding that that this explanation was ever provided to the other directors.

## T.     The Board Approves The Merger Agreement.

On June 22, 2014, the full Board met to consider final terms of the transaction with Avago.[375] According to the minutes, "[p]rior to the meeting, Mr. Raun had circulated to the Board a detailed description of the assumptions used in calculating the June 2014 forecast and the differences between those assumptions and those used in the December 2013 plan . . . , as requested by the Board at the previous Board meeting."[376] This statement appears to be wishful minute drafting. There is no evidence that this actually happened.

The minutes also recite that Raun "explained the December 2013 plan was intended to be an aggressive plan" and that "various events had affected the achievement of the projections underlying the December 2013 Plan and that the June 2014 forecast reflected management's current thinking as to what would be a reasonable forecast."[377] According to the minutes, "[t]he Board affirmed that Mr. Raun had prepared the June 2014 forecast

---

[374] JX 536.

[375] PTO ¶ 118.

[376] JX 540 at 2.

[377] *Id.*

at the request of the Board and the Strategic Alternatives Special Committee and agreed that the assumptions on which it was based were reasonable."[378]

Based on the June 2013 Projections, Deutsche Bank rendered its oral fairness opinion.[379] The Board adjourned, and the Special Committee met.[380] After the Special Committee recommended entering into the Avago transaction, the full Board reconvened and followed the Special Committee's recommendation.[381] On June 23, 2014, PLX formally announced the transaction.

## U.    The Merger Agreement

The final merger agreement contemplated a medium-form merger effected pursuant to Section 251(h) of the Delaware General Corporation Law.[382] The merger agreement prohibited PLX from soliciting competing offers and required the Board to continue to support the transaction, subject to a fiduciary out with matching rights.[383] It contemplated a termination fee of $10.85 million, representing 3.5% of equity value ($309 million) and 3.7% of enterprise value ($293 million).[384] Holders of approximately 14.7% of PLX's

---

[378] *Id.*

[379] *Id.* at 3; *see also* JX 544–45.

[380] *See* PTO ¶ 118; JX 541.

[381] JX 540 at 3.

[382] JX 542 § 1.3.

[383] JX 542 § 5.3.

[384] *See* JX 529 at 5; JX 542 § 7.2(b).

outstanding shares—including Potomac, management, and the entire Board—entered into tender and support agreements. PLX's second largest stockholder—Discovery Group I, LLC—publicly announced its support for the transaction.[385]

Avago launched the first-step tender offer on July 8, 2014.[386] PLX concurrently filed its Recommendation Statement.[387] The tender offer closed on August 11.[388] Holders of approximately 80.3% of PLX's outstanding shares tendered into the offer.[389] No competing bidders emerged. The Merger closed on August 12.[390]

## V.    This Litigation

On July 14, 2014, after the announcement of the Merger, the plaintiffs filed suit naming as defendants PLX's directors, Potomac, Avago, and the acquisition subsidiary that Avago used to effectuate the merger.[391] The plaintiffs moved for a preliminary injunction that would block the merger. On July 22, 2014, I approved an expedited schedule leading

---

[385] *See* JX 543; PLX Technology, Inc., Current Report (Form 8-K) (June 23, 2014).

[386] JX 555 at 3.

[387] *See* JX 551; PLX Technology, Inc., Solicitation/Recommendation Statement (Schedule 14 D-9) (July 8, 2014).

[388] JX 554 at 2.

[389] PTO ¶ 125.

[390] PTO ¶ 126.

[391] Dkt. 1. The separate role of the acquisition subsidiary is not important to this decision, so I do not refer to it separately.

70

up to a hearing on August 8.[392] By letter dated July 31, the plaintiffs withdrew their request for an injunction, citing the adequacy of money damages.[393]

On September 12, 2014, the defendants moved to dismiss the complaint.[394] After the plaintiffs amended their pleading,[395] the defendants again moved to dismiss.[396] After the Delaware Supreme Court issued its opinion in *In re Cornerstone Therapeutics, Inc. Stockholders Litigation*,[397] the parties submitted supplemental briefing in light of the decision.

On September 3, 2015, I dismissed the claims against Avago, Domenik, and Colombatto.[398] On August 17, 2016, the plaintiffs settled with all of the defendants except for Potomac.[399] On November 18, I approved the settlement.[400] On November 21, I granted the plaintiffs' motion for class certification.[401]

---

[392] Dkt. 26.

[393] Dkt. 42.

[394] Dkts. 48, 49, 52.

[395] Dkt. 66, 67.

[396] Dkts. 77, 78, 80, 81.

[397] 115 A.3d 1173 (Del. 2015).

[398] *See* Dkts. 127, 131, 207.

[399] Dkt. 159.

[400] Dkts. 192, 204.

[401] Dkt. 195.

On June 22, 2017, Potomac moved for summary judgment.[402] By order dated February 6, 2018, I denied the motion.[403] Trial took place from April 10–12.[404]

## II. LEGAL ANALYSIS

The plaintiffs seek damages from Potomac for aiding and abetting breaches of fiduciary duty. This claim has four elements: (i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in the breach by a non-fiduciary defendant, and (iv) damages proximately caused by the breach.[405] The plaintiffs established all of the elements except for causally related damages.

### A. The Existence Of A Fiduciary Relationship

The plaintiffs easily satisfied the first element of their claim. The Company's directors were fiduciaries who owed duties "to the corporation and its shareholders."[406] "This formulation captures the foundational relationship in which directors owe duties to the corporation for the ultimate benefit of the entity's residual claimants."[407]

---

[402] Dkt. 214.

[403] Dkt. 347.

[404] Dkts. 381–83.

[405] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

[406] *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 99 (Del. 2007); *accord Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989) ("[D]irectors owe fiduciary duties of care and loyalty to the corporation and its shareholders . . . ."); *Polk v. Good*, 507 A.2d 531, 536 (Del. 1986) ("In performing their duties the directors owe fundamental fiduciary duties of loyalty and care to the corporation and its shareholders.").

[407] *In re Trados Inc. S'holder Litig.* (*Trados II*), 73 A.3d 17, 36–37 (Del. Ch. 2013).

Directors of a Delaware corporation owe two fiduciary duties: loyalty and care.[408] The duty of loyalty included a requirement to act in good faith, which is "a subsidiary element, i.e., a condition, of the fundamental duty of loyalty."[409] To act in good faith means to seek subjectively to "promote the value of the corporation for the benefit of its stockholders."[410] A failure to act in good faith may be shown where the fiduciary "acts with a purpose other than that of advancing the best interests of the corporation."[411]

---

[408] *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006); *accord Mills Acq.*, 559 A.2d at 1280; *Polk*, 507 A.2d at 536.

[409] *Stone*, 911 A.2d at 370 (internal quotation marks omitted).

[410] *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 34 (Del. Ch. 2010); *accord Gheewalla*, 930 A.2d at 101 ("The directors of Delaware corporations have the legal responsibility to manage the business of a corporation for the benefit of its shareholder[ ] owners."); *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del. 1985) (citing "the basic principle that corporate directors have a fiduciary duty to act in the best interests of the corporation's stockholders"). *See generally* Leo E. Strine, Jr., *The Soviet Constitution Problem in Comparative Corporate Law: Testing the Proposition That European Corporate Law Is More Stockholder Focused than U.S. Corporate Law*, 89 S. Cal. L. Rev. 1239, 1249 (2016); ("[U]nder Delaware law . . . directors are required to focus on promoting stockholder welfare."); Leo E. Strine, Jr., *The Dangers of Denial: The Need for a Clear-Eyed Understanding of the Power and Accountability Structure Established by the Delaware General Corporation Law*, 50 Wake Forest L. Rev 761, 771 (2015) ("*Revlon* could not have been more clear that directors of a for-profit corporation must at all times pursue the best interests of the corporation's stockholders . . . ."); Leo E. Strine, Jr. et al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 Geo. L.J. 629, 634 (2010) ("[I]t is essential that directors take their responsibilities seriously by actually trying to manage the corporation in a manner advantageous to the stockholders.").

[411] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006) (internal quotation marks omitted); *accord Stone*, 911 A.2d at 369; *see Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 n.2 (Del. Ch. 1996) (Allen, C.) (defining a "bad faith" transaction as one "that is authorized for some purpose *other than* a genuine attempt to advance corporate welfare or is *known to constitute* a violation of applicable positive law"); *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989) (Allen, C.) (explaining that the business judgment rule would not protect "a fiduciary who

The fiduciary duties of directors have context-specific manifestations. When directors consider selling the corporation, their fiduciary duties obligate them "to seek the transaction offering the best value reasonably available to stockholders."[412] The best transaction reasonably available is not always a sale; it may mean remaining independent and not engaging in a transaction at all.[413]

---

could be shown to have caused a transaction to be effectuated (even one in which he had no financial interest) for a reason unrelated to a pursuit of the corporation's best interests"); *see also In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 439 (Del. Ch. 2012) (Strine, C.) ("[A] range of human motivations . . . can inspire fiduciaries and their advisors to be less than faithful to their contextual duty to pursue the best value for the company's stockholders."); *RJR Nabisco*, 1989 WL 7036, at *15 ("Greed is not the only human emotion that can pull one from the path of propriety; so might hatred, lust, envy, revenge, . . . shame or pride. Indeed any human emotion may cause a director to place his own interests, preferences or appetites before the welfare of the corporation.").

[412] *Paramount Commc'ns, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 43 (Del. 1993); *see Kahn v. Stern*, 183 A.3d 715, 2018 WL 1341719, at *1 n.3 (Del. Mar. 15, 2018) (TABLE) (describing "*Revlon* duties" as a "context-specific articulation of the directors' duties").

[413] *See Huff Energy Fund, L.P. v. Gershen*, 2016 WL 5462958, at *13 (Del. Ch. Sept. 29, 2016); *Chen v. Howard-Anderson*, 87 A.3d 648, 672 (Del. Ch. 2014); *Trados II*, 73 A.3d at 37. *Compare QVC*, 637 A.2d at 43 (holding that it was reasonably probable that the directors breached their fiduciary duties by pursuing an ostensibly superior value to be created by a long-term strategic combination when, post-transaction, a controller would have "the power to alter that vision," rendering its value highly contingent), *and Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 182 (Del. 1986) (holding that the alternative of maintaining the corporation as a stand-alone entity and the use of defensive measures to preserve that alternative "became moot" once the board determined that the values achievable through a sale process exceeded the board's assessment of stand-alone value), *with Paramount Commc'ns, Inc. v. Time Inc.*, 571 A.2d 1140, 1154 (Del. 1989) (holding that it was not reasonably probable that the directors breached their fiduciary duties by pursuing a superior long-term value of strategic, stock-for-stock merger without a post-transaction controller), *and Unocal*, 493 A.2d at 956 (holding that it was not reasonably probable that the directors breached their fiduciary duties by adopting a selective exchange offer to defend against a two-tiered tender offer where the blended value of the offer was less than $54 per share and the board reasonably believed the stand-alone

Another situational manifestation is the duty of disclosure.[414] When directors ask stockholders to take action, whether by approving a transaction (such as a merger, sale of assets, or charter amendment) or making an investment decision (such as tendering shares or making an appraisal election), directors must disclose truthfully to stockholders "all facts that are material to the stockholders' consideration of the transaction or matter and that are or can reasonably be obtained through their position as directors."[415]

When approving the Merger and making the decisions that led to it, the directors were acting as fiduciaries for the corporation and its stockholders. When distributing the Recommendation Statement and advising stockholders to tender into the first step of the medium-form Merger, the directors were again acting as fiduciaries. The plaintiffs therefore established the first element of their claim.

## B.     A Breach Of Fiduciary Duty

The second element of a claim for aiding and abetting requires that the plaintiffs prove a predicate breach of fiduciary duty. For purposes of the second element, the

---

value of corporation was much greater), *and Air Prods. & Chems., Inc. v. Airgas, Inc.*, 16 A.3d 48, 112 (Del. Ch. 2011) (holding that the board complied with its fiduciary duties by maintaining a rights plan to protect a higher stand-alone value of corporation rather than permit an immediate sale).

[414] *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009) (explaining that the "duty of disclosure is not an independent duty, but derives from the duties of care and loyalty" (internal quotation marks omitted)).

[415] *In re Wayport Inc. Litig.*, 76 A.3d 296, 314 (Del. Ch. 2013) (internal quotation marks omitted); *accord Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992) ("[D]irectors of Delaware corporations [have] a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action.").

75

plaintiffs attack both the sale process and the disclosures in the Recommendation Statement. Doctrinally, these seemingly separate species of misconduct blend, because the selection of the proper standard of review for evaluating the directors' decisions during the sale process depends in the first instance on whether the directors complied with their duty of disclosure.

"When determining whether directors have breached their duties, Delaware corporate law distinguishes between the standard of conduct and the standard of review."[416] "The standard of conduct describes what directors are expected to do and is defined by the content of the duties of loyalty and care. The standard of review is the test that a court applies when evaluating whether directors have met the standard of conduct."[417]

---

[416] *Chen*, 87 A.3d at 666; *see* William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Realigning the Standard of Review of Director Due Care with Delaware Public Policy: A Critique of* Van Gorkom *and Its Progeny as a Standard of Review Problem*, 96 Nw. U. L. Rev. 449, 451–52 (2002); William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Function Over Form: A Reassessment of the Standards of Review in Delaware Corporation Law*, 56 Bus. Law. 1287, 1295–99 (2001); *see also* E. Norman Veasey & Christine T. Di Guglielmo, *What Happened in Delaware Corporate Law and Governance from 1992–2004? A Retrospective on Some Key Developments*, 153 U. Pa. L. Rev. 1399, 1416–25 (2005) (distinguishing between the standards of fiduciary conduct and standards of review). *See generally* Julian Velasco, *The Role of Aspiration in Corporate Fiduciary Duties*, 54 Wm. & Mary L. Rev. 519, 553–58 (2012); Melvin Aron Eisenberg, *The Divergence of Standards of Conduct and Standards of Review in Corporate Law*, 62 Fordham L. Rev. 437, 461–67 (1993).

[417] *Trados II*, 73 A.3d at 35–36.

"Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness."[418] Which standard of review applies will depend initially on whether the board members:

> (i) were disinterested and independent (the business judgment rule), (ii) faced potential conflicts of interest because of the decisional dynamics present in particular recurring and recognizable situations (enhanced scrutiny), or (iii) confronted actual conflicts of interest such that the directors making the decision did not comprise a disinterested and independent board majority (entire fairness). The standard of review may change further depending on whether the directors took steps to address the potential or actual conflict, such as by creating an independent committee, conditioning the transaction on approval by disinterested stockholders, or both.[419]

Delaware's default standard of review is the business judgment rule, a principle of non-review that "reflects and promotes the role of the board of directors as the proper body to manage the business and affairs of the corporation."[420] The rule presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the

---

[418] *Reis v. Hazelett Strip–Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011). For reasons discussed at length elsewhere, this summary groups together under the heading of enhanced scrutiny what were once seemingly separate standards of intermediate review. *See generally Pell v. Kill*, 135 A.3d 764, 784–85 (Del. Ch. 2016) (explaining how "[p]articularly during the 1980s, standards of review seemed to proliferate," but that Delaware courts have subsequently consolidated the various intermediate standards within the framework of enhanced scrutiny); *Reis*, 28 A.3d at 457–58 (discussing variants of enhanced scrutiny).

[419] *Trados II*, 73 A.3d at 36.

[420] *In re Trados Inc. S'holder Litig. (Trados I)*, 2009 WL 2225958, at *6 (Del. Ch. July 24, 2009).

company."[421] Unless one of its elements is rebutted, "the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives."[422] "Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty."[423]

"Entire fairness, Delaware's most onerous standard, applies when the board labors under actual conflicts of interest."[424] Once entire fairness applies, the defendants must establish "to the court's satisfaction that the transaction was the product of both fair dealing *and* fair price."[425] "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs."[426]

In between lies enhanced scrutiny, which is Delaware's "intermediate standard of review."[427] It applies to "specific, recurring, and readily identifiable situations involving potential conflicts of interest where the realities of the decisionmaking context can subtly

---

[421] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[422] *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010) (Strine, V.C.).

[423] *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 34 (Del. Ch. 2014).

[424] *Trados II*, 73 A.3d at 44.

[425] *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995) (internal quotation marks omitted).

[426] *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006).

[427] *Trados II*, 73 A.3d at 43.

undermine the decisions of even independent and disinterested directors."[428] Inherent in these situations are subtle structural and situational conflicts that do not rise to a level sufficient to trigger entire fairness review, but also do not comfortably permit expansive judicial deference.[429] Framed generally, enhanced scrutiny requires that the defendant fiduciaries "bear the burden of persuasion to show that their motivations were proper and not selfish" and that "their actions were reasonable in relation to their legitimate objective."[430]

Traditionally, enhanced scrutiny would apply to decisions made in connection with a sale of a corporation for cash, as occurred in this case.[431] In *Corwin v. KKR Financial*

---

[428] *Id.*; *accord Reis*, 28 A.3d at 457–59; *see QVC*, 637 A.2d at 42 ("[T]here are rare situations which mandate that a court take a more direct and active role in overseeing the decisions made and actions taken by directors. In these situations, a court subjects the directors' conduct to enhanced scrutiny to ensure that it is reasonable."); *Dollar Thrifty*, 14 A.3d at 598 ("In a situation where heightened scrutiny applies, the predicate question of what the board's true motivation was comes into play. The court must take a nuanced and realistic look at the possibility that personal interests short of pure self-dealing have influenced the board to block a bid or to steer a deal to one bidder rather than another.").

[429] *In re Rural Metro Corp.*, 88 A.3d 54, 82 (Del. Ch. 2014), *aff'd sub nom. RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816 (Del. 2015); *accord Huff Energy Fund*, 2016 WL 542958, at *13; *see Dollar Thrifty*, 14 A.3d at 597 ("Avoiding a crude bifurcation of the world into two starkly divergent categories—business judgment rule review reflecting a policy of maximal deference to disinterested board decisionmaking and entire fairness review reflecting a policy of extreme skepticism toward self-dealing decisions—the Delaware Supreme Court's *Unocal* and *Revlon* decisions adopted a middle ground."); *Golden Cycle, LLC v. Allan*, 1998 WL 892631, at *11 (Del. Ch. Dec. 10, 1998) (locating enhanced scrutiny under *Unocal* and *Revlon* between the business judgment rule and the entire fairness test).

[430] *Mercier v. Inter-Tel (Del.), Inc.*, 929 A.2d 786, 810 (Del. Ch. 2007) (Strine, V.C.).

[431] *See QVC*, 637 A.2d at 42–43, 45; *Revlon*, 506 A.2d at 182.

*Holdings, LLC*, the Delaware Supreme Court held that "when a transaction not subject to the entire fairness standard is approved by a fully informed, uncoerced vote of the disinterested stockholders, the business judgment rule applies."[432] Applying *Corwin*, this court has held that when the holders of a majority of a company's shares make a fully informed, disinterested, and uncoerced decision to tender into a medium-form merger under Section 251(h), the business judgment rule applies.[433] To determine what standard of review applies therefore requires an assessment of whether the stockholder decision was fully informed, which in turn requires determining whether the directors breached their duty of disclosure. This decision starts with that issue.

### 1.     The Disclosure Claim

When asking stockholders to tender into the first step of the medium-form Merger, the members of the Board owed a "fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action."[434] A fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[435] The test does not require "a substantial likelihood

---

[432] 125 A.3d 304, 309 (Del. 2015).

[433] *In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 747 (Del. Ch. 2016), *aff'd*, 156 A.3d 697 (Del. 2017) (TABLE).

[434] *Stroud*, 606 A.2d at 84; *accord Malone v. Brincat*, 722 A.2d 5, 12 (Del. 1998) ("The directors of a Delaware corporation are required to disclose fully and fairly all material information within the board's control when it seeks shareholder action.").

[435] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

that [the] disclosure . . . would have caused the reasonable investor to change his vote."[436] The question is rather whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[437]

### a.     The December 2013 Tip And Singer's Role

The plaintiffs argue that the Recommendation Statement failed to disclose Krause's tip to Deutsche Bank in December 2013, which Deutsche Bank relayed to Singer. In this tip, Krause conveyed in substance that after Avago completed the LSI deal, it wanted to acquire PLX for approximately $300 million.[438] The plaintiffs argue that the Recommendation Statement also failed to disclose that Krause and Singer discussed the pricing of the deal during their dinner meeting on May 21, 2014. Adding to the mix, the plaintiffs have identified other aspects of the Recommendation Statement that misleadingly downplay Singer's involvement in the deal process. The plaintiffs proved that the Recommendation Statement's presentation of these events was materially misleading.

As a general matter, when "arm's-length negotiation has resulted in an agreement which fully expresses the terms essential to an understanding by shareholders of the impact of the merger, it is not necessary to describe all the bends and turns in the road which led

---

[436] *Id.* (same).

[437] *Id.* (same).

[438] *See* JX 1032 at 2.

81

to that result."[439] Early contacts that do not lead to more formal negotiations or a transaction are not required to be disclosed.[440]

In this case, Krause's tip to Deutsche Bank, which Deutsche Bank relayed to Singer, was more than just a bend or turn in the road. On December 19, 2013, Krause told Deutsche Bank (and Deutsche Bank told Singer) that Avago wanted to buy PLX, when it would bid, and how much it wanted to pay.[441] The Recommendation Statement fails to mention the tip. It describes the surrounding events as follows:

> On December 18, 2013, the PLX annual meeting of stockholders resulted in the election of three new members of PLX's Board of Directors from the slate proposed by Potomac Capital.
>
> 2014 Sales Process
>
> On December 23, 2013, the PLX Board of Directors updated the new directors on PLX's consideration of strategic transactions over the preceding two years, including the 2012 Go-Shop Process and the Fall 2013 Market Check. Deutsche Bank also noted that the Fall 2013 Market Check had not resulted in any formal proposal to acquire PLX and that several prospective bidders had indicated that PLX's stock price already reflected a significant acquisition premium.[442]

---

[439] *Van de Walle v. Unimation, Inc.*, 1991 WL 29303, at *15 (Del. Ch. Mar. 7, 1991) (internal quotation marks omitted).

[440] *See Wis. Inv. Bd. v. Bartlett*, 2000 WL 238026, at *8 (Del.Ch. Feb. 24, 2000) ("One cannot conclude that a failure to disclose the details of negotiations gone south would be either viably practical or material to shareholders in the meaningful way intended by our case law.").

[441] *See* JX 1031; JX 1032 at 2.

[442] JX 551 at 24.

According to the Recommendation Statement, Avago did not renew its interest in PLX until May 2014.[443]

A stockholder who knew about the tip could take a very different view of the Board's subsequent efforts to explore alternatives and negotiate with Avago, as well as the role Singer played in the process. The early communication undercuts the legitimacy of the eventual price negotiations with Avago that Singer led. Rather than appearing like arm's-length negotiations, the quick back-and-forth in May 2014 can be seen as a means of arriving at the $300 million valuation that Krause identified in December 2013. Instead of Singer and the Board negotiating for the best transaction reasonably available and being prepared to remain an independent company, it looks like they engaged in the "art of the possible"[444] and accepted what Avago had planned to offer all along. The fact that Deutsche Bank and Singer did not share Krause's tip calls into question their motivations on behalf of PLX. Rather than actors attempting in good faith to obtain the best outcome possible, they look like self-interested agents who were happy with a quick sale that would serve their interests. The Recommendation Statement's failure to mention Krause's tip was a material omission.

---

[443] *See Id.* at 25.

[444] Schmitt Dep. 172–73.

Next, the Recommendation Statement failed to mention that Singer and Krause discussed pricing when they had dinner on May 21, 2014.[445] The Recommendation Statement describes the timeline as follows:

> On May 19, 2014, representatives of Avago contacted PLX to directly communicate Avago's interest in renewing its offer to acquire PLX. A follow-up meeting was held on May 21, 2014, at which representatives of PLX provided Avago an update on PLX's business. Also on May 21, 2014, Mr. Singer met with Mr. Thomas Krause of Avago to discuss Avago's potential offer to acquire PLX. Mr. Krause and Mr. Singer discussed general terms for a potential acquisition of PLX by Avago. Mr. Krause noted that Avago believed that the then-current PLX stock price already included a premium as a result of Potomac Capital's actions. Following the meeting, the Special Committee discussed Avago's interest.
>
> On May 22, 2014, Avago sent a non-binding letter of interest to the PLX Board of Directors proposing to acquire PLX at a price of $6.25 per share. The letter stated Avago's willingness to enter into a merger agreement with PLX on substantially the same terms as the IDT merger agreement, with changes to reflect an all-cash transaction and the deletion of the "go-shop" provision in the IDT merger agreement.[446]

Particularly when viewed against the backdrop of Krause's early communication with Deutsche Bank and Singer's knowledge of that communication, the fact that Krause and Singer discussed pricing on May 21 was material information. A reasonable stockholder would want to know that information to evaluate whether Singer and his fellow directors actually bargained at arms' length with Avago, or whether Singer was guiding the Board to the figure that Avago was already willing to pay.

---

[445] JX 433 at 1; JX 1026.

[446] JX 551 at 26.

84

Given this backdrop, the Recommendation Statement's discussion of the development of PLX's counteroffer also becomes problematic. The Recommendation Statement describes the process as follows:

> Later on May 22, 2014, the Special Committee and Deutsche Bank discussed the proposal from Avago and what further steps should be taken to be able to respond to the proposal. The Special Committee also discussed the PLX valuation issues and directed Deutsche Bank to prepare a valuation assessment to present to the Special Committee.
>
> On May 23, 2014, the Special Committee met with Deutsche Bank . . . . Deutsche Bank then provided an update on market conditions and PLX valuation issues, and the Special Committee discussed the proposal from Avago of $6.25 per share. Deutsche Bank presented and discussed with the Special Committee certain valuation analyses, including, among other things, Deutsche Bank's view that the PLX share price was impacted by the takeover premium built into the share price following Potomac Capital's 13D filing in January 2013. Deutsche Bank and the Special Committee also discussed the market analysts' 2014 and 2015 projected estimates for PLX as compared against management's projections. The Special Committee directed Deutsche Bank to include both in future analyses and discussions.
>
> . . .
>
> After considering the analyses presented by Deutsche Bank, the prior market checks, the other indications of interest received by PLX from time to time and the sufficiency of the 2014 Market Check (noting in particular that the first two market checks had only resulted in an offer from Avago, and that the terminated IDT Merger had already put potential buyers on alert but only Avago made a proposal to acquire PLX), the Special Committee unanimously agreed to recommend to the PLX Board of Directors that PLX prepare a counter proposal at $6.75 per share and a strategy for responding to any further counter proposals from Avago.[447]

The record in this case calls into question whether there was a meeting of the Special Committee and Deutsche Bank on May 22. What seems more likely is that Singer discussed

---

[447] *Id.*

85

the offer with Deutsche Bank, and they decided on a counter offer of $6.75. After that discussion, Deutsche Bank prepared a letter to that effect and circulated it to Raun, Schmitt, Singer, and Salameh.[448] Singer also asked Deutsche Bank to prepare some market analysis to support a $6.75 counter.[449]

Viewed in isolation, I would not regard these last details as material. But considered in the context of Krause's tip and Singer's dinner with Krause, the prominent role that Singer played in developing the counteroffer with Deutsche Bank becomes material. A stockholder would want to know about Singer's role when evaluating whether the directors were negotiating at arms' length, or whether Singer was orchestrating a deal at a price that Krause set in December 2013.

Finally, the plaintiffs point out that Singer had undisclosed conversations with "a member of Avago's management" about tender and support agreements. The minutes of a meeting of the Special Committee on June 15, 2014 establish that the conversation occurred.[450] The Recommendation Statement fails to mention it, stating only that the Special Committee discussed Avago's request.[451]

Here too, I would resist viewing Singer's involvement as material in the abstract. Taken as a whole, however, the Recommendation Statement appears to have sought to

---

[448] *See* JX 434 at 2–3.

[449] JX 1030 at 1.

[450] JX 516 at 1.

[451] JX 551 at 29.

86

minimize Singer's role. The Recommendation Statement should have described Singer's involvement accurately and candidly by identifying him as the interlocutor.[452]

### b. The Reliability Of The June 2014 Projections

The plaintiffs next contest the Recommendation Statement's description of the June 2014 Projections as having been prepared "in the ordinary course of business for operating purposes . . . ."[453] The plaintiffs proved at trial that this description was misleading.

The Recommendation Statement discusses the June 2014 Projections at length in a section titled "Projected Financial Information," which states:

> PLX does not, as a matter of course, make detailed or long-term public forecasts or projections as to its future financial performance due to the unpredictability of the underlying assumptions and estimates. At the December 12, 2013 PLX Board of Directors meeting, PLX management presented a five year plan covering the period 2014–2018 (the "December 2013 [Projections]"). A notation to the December 2013 [Projections] stated, "Although this is an aggressive plan compared to the past couple years performance and where we stand this quarter with soft demand from Storage market, management believes we should drive internally for this number as the plan. The key will be getting our strong Gen 3 design pipe into production, a stable economy and a return of federal spending with our end customers." The December 2013 [Projections] reflected growth rates significantly higher than historic levels and was based on certain assumptions with respect to investment levels on certain products, timing of production and ramp of certain products, stable economic conditions, and return of federal spending with the end customers. Between December 2013 and June 2014, the PLX Board of Directors and PLX management discussed updating the five year forecast based on more current information. In June 2014, PLX management prepared a revised five year plan to better reflect management's current expectations of future company performance. On June 13, 2014, PLX

---

[452] *See van der Fluit v. Yates*, 2017 WL 5953514, at *8 (Del. Ch. Nov. 30, 2017) (holding that plaintiff had stated claim for breach of duty of disclosure where complaint failed to identify who the negotiators were who had contact with bidders).

[453] JX 551 at 55.

87

management delivered the revised five year plan (the "June 2014 [Projections]") to Deutsche Bank. The June 2014 [Projections] w[ere] based on updated assumptions as of June 2014 and reflected downward adjustments to revenue due to lower than expected design activity for, anticipated production delays on, and reduced market demand for, certain products. . . . The December 2013 [Projections] were provided to [Avago] in May 2014 and did not include PLX's first quarter actual revenue results. The Upside Case projections as presented below are consistent with those presented to [Avago] in May 2014 except that they now incorporate PLX's actual revenue results for the first quarter. . . . The December 2013 [Projections] w[ere] later updated to include PLX's actual first quarter results. The December 2013 [Projections], as updated, and the June 2014 [Projections[ (collectively, the "Projections"), which are summarized below, were also furnished to Deutsche Bank, which were relied upon by Deutsche Bank in connection with their financial analysis and Fairness Opinion as follows, except . . . where PLX management and the PLX Board of Directors instructed Deutsche Bank to analyze both the Base Case and the Upside Case, Deutsche Bank was instructed by PLX management and the PLX Board of Directors to rely on the Base Case as the primary basis of its analyses. The June 2014 [Projections are] referred to as the "Base Case" in Deutsche Bank's analysis (and in the further discussion below), because PLX's management informed Deutsche Bank that the Base Case represented the best currently available estimates and judgments by management as to the expected future results of operations and financial conditions of PLX, and accordingly are the projections which, with PLX's consent, Deutsche Bank relied upon in performing its analysis. The December 2013 [Projections], as updated, [are] referred to as the "Upside Case" in Deutsche Bank's analysis . . . .[454]

This paragraph is misleading.

For starters, PLX prepared detailed and long-term forecasts in the ordinary course of business. Although it was accurate to say that the figures were not for public consumption, PLX prepared a three-year plan on an annual basis.[455] As discussed in the

---

[454] *Id.* at 54–55.

[455] Whipple Dep. 94–95 ("[E]very year around Thanksgiving, we sat down as a group and we did a three—typically a three-year plan, which—the first year of which became our budget for the following year.").

Factual Background, it was also technically true that the December 2013 Projections contained the notation described in the Recommendation Statement, but the language in context did not approach the prominence it received in the Recommendation Statement.

Next, contrary to the impression created by the Recommendation Statement, the Board and management did not discuss updating the December 2013 Projections "[b]etween December 2013 and June 2014 . . . based on more current information." The issue first came up on May 23, 2014 after the Special Committee received Avago's offer of $6.25 per share.[456] While it is technically true that May 2014 is "[b]etween December 2013 and June 2014," the Recommendation Statement creates the impression of regular discussion and review. Instead of updating the plan, the Board used it as late as April 2014 for decisions in the ordinary course of business involving insurance and compensation.[457]

Relatedly, the effort to produce the June 2014 Projections did not actually begin until June 7, 2014, after PLX and Avago had agreed on $6.50 per share.[458] The new figures did not reflect "more current information," as the Recommendation Statement suggested.

---

[456] JX 459 at 3; *see also* Cho Dep. 130–37; Raun Dep. 440–42; Salameh Dep. 90–91; Schmitt Dep. 177–79; Whipple Dep. 104–05.

[457] *See* JX 385 at 20; JX 383 at 32. The plaintiffs' expert noted that the use of the projections for insurance purposes evidences their reliability, because providing false information to insurance companies can be pursued as insurance fraud and can result in a policy becoming void. Quintero Tr. 602–03. *Cf. Del. Open MRI Radiology Assocs. v. Kessler*, 898 A.2d 290, 317 n.57 (Del. Ch. 2006) (finding projections credible where they had been presented to "federally-regulated financial institutions for financing purposes" and "it is a felony to knowingly obtain any funds from a financial institution by false or fraudulent pretenses or representations").

[458] *See* JX 491 at 1.

When PLX's Vice President of Sales asked his sales managers to revisit their estimates as part of this process, he noted that "[w]e clearly have enough wins and momentum to drive the 2014–2018 numbers in the 5 year plan."[459] The June 2014 Projections were prepared for Deutsche Bank's valuation analysis. When Deutsche Bank ran the numbers, they generated the answer the banker's wanted: a range of $4.81 to $6.79 per share.[460]

In light of the circumstances surrounding their preparation, it was misleading for the Recommendation Statement to claim that the June 2014 Projections "were prepared in the ordinary course of business for operating purposes." The June 2014 Projections were prepared after Avago made its bid so that Deutsche Bank could use them in its fairness opinion.

### c.  The May 24 Analysis

Finally, the plaintiffs argue that the Recommendation Statement was materially misleading because it failed to include a discounted cash flow analysis based on the

---

[459] *Id.* There was testimony from interested witnesses to the effect that management followed the same process to develop the June 2014 Projections that they had followed in December 2013. *See* Raun Dep. 177–78 (confirming that "the June five-year analysis [was] very similar" to the analysis in December 2013 "for the outlying years"); Salameh Dep. 164, 273 (testifying management "did a detailed, bottoms-up . . . , customer by customer, product by product" review for 2014–2016 and also a "top-down, just a reality check"). Given the circumstances surrounding the preparation of the June 2014 Projections, I am unable to credit this testimony, which was given by obviously interested parties. In weighing the credibility of this testimony, I have also taken into account the interested witnesses' widespread efforts to reconfigure the record by drafting questionable minutes and overemphasizing the "aggressive" nature of the December 2013 Projections.

[460] JX 499 at 1. During this litigation, the interested witnesses testified that this was the proper characterization. *See* Cho Dep. 191–95; Salameh Dep. 257–58.

90

December 2013 Projections. On the facts of this case, failing to disclose that analysis was material.

Under Delaware law, when a board relies on the advice of a financial advisor in making a decision that requires stockholder action, the stockholders are entitled to receive "a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender rely."[461] A fair summary "need not contain all information underlying the financial advisor's opinion contained in its report. . . .The essence of a fair summary is not a cornucopia of financial data, but rather an accurate description of the advisor's methodology and key assumptions."[462]

Information in a banker's analysis also may require disclosure because of the directors' fiduciary obligation "to avoid misleading partial disclosures."[463] "[O]nce defendants travel down the road of partial disclosure . . . , they ha[ve] an obligation to provide the stockholders with an accurate, full, and fair characterization."[464] "When a document ventures into certain subjects, it must do so in a manner that is materially

---

[461] *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 449 (Del. Ch. 2002) (Strine, V.C.).

[462] *In re Trulia, Inc. Stockholder Litig.*, 129 A.3d 884, 900–-01 (Del. Ch. 2016) (internal citations omitted).

[463] *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996).

[464] *Id.* at 1056 n.1 (internal quotation marks omitted).

complete and unbiased by the omission of material facts."[465] Even if the additional information independently would fall short of the traditional materiality standard, it must be disclosed if necessary to prevent other disclosed information from being misleading.[466]

When the Special Committee met on May 23, 2014, to discuss Avago's offer of $6.25 per share, the Special Committee asked for a discounted cash flow analysis based on the December 2013 Projections.[467] The Special Committee also asked for a separate discounted cash flow analysis based on new projections, which Deutsche Bank prepared using the Preliminary Sensitivity Case.[468] During a meeting of the Board on May 24, the directors received and reviewed the two discounted cash flow analysis.[469] When the Special Committee negotiated the price with Avago, the only discounted cash flow analyses it possessed were based on the December 2013 Projections and the Preliminary Sensitivity Case. For its final fairness opinion, Deutsche Bank replaced the Preliminary Sensitivity Case with the June 2014 Projections.[470]

When describing the Special Committee meeting on May 23, 2014, the Recommendation Statement discusses the Special Committee's request for two discounted

---

[465] *Pure Res.*, 808 A.2d at 448.

[466] *Johnson v. Shapiro*, 2002 WL 31438477, at *4 (Del. Ch. Oct. 18, 2002).

[467] JX 459 at 3.

[468] *Id.*; *see also* Schmitt Dep. 180–83.

[469] *See* JX 462 at 13–14; JX 465 at 4.

[470] *Compare* JX 462 at 14, *with* JX 529 at 19.

92

cash flow analyses.[471] When describing the Board meeting on May 24, the Recommendation Statement mentions that the Board received and discussed the two discounted cash flow analyses.[472] The Recommendation Statement does not, however, disclose the results of the May 24 discounted cash flow analysis based on the December 2013 Projections. The record shows that it yielded a valuation range of $6.90 to $9.78 per share, with a midpoint of $8.27 per share.[473] The entire range of the analysis exceeded both the directors' counteroffer and the eventual deal price.

Subsequently, in a section titled "Discounted Cash Flow Analysis," the Recommendation Statement describes two analyses that Deutsche Bank prepared for the Board's meetings on June 20 and 22, when the Board formally approved the Merger. Those analyses used the December 2013 Projections and the January 2014 Projections. The June analysis that Deutsche Bank prepared using the December 2013 Projections generated a range of $6.39 to $8.98 per share, with a midpoint of $7.69. Under the revised analysis, the directors' counteroffer and the final deal price fell within the range.[474]

Whether the directors were obligated to disclose the analysis from May 24, 2014 strikes me as a close call. It was not part of Deutsche Bank's final analysis, and the

---

[471] JX 551 at 26–27.

[472] *Id.* at 27.

[473] JX 462 at 13.

[474] Potomac has argued that the later valuation more accurately accounted for the Company's options and restricted stock units and used a more appropriate tax rate. *Compare* JX 529 at 20 *with* JX 462 at 13. A description of the two ranges could easily have made those points.

93

midpoint of the May range was only 7% lower than the midpoint of the June range. Under the facts and circumstances of this case, however, I believe that omitting the May valuation range constituted a misleading partial disclosure. Even if the information was not independently material, once the Recommendation Statement discussed the May 24 valuation, stockholders were entitled to know the range it produced, particularly when it was one of only two valuations that the directors possessed when they negotiated the price of the deal and when both the counteroffer and the final deal price fell below the valuation range.

### d. The Predicate Breach Of The Duty Of Disclosure

The plaintiffs proved that the directors breached their duty of disclosure by describing the June 2014 Projections in misleading fashion and by failing to disclose other information that would be material to a stockholder's decision to tender, including Krause's tip to Deutsche Bank. The breaches of the duty of disclosure satisfy the second element of the plaintiffs' claim against Potomac for aiding and abetting. As discussed in the next section, the breaches also affect the operative standard of review for purposes of the sale process claim.

### 2. The Sale Process Claims

In addition to asserting disclosure claims, the plaintiffs contend that the directors breached their fiduciary duties during the sale process. In substance, the plaintiffs assert that the directors breached their fiduciary duties by permitting Singer to lead them into a near-term sale when PLX would have been better served by remaining independent, building its business, and potentially pursuing a sale at a later date.

### a. The Standard of Review

As discussed previously, when determining whether corporate fiduciaries have breached their duties, a court applying Delaware law evaluates the directors' conduct through the lens of a standard of review. The Delaware Supreme Court has held that the intermediate standard of enhanced scrutiny applies when directors consider selling the corporation for cash.[475] Subsequent decisions have clarified that enhanced scrutiny applies in this context because of the potential conflicts of interest that fiduciaries face when considering whether to sell the corporation, to whom, and on what terms.[476]

In this case, the Board approved a sale of PLX to Avago for cash, making enhanced scrutiny the operative standard of review. Under *Corwin*, however, the business judgment rule would apply if the directors had complied with their duty of disclosure.[477] This decision has held that the Recommendation Statement was misleading, so the fact that holders of a majority of the Company's shares tendered into the first step of the medium-form Merger does not lower the standard of review.[478]

---

[475] *Revlon*, 506 A.2d at 180–82.

[476] *See, e.g.*, *El Paso*, 41 A.3d at 439 ("[T]he potential sale of a corporation has enormous implications for corporate managers and advisors, and a range of human motivations, including but by no means limited to greed, can inspire fiduciaries and their advisors to be less than faithful . . . ."); *Dollar Thrifty*, 14 A.3d at 597 ("The heightened scrutiny that applies in the *Revlon* (and *Unocal*) contexts are, in large measure, rooted in a concern that the board might harbor personal motivations in the sale context that differ from what is best for the corporation and its stockholders.").

[477] *See Corwin*, 125 A.3d at 309; *Volcano*, 143 A.3d at 747.

[478] Potomac has also argued that after *Corwin*, enhanced scrutiny only applies before closing, when a plaintiff seeks a preliminary injunction. At least for purposes of an aiding-and-abetting claim, the Delaware Supreme Court has rejected this position and held that

The operative standard of review is therefore enhanced scrutiny. When that standard applies, the defendant fiduciaries bear the burden of proving that they "act[ed] reasonably to seek the transaction offering the best value reasonably available to the stockholders."[479] When a plaintiff sues a third party for aiding and abetting a breach of fiduciary duty, the plaintiffs bear the burden of proving that the directors' conduct fell outside the range of reasonableness.[480]

---

enhanced scrutiny remains the operative standard of review in a post-closing damages action. *RBC Capital*, 129 A.3d at 857 ("[W]e reject RBC's contention that the trial court erred by finding a due care violation without finding gross negligence. RBC argues that intermediate scrutiny under *Revlon* exists to determine whether plaintiff stockholders should receive pre-closing injunctive relief, but it cannot be used to establish a breach of fiduciary duty that warrants post-closing damages. . . . We agree with the trial court that the individual defendants breached their fiduciary duties by engaging in conduct that fell outside the range of reasonableness, and that this was a sufficient predicate for its finding of aiding and abetting liability against RBC."). In pre-*Corwin* decisions, the Delaware Supreme Court applied enhanced scrutiny in post-closing damages actions. *See*, *e.g.*, *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 64–65 (Del. 1989) (holding that enhanced scrutiny was the proper standard of review in a post-closing damages action but affirming the trial court's finding that the directors had carried their burden of proof); *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1286 (Del. 1989) (holding that enhanced scrutiny would have been the proper standard of review in a post-closing damages action, if the case had not settled). For lengthier discussions of precedent indicating that the fact of closing, standing alone, would not historically have altered the standard of review, see *Chen*, 87 A.3d at 668–69; see also *In re PLX Technology, Inc. S'holder Litig.*, 2018 WL 747180, at *2–3 (Del. Ch. Feb. 6, 2018) (denying summary judgment on this point).

[479] *QVC*, 637 A.2d at 43.

[480] *See*, *e.g.*, *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1039 (Del. Ch. 2006) ("[T]he test for stating an aiding and abetting claim is a stringent one . . . —a plaintiff must prove [its elements]"); *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 1995 WL 376919, at *7 (Del. Ch. June 15, 1995) (agreeing with the defendants' contention that "[p]laintiff must prove his aider and abettor theory to hold [a third party] liable"), *aff'd*, 678 A.2d 533 (Del. 1996).

Determining whether directors acted reasonably requires that the court consider both (i) "the decisionmaking process employed by the directors, including the information on which the directors based their decision," and (ii) "the directors' action in light of the circumstances then existing."[481] "Through this examination, the court seeks to assure itself that the board acted reasonably, in the sense of taking a logical and reasoned approach for the purpose of advancing a proper objective, and to thereby smoke out mere pretextual justifications for improperly motivated decisions."[482]

"The reasonableness standard permits a reviewing court to address inequitable action even when directors may have subjectively believed that they were acting properly."[483] The objective standard does not, however, permit a reviewing court to freely substitute its own judgment for the directors':

> There are many business and financial considerations implicated in investigating and selecting the best value reasonably available. The board of directors is the corporate decisionmaking body best equipped to make these judgments. Accordingly, a court applying enhanced judicial scrutiny should be deciding whether the directors made **a reasonable** decision, not **a perfect** decision. If a board selected one of several reasonable alternatives, a court

---

[481] *QVC*, 637 A.2d at 45.

[482] *Dollar Thrifty*, 14 A.3d at 598; *see In re Netsmart Techs., Inc. S'holder Litig.*, 924 A.2d 171, 192 (Del. Ch. 2007) (Strine, V.C.) ("Although linguistically not obvious, this reasonableness review is more searching than rationality review, and there is less tolerance for slack by the directors."); *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1000 (Del. Ch. 2005) (Strine, V.C.) ("[T]he Supreme Court held that courts would subject directors subject to *Revlon* . . . to a heightened standard of reasonableness review, rather than the laxer standard of rationality review applicable under the business judgment rule.").

[483] *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 830–31 (Del. Ch. 2011).

97

should not second-guess that choice even though it might have decided otherwise or subsequent events may have cast doubt on the board's determination. Thus, courts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness.[484]

Enhanced scrutiny "is not a license for law-trained courts to second-guess reasonable, but debatable, tactical choices that directors have made in good faith."[485] "What typically drives a finding of unreasonableness is evidence of self-interest, undue favoritism or disdain towards a particular bidder, or a similar non-stockholder-motivated influence that calls into question the integrity of the process."[486] "[W]hen there is a reason to conclude that debatable tactical decisions were motivated not by a principled evaluation of the risks and benefits to the company's stockholders, but by a fiduciary's consideration of his own financial or other personal self-interests, then the core animating principle of *Revlon* is implicated."[487]

### b.      Conflicts Of Interest In The Boardroom

The divergent interest that led to a predicate breach of duty in this case was Singer's interest in achieving a near-term sale. As Potomac's agent and co-managing member,

---

[484] *QVC*, 637 A.2d at 45.

[485] *Toys "R" Us*, 877 A.2d at 1000; *accord Dollar Thrifty*, 14 A.3d at 595–96 ("[A]t bottom *Revlon* is a test of reasonableness; directors are generally free to select the path to value maximization, so long as they choose a reasonable route to get there.").

[486] *Del Monte*, 25 A.3d at 831.

[487] *El Paso*, 41 A.3d at 439.

Singer faced the dual fiduciary problem identified in *Weinberger v. UOP, Inc.*[488] There, the Delaware Supreme Court held that there was "no dilution" of the duty of loyalty when a director "holds dual or multiple" fiduciary obligations and "no 'safe harbor' for such divided loyalties in Delaware."[489] "If the interests of the beneficiaries to whom the dual fiduciary owes duties diverge, the fiduciary faces an inherent conflict of interest."[490] "If the interests of the beneficiaries are aligned, then there is no conflict."[491]

Ordinarily, the fact that Potomac held a large block of common stock would be

---

[488] 457 A.2d 701 (Del. 1983).

[489] *Id.* at 710.

[490] *Chen*, 87 A.3d at 670; *see, e.g.*, *Krasner v. Moffett*, 826 A.2d 277, 283 (Del. 2003) ("[T]hree of the FSC directors . . . were interested in the MEC transaction because they served on the boards . . . of both MOXY and FSC."); *McMullin*, 765 A.2d at 923 ("The ARCO officers and designees on Chemical's board owed Chemical's minority shareholders 'an uncompromising duty of loyalty.' There is no dilution of that obligation in a parent subsidiary context for the individuals who acted in a dual capacity as officers or designees of ARCO and as directors of Chemical." (footnote omitted)); *Rabkin v. Philip A. Hunt Chem. Corp.*, 498 A.2d 1099, 1106 (Del. 1985) (holding that parent corporation's directors on subsidiary board faced conflict of interest); *Weinberger*, 457 A.2d at 710 (holding that officers of parent corporation faced conflict of interest when acting as subsidiary directors regarding transaction with parent); *see also Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993) (explaining for purposes of demand futility that "[d]irectorial interest exists whenever divided loyalties are present" (internal quotation marks omitted)); *Goldman v. Pogo.com Inc.*, 2002 WL 1358760, at *3 (Del. Ch. June 14, 2002) ("Because Khosla and Wu were the representatives of shareholders which, in their institutional capacities, [were] both alleged to have had a direct financial interest in this transaction, a reasonable doubt is raised as to Khosla and Wu's disinterestedness in having voted to approve the . . . [l]oan."); *Sealy Mattress Co. of N.J. v. Sealy, Inc.*, 532 A.2d 1324, 1328, 1336–37 (Del. Ch. 1987) (same).

[491] *Chen*, 87 A.3d at 670; *see, e.g.*, *Van de Walle*, 1991 WL 29303, at *11.

helpful to Singer and undermine any concern about divergent interest.[492] "Delaware law presumes that investors act to maximize the value of their own investments."[493] "When a large stockholder supports a sales process and receives the same per-share consideration as every other stockholder, that is ordinarily evidence of fairness, not of the opposite . . . ."[494] When directors or their affiliates own "material amounts" of common stock, it aligns their interests with other stockholders by giving them a "motivation to seek the highest price" and the "personal incentive as stockholders to think about the trade off between selling now and the risks of not doing so."[495] If the decision is made to sell, "[a] director who is also a shareholder of his corporation is more likely to have interests that are aligned with the other shareholders of that corporation as it is in his best interest, as a shareholder, to negotiate a transaction that will result in the largest return for all shareholders."[496]

---

[492] This is not a case where a large blockholder owned a security other than common stock with a return profile that created divergent incentives. *Cf. Frederick Hsu Living Trust v. ODN Hldg. Corp.*, 2017 WL 1437308, at \*28–29 (Del. Ch. Apr. 14, 2017) (finding that representatives of venture capital fund who served on board faced the dual fiduciary problem where the fund owned preferred stock carrying a redemption right and the directors engaged in a *de facto* liquidation to raise funds to redeem the shares); *Trados II*, 73 A.3d at 46–47 (finding that three of the directors faced the dual fiduciary problem because the merger triggered the preferred stockholders' liquidation preference, which gave those directors "a divergent interest in the [m]erger that conflicted with the interests of the common stock").

[493] *Katell v. Morgan Stanley Gp., Inc.*, 1995 WL 376952, at \*12 (Del. Ch. June 15, 1995).

[494] *Iroquois Master Fund Ltd. v. Answers Corp.*, 2014 WL 7010777, at \*1 n.1 (Del. 2014) (ORDER).

[495] *Dollar Thrifty*, 14 A.3d at 600.

[496] *Orman v. Cullman*, 794 A.2d 5, 27 n.56 (Del. Ch. 2002); *see In re Mobile Commc'ns Corp. of Am., Inc. Consol. Litig.*, 1991 WL 1392, at \*9 (Del. Ch. Jan. 7, 1991)

Delaware law recognizes that in some scenarios, circumstances may cause the interests of investors who hold common stock to diverge. For example, liquidity is one "benefit that may lead directors to breach their fiduciary duties," and stockholder directors may be found to have breached their duty of loyalty if a "desire to gain liquidity . . . caused them to manipulate the sales process" and subordinate the best interests of the corporation and the stockholders as a whole.[497] For similar reasons, particular types of investors may espouse short-term investment strategies and structure their affairs to benefit economically

---

(Allen, C.) (noting that directors' substantial stockholdings gave them "powerful economic (and psychological) incentives to get the best available deal"), *aff'd*, 608 A.2d 729 (Del. 1992).

[497] *In re Answers Corp. S'holder Litig.*, 2012 WL 1253072, at *7 (Del. Ch. Apr. 11, 2012); *see McMullin*, 765 A.2d at 922–32 (reversing grant of motion to dismiss where complaint alleged that controlling stockholder and its director designees sacrificed value in a sale to achieve controlling stockholder's goal of obtaining near-term liquidity and significant component of the transaction consideration in cash); *N.J. Carpenters Pension Fund v. infoGROUP, Inc.*, 2011 WL 4825888, at *4, *9–10 (Del. Ch. Sept. 30, 2011, revised Oct. 6, 2011) (denying motion to dismiss where the plaintiff alleged that the director who was also a large stockholder sacrificed value in sale because he needed liquidity to satisfy personal debts and fund a new venture); *In re TeleCorp PCS, Inc. S'holders Litig.*, Cons. C.A. No. 19260-VCS, at 16 (Del. Ch. June 17, 2002) (TRANSCRIPT) ("What [these large stockholders] weren't entitled to do was to use their influence as fiduciaries to procure liquidity from AT&T Wireless on the backs of public stockholders in an unfair merger."); *see also In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 780 (Del. Ch. 2011) (Strine, C.) (considering large stockholder's desire for liquidity when evaluating performance of affiliated special committee member as part of assessment of entire fairness of transaction with controller; stating "[a]lthough I am not prepared on this record to find that Handelsman consciously agreed to a suboptimal deal for Southern Peru simply to achieve liquidity for Cerro from Grupo Mexico, there is little doubt in my mind that Cerro's own predicament as a stockholder dependent on Grupo Mexico's whim as a controller for registration rights influenced how Handelsman approached the situation." (emphasis omitted)), *aff'd sub nom. Americas Mining v. Theriault*, 51 A.3d 1213 (Del. 2012).

from those strategies, thereby creating a divergent interest in pursuing short-term performance at the expense of long-term wealth.[498] In particular, "[a]ctivist hedge funds . . . are impatient shareholders, who look for value and want it realized in the near or intermediate term. They tell managers how to realize the value and challenge publicly those who resist the advice, using the proxy contest as a threat."[499]

It is not enough for a plaintiff simply "to argue in the abstract that a particular director has a conflict of interest because she is affiliated with a particular type of institution" that has particular incentives or pursues a particular strategy.[500] At trial, a

---

[498] *See Glob. GT LP v. Golden Telecom, Inc.*, 993 A.2d 497, 508–09 (Del. Ch. 2010) (Strine, V.C.) ("[C]ertain institutional investors may be happy to take a sizeable merger-generated gain on a stock for quarterly reporting purposes, or to offset other losses, even if that gain is not representative of what the company should have yielded in a genuinely competitive process."), *aff'd*, 11 A.3d 214 (Del. 2010); Leo E. Strine, Jr., *Toward Common Sense and Common Ground? Reflections on the Shared Interests of Managers and Labor in a More Rational System of Corporate Governance*, 33 J. Corp. L. 1, 5 (2007) (explaining that "[hedge] funds are under pressure to generate short-term results" and that one "standard pressure play[]" is "to see if a public company can be put into play"); Marcel Kahan & Edward B. Rock, *Hedge Funds in Corporate Governance and Corporate Control*, 155 U. Pa. L. Rev. 1021, 1071 (2007) ("Hedge funds are set up to make money for their investors without regard to . . . shareholders generally . . . . Indeed, because hedge funds frequently engage in hedges and other sophisticated trading and arbitrage strategies, such conflicts of interest are likely to arise more frequently for hedge funds than for other institutional investors.").

[499] William W. Bratton & Michael L. Wachter, *The Case Against Shareholder Empowerment*, 158 U. Pa. L. Rev. 653, 682 (2010). *See generally* Leo E. Strine, Jr., *Who Bleeds When the Wolves Bite? A Flesh-And-Blood Perspective on Hedge Fund Activism and Our Strange Corporate Governance System*, 126 Yale L.J. 1870, 1892–1910 (2017). *But see* Lucian A. Bebchuk et al., *The Long-Term Effects of Hedge Funds Activism*, 115 Colum. L. Rev. 1085, 1093–96 (2015) (disputing "the myopic-activists claim").

[500] *Chen*, 87 A.3d at 671; *see id.* at 672 (granting summary judgment in favor of two directors affiliated with private equity funds where plaintiffs asserted that funds were winding down and needed liquidity to make distributions but the evidence showed that one

plaintiff must prove by a preponderance of the evidence that the director harbored a divergent interest.[501]

The record in this case convinces me that Singer and Potomac had a divergent interest in achieving quick profits by orchestrating a near-term sale at PLX. During their activist campaign and subsequent proxy contest, Singer and Potomac argued vehemently that PLX should be sold quickly.[502] Singer's thesis for investing in PLX depended entirely on a short-term sale to the other bidder who emerged during the go-shop period for the IDT

---

fund did not have a wind-down issue, the other fund's life had been extended and could be extended further, the underlying shares could be distributed in-kind to investors, and the director and fund principal had proposed further investment in the company); *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 667 (Del. Ch. 2013) (Strine, C.) (dismissing complaint challenging sale that was the product of a lengthy and thorough pre-signing market check in which plaintiff conceded that "all logical buyers were made aware . . . and that they all had the time and fair opportunity to bid," and rejecting allegation that private equity firm "typically flips companies it invests in every three to five years" and favored a sale to achieve liquidity for the investors in one of its funds and to invest in a new fund); *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1036 (Del. Ch. 2012) (Strine, C.) (applying general rule of equal treatment where controlling stockholder received same consideration as minority in third party sale to dismiss challenge to transaction; recognizing there could be "very narrow circumstances in which a controlling stockholder's immediate need for liquidity could constitute a disabling conflict of interest irrespective of pro rata treatment" and rejecting liquidity-based interest given lack of specific allegations in complaint).

[501] *See Trados II*, 73 A.3d at 54 ("At trial, the plaintiff could not rely on general characterizations of the VC ecosystem. The plaintiff had to prove by a preponderance of evidence that Prang was not disinterested or independent in this case.").

[502] *See* JX 63 (Potomac letter asserting that PLX must be sold); JX 77 (same).

transaction.[503] He never prepared any valuation or other analysis of the fundamental value of PLX.[504] He lacked any ideas for generating value at PLX other than to sell it.[505]

After Singer and Potomac surfaced, PLX's management team and the incumbent directors investigated the firm and its tactics, then met with Singer face to face. They concluded that Singer wanted PLX sold,[506] and they said that in public filings in response to Potomac's activist campaign and in their proxy materials.[507] When making statements about Potomac and Singer in public filings with the SEC and in communications with

---

[503] Singer Dep. 40–41; *see* JX 65.

[504] Singer Dep. 42.

[505] *See* JX 88 at 1; JX 89 at 1; JX 192 at 2; JX 266 at 2–3; Riordan Dep. 63 ("Q. So did Singer make any operational suggestions about what the company could do differently? A. Other than for all the board to resign, no.").

[506] *See, e.g.,* JX 189 at 2 (Salameh describing Potomac as "an activist hedge fund with a relatively short-term horizon"); JX 245 at 11 (Salemeh reporting on Singer's threat to "take it upon himself to contact prospective acquirers to solicit their interest in PLX"); Whipple Dep. 22 (describing Singer and Potomac as activist stockholders "who think they can achieve shareholder value by forcing the sale of the company"); *id.* at 13 (testifying that Singer "had one motive in buying stock in PLX. That was to take control and sell it"); Riordan Dep. 53 ("Eric Singer's position was that we should sell the company, and that was . . . his one and only agenda."); *id.* at 181 ("You don't have to be a mind reader. As we've talked about for hours now, that's what he said he wanted done. He wanted the company sold. He made no . . . [a]llusions to anything other than that. I want you to sell the company."); *id.* at 76 (Singer's "clear intentions, what he told us, was that . . . we should sell the company").

[507] *See, e.g.*, JX 282 at 3 (PLX characterizing Potomac as "a self-interested activist investor that is focused on short-term gains at the expense of other PLX Technology stockholders" (emphasis omitted)); Raun Dep. 276–77, 284–85 (confirming accuracy of criticisms of Potomac as an activist investor with a short-term focus); Hart Dep. 25–29 (same).

stockholders, the federal securities laws obligated the defendant directors and PLX to speak truthfully.[508] So did Delaware law.[509]

Once on the Board, Singer consistently acted with that intent. He initially focused on what the Board had done to try to sell the Company, concluding that the Board was "crazy for turning down $6+ from avago few months ago."[510] He only backed off when he learned that Avago could not re-engage for several months. When Avago did re-engage, he got to a deal within days.

In addition to Singer's divergent interest, Deutsche Bank also had significant reasons to favor a near-term sale to Avago. Because the plaintiffs settled with Deutsche Bank, they did not spend significant trial time on Deutsche Bank's issues, but they appear to have influenced the boardroom dynamic and therefore deserve mention..

One factor was Deutsche Bank's contingent fee arrangement, which gave Deutsche

---

[508] *See* 15 U.S.C. § 78n (enabling statute); 17 C.F.R. § 240.14a-9 ("No solicitation subject to this regulation shall be made by means of any proxy . . . containing any statement which . . . is false or misleading with respect to any material fact . . . ."); *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1087 (1991) (holding that "knowingly false statements of reasons [for recommending certain actions] may be actionable even though conclusory in form").

[509] *See Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998) ("Whenever directors communicate publicly or directly with shareholders about the corporation's affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith and loyalty. It follows *a fortiori* that when directors communicate publicly or directly with shareholders about corporate matters the *sine qua non* of directors' fiduciary duty to shareholders is honesty."); *id.* at 10–11 ("Shareholders are entitled to rely upon the truthfulness of all information disseminated to them by the directors they elect to manage the corporate enterprise.").

[510] JX 315.

Bank a powerful financial incentive to favor a sale over having PLX remain independent.[511]

The other factor was Deutsche Bank's longstanding and thick relationship with Avago, which included advising Avago contemporaneously on its acquisition of LSI. Avago announced the LSI deal on December 16, 2013, meaning that Deutsche Bank was representing both PLX and Avago during PLX's market check in fall 2013.[512] It also meant that Deutsche Bank was representing both PLX and Avago on December 19, 2013, when Krause tipped Deutsche Bank about Avago's plan to acquire PLX for $300 million after it completed the LSI acquisition. Deutsche Bank only stopped formally representing Avago

---

[511] *See In re TIBCO Software Inc. S'holder Litig.*, 2015 WL 6155894, at *26 (Del. Ch. Oct. 20, 2015) (recognizing that a contingent fee can provide a banker with "a powerful incentive . . . to refrain from providing information to the Board" that could have jeopardized a deal or caused the board to seek a fee reduction); *Rural Metro*, 88 A.3d at 94 ("Although a contingent compensation arrangement that pays an agent a percentage of deal value generally will align the interests of the agent in getting more compensation with the principal's desire to obtain the best value, the interests of the agent and principal diverge over whether to take the deal in the first place. The agent only gets paid if the deal happens, but for the principal, the best value may be not doing the deal at all." (footnote omitted)); *El Paso*, 41 A.3d at 442 (discussing how a $35-million-or-nothing contingent fee made "more questionable some of the tactical advice given by Morgan Stanley and some of its valuation advice"); *In re Atheros Commc'ns, Inc.*, 2011 WL 864928, at *8 (Del. Ch. Mar. 4, 2011) (noting that a "contingent fee can readily be seen as providing an extraordinary incentive for [an investment bank] to support the [t]ransaction"); *Forgo v. Health Grades, Inc.*, C.A. No. 5716-VCS, at 10 (Del. Ch. Sept. 3, 2010) (TRANSCRIPT) ("[T]he reality is if [the investment bank] can get a deal, they get a deal."); *Netsmart*, 924 A.2d at 199 (noting that although investment bank would receive 1.7% of any deal, it had "a strong incentive to bring about conditions that would facilitate a deal that would close"); *In re Tele-Communications, Inc. S'holders Litig.*, 2005 WL 3642727, at *10 (Del. Ch. Jan. 10, 2006) ("[T]he contingent compensation of the financial advisor, DLJ, of roughly $40 million creates a serious issue of material fact, as to whether DLJ (and DLJ's legal counsel) could provide independent advice to the Special Committee.").

[512] *See* JX 311.

on the LSI deal in May 2014, days before Avago re-engaged with PLX. Deutsche Bank's

ongoing relationship with Avago gave it a powerful incentive "to maintain good will and

not push too hard" during the negotiations.[513] From a formalistic standpoint, Deutsche

Bank narrowly avoided simultaneously representing the buyer and the seller on the same

deal, but when dealing with an industry that values relationships, and recognizing that

bankers frequently provide advisory services first and document the engagement letter

later, a reviewing court cannot ignore the situation that Deutsche Bank created. As with

Singer's conflict, Deutsche Bank's position on both sides of the deal necessarily colors the

---

[513] *Rural Metro*, 88 A.3d at 94; *see El Paso*, 41 A.3d at 444 (noting that conflicted negotiator has a duty "to squeeze the last drop of the lemon out for . . . stockholders," but that the conflict gave the negotiator "a motive to keep juice in the lemon that he could use to make a financial Collins for himself"); *id.* ("[A] fist fight of a negotiation might leave a bloodied [adversary] unreceptive to a [future deal] . . . ."); *Gesoff*, 902 A.2d at 1150–51 (holding that investment bank's relationship with buy-side controlling stockholder "robs [its] fairness opinion of its value as an indicator of fairness"); *see also Del Monte*, 25 A.3d at 835 (granting a preliminary injunction postponing the vote on a merger where the financial advisor manipulated the sale process to engineer a transaction that would allow it to obtain lucrative buy-side financing fees); *Toys "R" Us,* 877 A.2d at 1005 (considering whether an investment bankers role in providing stapled financing created a conflict of interest that merited injunctive relief); *Ortsman v. Green*, 2007 WL 702475, at *1–2 (Del. Ch. Feb. 28, 2007) (ordering expedited discovery where target's financial advisor participated in the buy-side financing even though company retained a separate financial advisor to render a fairness opinion); *Khanna v. McMinn*, 2006 WL 1388744, at *25 (Del. Ch. May 9, 2006) (finding plaintiffs had raised facts sufficient to "create a reasonable doubt that the transaction was the product of a valid exercise of business judgment" where investment bank provided a bridge loan to the target and thus had an interest in ensuring the closing of the transaction); *In re Prime Hospitality, Inc. S'holders Litig.*, 2005 WL 1138738, at *12 (Del. Ch. May 4, 2005) (rejecting settlement of *Revlon* claim and questioning "how can the Court attribute weight to the notion that [the allegedly conflicted banker] was retained by Prime to shop the company?"). *Cf. In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 116 (Del. Ch. 2007) (Strine, V.C.) (noting that if CEO received equity on the buy side post-merger, "the failure to get the [optimal] price for Lear now would not hurt him as much as the public stockholders").

court's assessment of the decisions that the directors made.

### c. The Sale Process In This Case

Absent divergent interests, the Board's sale process in this case would fall within a range of reasonableness. The Board combined a narrow, pre-signing canvass with a post-signing market check. This was a reasonable approach.

In the *C&J Energy* decision,[514] the Delaware Supreme Court held that a challenge to a transaction involving only a passive, post-signing market check could not support a reasonable likelihood of a breach of duty, explaining that a board may "pursue the transaction it reasonably views as most valuable to stockholders, so long as the transaction is subject to an effective market check under circumstances in which any bidder interested in paying more has a reasonable opportunity to do so."[515] The high court emphasized that "[s]uch a market check does not have to involve an active solicitation, so long as interested bidders have a fair opportunity to present a higher-value alternative, and the board has the flexibility to eschew the original transaction and accept the higher-value deal."[516]

The Merger Agreement satisfied the *C & J Energy* standard. The parties announced the Merger on June 23, 2014,[517] and the Merger Agreement contemplated a first-step tender

---

[514] *C & J Energy Servs., Inc. v. City of Miami Gen. Empls.' and Sanitation Empls.' Ret. Tr.*, 107 A.3d 1049 (Del. 2014).

[515] *Id.* at 1067.

[516] *Id.* at 1067–68.

[517] *See* PLX Technology, Inc., Current Report (Form 8-K) (June 23, 2014).

108

offer period that would run from July 8 through August 11.[518] From the announcement until closing, this structure gave competing suitors forty-nine calendar days to express interest. The Merger Agreement contained a no-shop clause subject to a fiduciary out,[519] a termination fee equal to approximately 3.5% of the equity value and 3.7% of the enterprise value of the transaction,[520] and a matching right.[521] Significant stockholders executed tender and support agreements governing 14.7% of the Company's outstanding shares.[522] These transaction features compare favorably with the passive market checks that this court's precedents have approved.[523]

In addition, in this case, the Board conducted a pre-signing outreach. Between February and April 2014, Raun was in contact with four potential transaction partners other than Avago.[524] After Avago engaged, Deutsche Bank quickly touched base with the three most likely to have interest.[525] Before that, in fall 2013, the Board had engaged in a non-

---

[518] *See* JX 554 at 2; JX 555 at 3.

[519] JX 542 § 5.3.

[520] *Id.* § 7.2(b); *see* JX 529 at 5.

[521] JX 542 § 5.3(f) (providing Avago with four business days after receiving written notice of a superior proposal to negotiate in good faith with PLX to adjust the terms and conditions of the Merger Agreement).

[522] *See* JX 543; PLX Technology, Inc., Current Report (Form 8-K) 3 (June 23, 2014).

[523] *See* Appendix (collecting Delaware decisions approving a passive market check).

[524] *Cf.* JX 420 at 1.

[525] *See* JX 459 at 3.

public market check in response to Potomac's activist campaign and threat of a proxy contest.[526]

On these facts, there ordinarily would be not be grounds to debate whether the Board fulfilled its duties. Where undisclosed conflicts of interest exist, however, even otherwise reasonable choices "must be viewed more skeptically."[527] Importantly, the plaintiffs do not contend that the Board improperly titled the playing field or steered the company to a favored bidder. They argue that PLX should not have been sold at all.

The record in this case indicates that Potomac and Singer succeeded in influencing the directors to favor a sale when they otherwise would have decided to remain independent. First, after Potomac launched its proxy contest, the incumbent directors decided to form the Special Committee and explore a possible sale.[528] Deutsche Bank had warned against a sale process, opining that a sale at that point could "leave[] value on the table as [PLX] continues to outperform."[529] Management believed that "[g]iven the recent changes in PLX, we do not think this is a good time to sell."[530] Schmitt admitted that "[i]n a normal business environment, we did not believe it was best to sell the company. Given

---

[526] *See* JX 208.

[527] *El Paso*, 41 A.3d at 434; *accord Del Monte*, 25 A.3d at 817.

[528] JX 203 at 4.

[529] JX 194 at 14.

[530] JX 133 at 33, 75.

the situation, that may have caused us to look at things a little differently."[531] Riordan agreed that the authorization of the Special Committee was prompted by Potomac's intervention.[532] This was a Board that was susceptible to activist pressure.

Second, after Singer and Potomac's other nominees joined the Board, the incumbent directors found within themselves a new willingness to support a sale at prices below the values that they had previously rejected. In April 2013, PLX had firmly turned down Avago's approaches and told Krause that any future proposal would have to "start with a 7."[533] During the ensuing year, PLX's business grew stronger and its market share increased.[534] Whipple explained the dynamic as follows:

> We sold PLX to IDT for $7 a share, cash and stock. A year later, we were the monopoly in the business. We had killed . . . IDT's ability to compete in the PCI Express business. We had finished our most profitable year. We had gotten rid of Teranetics. We had a technology which we believed was going to be dramatically more powerful than the Ethernet technologies that existed in the data center today. And we sold the company for less than $7. I thought that was wrong.[535]

---

[531] Schmitt Dep. 52.

[532] Riordan Dep. 106.

[533] JX 158 at 2; JX 161 at 2.

[534] *See* JX 282 at 19, 21; Whipple Dep. 71, 89–90.

[535] Whipple Dep. 60–61; *see id.* at 62 (testifying that 2014 was not the time to sell PLX); *id.* ("A few years later, after PCI ExpressFabric had developed, we would have been worth a lot more money."); Riordan Dep. 77–78 (testifying that PLX was "at a low point in the company's potential value"); *see also* JX 189 at 2 (August 4, 2013 letter to Singer stating: "While we continue to be open to exploring alternatives to maximize stockholder value, our Board does not believe that a commitment to acting in the best interests of all stockholders and to maximizing stockholder value means selling PLX at an inopportune time and for an inadequate price – even if that price represents a premium to the current trading price."); JX 133 at 33, 75 (April 8, 2013 presentation to PLX's insurance carriers

Yet once Singer and Potomac's other nominees had joined the Board, the directors agreed to accept less than what they had rejected when PLX's business was weaker.

Third, the incumbent directors deferred to Singer when he sought to position himself to best achieve a sale. After being elected to the Board, Singer asked to chair the Special Committee.[536] The Board agreed.[537] Later, when Salameh suggested that that the Special Committee was no longer needed, Singer resisted.[538] The Special Committee remained in place, and its existence and Singer's status as Chair were disclosed in PLX's Form 10-K.[539]

Fourth, the directors permitted Singer to take control of the sale process when it mattered most.[540] From January until April 2014, while Avago was busy with the LSI transaction, Singer bided his time and was not overly forceful. But when Avago resurfaced, Singer asserted himself. He caucused privately with Deutsche Bank,[541] and he had one-on-

---

stating: "Given the recent changes at PLX, we do not think this is a good time to sell."); Schmitt Dep. 17 ("Q. And you formed [the Special Committee], but, again, there was . . . nothing to indicate that you – that you folks believed that this was a good time to sell the company, correct? [Objection] A. I'll say that's correct.").

[536] *See* JX 330.

[537] JX 360 at 2–3.

[538] *See* JX 405.

[539] *See* JX 408 at 7, 9.

[540] *See* Whipple Dep. 67 (testifying that Singer "took control of the special committee").

[541] *See* JX 413; JX 512 at 1; JX 1026; JX 1029; JX 1030.

one meetings with Avago.[542] During a pivotal meeting on May 23, 2014, Singer guided the Special Committee to the counteroffer of $6.75 per share.[543] On May 24, he obtained Board approval to make the counteroffer and to conclude a deal at a price of $6.50 or higher.[544]

Fifth, at the time they approved the counteroffer and granted authority for a deal at $6.50, the directors lacked essential information. As in *Rural Metro*, they had not yet received a valuation of the Company on a standalone basis.[545] Deutsche Bank had quickly pulled together some market information at Singer's request to support a counteroffer at $6.75 per share, but that was it.[546]

---

[542] *See* JX 423 at 1; JX 424; JX 433 at 1; JX 472 at 1; JX 518 at 2; *see* Singer Tr. 236–44.

[543] Schmitt Dep.172.

[544] JX 465 at 5.

[545] *See Rural Metro*, 88 A.3d at 95–96 ("Because RBC did not prepare a valuation deck until March 27, RBC was not prepared to discuss valuation at critical meetings in March 2011. During the final negotiations over price, RBC took advantage of the informational vacuum it created to prime the directors to support a deal at $17.25."); *id.* at 96 ("Because the Board's financial advisors did not provide the directors with valuation materials until the final board meeting, just hours before the merger was approved, the directors did not have an opportunity to examine those materials critically and understand how the value of the merger compared to Rural's value as a going concern."). *Cf. El Paso*, 41 A.3d at 441 (citing problems created by conflicted financial advisor "hav[ing] its hands in the dough" of the financial analyses of potential alternatives; noting "questionable aspects" to the conflicted financial advisor's valuation "that could be seen as suspicious"); *id.* at 444–45 (citing "odd aspects to some of the financial analyses presented, which seem to go some way to making the . . . bid look more favorable . . . than perhaps a more consistent approach to valuation would have done").

[546] *See* JX 1030.

Sixth, Schmitt candidly recognized when the Special Committee decided on its counteroffer, it was engaging in the "art of the possible."[547] In contrast to the enhanced scrutiny standard, which requires that directors "seek the transaction offering the best value reasonably available to the stockholders,"[548] the art of the possible refers to "the attainable . . . the next best."[549] Singer similarly testified that the Special Committee was focused on maintaining "deal momentum."[550] This testimony provides direct evidence of breach.[551]

Seventh, consistent with a desire to get to a result, the Special Committee instructed management during its meeting on May 23, 2014, to generate a lower set of revenue projections, even though there had not been any new developments in PLX's business to

---

[547] Schmitt Dep. 172–173.

[548] *QVC*, 637 A.2d at 43.

[549] Brent J. Hutton, *For the Protection of Investors and the Public: Why Fannie Mae's Mortgage-Backed Securities Should Be Subject to the Disclosure Requirements of the Securities Act of 1933*, 89 Tul. L. Rev. 125, 127 (2014) (internal quotation marks omitted).

[550] Singer Tr. 254–55.

[551] *Cf. In re First Boston, Inc. S'holders Litig.*, 1990 WL 78836, at *7 (Del. Ch. June 7, 1990) (Allen, C.) (explaining that directors who serve on a special committee to evaluate an interested transaction are expected not simply to assess fairness but rather "to approve only a transaction that is in the best interests of the public shareholders, [and] to say no to any transaction that is not fair to those shareholders and is not the best transaction available"); *In re Trans World Airlines, Inc. S'holders Litig.*, 1988 WL 111271, at *5 (1988) (Allen, C.) (observing that special negotiating committee members who believed their only obligation was to determine fairness and not to maximize value for the common stock had an "imperfect appreciation of the proper scope and purpose of such a special committee"), *abrogated on other grounds by Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110 (Del. 1994).

warrant changing the December 2013 Projections.[552] The Special Committee also decided that Deutsche Bank did not need to engage in any additional pre-signing market check activities.[553]

Taken as a whole, this evidence suggests that Potomac and Singer undermined the Board's process and led the Board into a deal that it otherwise would not have approved. Yet in spite of this evidence, I could not conclude that the Board's decisions fell outside the range of reasonableness without one other critical fact: Krause's secret tip to Deutsch Bank in December 2013 about Avago's plans for PLX. In my view, by withholding this information from the rest of the Board, Singer breached his fiduciary duty and induced the other directors to breach theirs. For present purposes, by withholding this information, he fatally undermined the sale process.

No one can tell what would have happened if Singer and Deutsche Bank had been candid, but the Board might well have proceeded differently.[554] Knowing that Avago planned to return to the table once it completed the LSI acquisition, the Board could have been more vigorous in its pre-signing market canvas. Had the directors been armed with the knowledge that Avago expected to pay $300 million, they could have negotiated more

---

[552] JX 459 at 3.

[553] *See id.*

[554] *See Rural Metro*, 88 A.3d at 101 ("RBC's self-interested manipulations caused the Rural process to unfold differently than it otherwise would have."); *El Paso*, 41 A.3d at 447 ("No one can tell what would have happened had unconflicted parties negotiated the Merger. That is beyond the capacity of humans."); *Del Monte*, 25 A.3d at 833 ("But for Barclays' manipulations, the Del Monte process would have played out differently.").

effectively for a higher price. Most important, the Board could have taken more time to consider the Company's alternatives in depth, rather than agreeing in principle to a deal at Avago's preferred price after nine busy days in May. Among other things, they could have made sure that Deutsche Bank had prepared a current valuation of the Company, and they could have addressed any concerns about the December 2013 Projections more thoroughly.

Viewing the record as a whole, and with particular emphasis on Singer and Deutsche Bank's failure to disclose Krause's tip, the plaintiffs proved that "the adequacy of the decisionmaking process employed by the directors, including the information on which the directors based their decision" fell outside the range of reasonableness.[555] The plaintiffs therefore proved a breach of duty in connection with the sale process.

## C.    Knowing Participation In The Breach

The third element of a claim for aiding and abetting is the third party's knowing participation in the breach. "The adjective 'knowing' modifies the concept of 'participation,' not breach."[556] The underlying wrong does not have to be knowing or intentional; it can be a breach of the duty of care.[557]

---

[555] *See QVC*, 637 A.2d at 45.

[556] *Rural Metro*, 88 A.3d at 97.

[557] *Singh v. Attenborough*, 137 A.3d 151, 152–53 (Del. 2016) (ORDER); *see RBC Capital*, 129 A.3d at 862 (affirming imposition of liability on financial advisor who aided and abetted the board's breach of its duty of care). *See generally* Restatement (Second) of Torts § 876 cmt. d (Am. Law Inst. 1979) (explaining that secondary liability can attach where the underlying breach "is merely a negligent act" and "applies whether or not the [underlying wrongdoer] knows his act is tortious").

Under 876(b) of the Restatement (Second) of Torts, knowing participation exists when a third party:

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.[558]

For purposes of a board decision, the requirement of participation can be established if the third party "participated in the board's decisions, conspired with [the] board, or otherwise caused the board to make the decisions at issue."[559] In particular, a third party can be liable for aiding and abetting a breach of the duty of care if the third party "purposely induced the breach of the duty of care . . . ."[560] The method of facilitating the breach can include

---

[558] Restatement (Second) of Torts § 876(b) (Am. Law Inst. 1979); *see Anderson v. Airco, Inc.*, 2004 WL 2827887, *2–3 (Del. Super. Nov. 30, 2004).

[559] *Malpiede*, 780 A.2d at 1098.

[560] *Goodwin v. Live Entm't, Inc.*, 1999 WL 64265, at *28 (Del. Ch. Jan. 25, 1999) (Strine, V.C.) (granting summary judgment in favor of defendants charged with aiding and abetting a breach of the duty of care but suggesting that such a claim could proceed if "third-parties, for improper motives of their own, intentionally duped the Live directors into breaching their duty of care"); *RBC Capital*, 129 A.3d at 842 (upholding finding of aiding and abetting where financial advisor inexplicably modified its precedent transaction analysis); *Wayport*, 76 A.3d at 322 n.3 ("[A] non-fiduciary aider and abettor could face different liability exposure than the defendant fiduciaries if, for example, the non-fiduciary misled unwitting directors to achieve a desired result."); *see also Mills Acq.*, 559 A.2d at 1283-84, 1284 n.33 (describing management's knowing silence about a tip as "a fraud on the Board"); *Del Monte*, 25 A.3d at 836 (holding that investment bank's knowing silence about its buy-side intentions, its involvement with the successful bidder, and its violation of a no-teaming provision misled the board). *Cf. Singh*, 137 A.3d at 152 ("[A]n advisor

"creating the informational vacuum" in which the board breaches its duty of care.[561]

When the aiding and abetting claim targets an unrelated third party, a court's analysis of whether a secondary actor "knowingly participated" is necessarily fact intensive. Illustrative factors include the following:

- The nature of the tortious act that the secondary actor participated in or encouraged, including its severity, the clarity of the violation, the extent of the consequences, and the secondary actor's knowledge of these aspects;

- The amount, kind, and duration of assistance given, including how directly involved the secondary actor was in the primary actor's conduct;

- The nature of the relationship between the secondary and primary actors; and

- The secondary actor's state of mind.[562]

When the fiduciary and primary wrongdoer is also a representative of the secondary actor who either controls the actor or who occupies a sufficiently high position that his

---

whose bad-faith actions cause its board clients to breach their situational fiduciary duties . . . is liable for aiding and abetting."); *Technicolor*, 663 A.2d at 1170 n.25 ("[T]he manipulation of the disinterested majority by an interested director vitiates the majority's ability to act as a neutral decision-making body.").

[561] *Rural Metro*, 88 A.3d at 97 (holding that a party is liable for aiding and abetting when it "participates in the breach by misleading the board or creating the informational vacuum"); *see Mesirov v. Enbridge Energy Co., Inc.*, 2018 WL 4182204, at *15 (Del. Ch. Aug. 29, 2018) (sustaining claim for aiding and abetting against financial advisor for preparing misleading analyses and creating an informational vacuum); *TIBCO Software*, 2015 WL 6155894, at *25 (same); *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *48 (Del. Ch. Sept. 4, 2014) (holding that interested director aided and abetted breach of duty by failing to adequately explain valuation, thereby misleading the board and creating an informational vacuum), *aff'd sub nom. Fuchs v. Wren Holdings, LLC*, 129 A.3d 882 (Del. 2015) (TABLE).

[562] *In re Dole Food, Inc. S'holder Litig.*, 2015 WL 5052214, at *42 (Del. Ch. Aug. 27, 2015).

knowledge is imputed to the secondary actor, then the test is easier to satisfy. For example, this court has recognized that the acquisition vehicles that a controlling stockholder uses to effectuate an unfair freeze-out merger are liable as aiders and abettors to the same degree as the controller, because the controller's knowledge is imputed to those entities.[563] This court also has employed the same reasoning to recognize that an investment fund can be liable for aiding and abetting when "the same individuals who have made the Fund's investment decisions" are also the fiduciaries who engaged in misconduct.[564]

In this case, Singer was a co-managing member of Potomac and its agent, and his knowledge is imputed to Potomac in those capacities.[565] Singer led Potomac's activist campaign at PLX. Potomac owned PLX stock, filed Schedule 13Ds, served books and records demands, nominated the dissident director slate, filed the proxy materials, and stood to collect the short-term gains from a quick sale. Singer directed Potomac's activities and, once elected to the Board, Singer continued to act on Potomac's behalf. By failing to

---

[563] *See id.* at *39; *In re Emerging Commc'ns, Inc. Sholders Litig.*, 2004 WL 1305745, at *38 (Del. Ch. May 3, 2004).

[564] *Forsythe v. ESC Fund Mgmt. Co.*, 2007 WL 2982247, at *13 (Del. Ch. Oct. 9, 2007) ("These investment decisions form the basis of the plaintiffs' breach of fiduciary duty claims. Therefore, the court may infer CIBC's knowledge of the Special Limited Partner's and Investment Advisor's breaches of fiduciary duty.").

[565] *See Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 642–43 (Del. Ch. 2013) (imputing knowledge of fund principals to investment funds for purposes of "knowing participation" element of aiding and abetting claim); *see also Metro. Life Ins. Co. v. Tremont Gp. Hldgs., Inc.*, 2012 WL 6632681, at *19 (Del. Ch. Dec. 20, 2012); *Khanna*, 2006 WL 1388744, at *27; *Carlson v. Hallinan*, 925 A.2d 506, 542 (Del. Ch. 2006).

share Krause's tip with the Board, Singer created a critical informational gap that contributed to the Board's breach of duty.[566]

Because of Singer's relationship with Potomac and his role in directing and implementing Potomac's strategy, Singer's knowledge and actions can be attributed to Potomac. This holding does not stand for the proposition that the actions of the director-representative of a stockholder can always be attributed to a stockholder.[567] For example, Delaware law does not recognize any basis to attribute the actions of an independent director to the control of the stockholder that nominated or appointed him, simply by virtue of the fact of the nomination or appointment.[568] In this case, the combination of Singer's

[566] *See Rural Metro*, 88 A.3d at 99 (holding that investment banker knowingly participated in board's breach of duty where "RBC *created* the unreasonable process and informational gaps that led to the Board's breach of duty." (emphasis added)); *see also Mills Acq.*, 559 A.2d at 1283–84, 1284 n.33 (describing management's knowing silence about a tip as "a fraud upon the Board"); *Del Monte*, 25 A.3d at 836 (holding that investment bank's knowing silence about its buy-side intentions, its involvement with the successful bidder, and its violation of a no-teaming provision misled the board). *Cf. Technicolor*, 663 A.2d at 1170 n.25; *El Paso*, 41 A.3d at 443 ("Worst of all was that the supposedly well-motivated and expert CEO entrusted with all the key price negotiations kept from the Board his interest in pursuing a management buy-out of the Company's E & P business.").

[567] *Cf. Khanna v. McMinn*, 2006 WL 1388744, at *28 (Del. Ch. May 9, 2006) (declining to impute liability to stockholder who appointed director under doctrine of *respondeat superior*"); *Emerson Radio Corp. v. International Jensen Inc.*, 1996 WL 483086, at *20 n.18 (Del. Ch. Aug. 20, 1996) (declining to impose fiduciary status on fund where one of three general partners who controlled the fund also served as a corporate director).

[568] *Cf. Aronson*, 473 A.2d at 816 ("[I]t is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corporate director. It is the care, attention and sense of individual responsibility to the performance of one's duties, not the method of election, that generally touches on independence."); *Khanna*, 2006 WL

position with, ties to, and actions on behalf of Potomac supports a different result and

warrants a finding that Potomac knowingly participated in the steps Singer took to breach

his fiduciary duties and induce a breach by the Company's other directors. The plaintiffs

thus satisfied the third element of their claim for aiding and abetting a breach of fiduciary

duty.

**D.      Damages**

The final element of a claim for aiding and abetting is proof of damages that resulted

from the breach. The plaintiffs failed to carry their burden of proof on this element.

When seeking post-closing damages for breach of the duty of disclosure, the

plaintiff must prove quantifiable damages that are "logically and reasonably related to the

harm or injury for which compensation is being awarded."[569]

> The traditional measure of damages is that which is utilized in connection
> with an award of compensatory damages, whose purpose is to compensate a
> plaintiff for its proven, actual loss caused by the defendant's wrongful
> conduct. To achieve that purpose, compensatory damages are measured by
> the plaintiff's "out-of-pocket" actual loss. Thus, where a merger is found to
> have been effected at an unfairly low price, the shareholders are normally
> entitled to out-of-pocket (*i.e.*, compensatory) money damages equal to the

---

1388744, at \*15 ("Directors must be nominated and elected to the board in one fashion or another, and to hold otherwise would unnecessarily subject the independence of many corporate directors to doubt." (footnotes and quotation marks omitted)); *In re W. Nat. Corp. S'holders Litig.*, 2000 WL 710192, at \*15 (Del. Ch. May 22, 2000) ("The fact that a company's executive chairman or a large shareholder played some role in the nomination process should not, without additional evidence, automatically foreclose a director's potential independence.").

[569] *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773 (Del. 2006).

"fair" or "intrinsic" value of their stock at the time of the merger, less the price per share that they actually received.[570]

The "fair" or "intrinsic" value of the shares is determined using the same methodologies employed in an appraisal.[571] Consequently, this form of damages is sometimes colloquially called a "quasi-appraisal" remedy.[572] The premise for the award is that without the disclosure of false or misleading information, or the failure to disclose material

---

[570] *Strassburger v. Earley*, 752 A.2d 557, 579 (Del. Ch. 2000).

[571] *See, e.g.*, *Weinberger*, 457 A.2d 701, 713–14 (Del. 1983) (equating the fair price measure in fiduciary duty action with the fair value standard in appraisal); *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 114 (Del. 1952) (adopting for a breach of fiduciary duty case the valuation standard for appraisal announced in *Tri–Continental Corp. v. Battye*, 74 A.2d 71 (Del. Ch. 1950)); *see also Bershad v. Curtiss–Wright Corp.*, 535 A.2d 840, 845 (Del. 1987) (explaining that fair price measure in a breach of fiduciary duty case "flow[s] from the statutory provisions . . . designed to ensure fair value by an appraisal, 8 Del. C. § 262"); *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 940 (Del. 1985) (following *Sterling*); *Poole v. N.V. Deli Maatschappij*, 243 A.2d 67, 69 (Del. 1968) (affirming Court of Chancery's conclusion that when determining the stock's "true value" for purposes of compensatory damages, "the stock is to be evaluated on a going-concern basis and not on a liquidation basis; that the actual or true [value] of the stock is to be determined by considering the various factors of value including earnings, dividends, market price, assets, and the other factors deemed relevant in a stock evaluation problem arising under . . . 8 Del. C. § 262"); *Kessler*, 898 A.2d at 342–44 (determining fair value and using that as a basis for damages in breach of fiduciary duty case); *Emerging Commc'ns*, 2004 WL 1305745, at *24 (finding that "fair value" was $38.05, stating that "[f]rom that fair value finding it further follows that the $10.25 per share merger price was not a 'fair price' within the meaning of the Delaware fiduciary duty case law beginning with *Weinberger*," and granting the difference as damages). *See generally Reis*, 28 A.3d at 461–64.

[572] *See Weinberger*, 457 A.2d at 714 (coining the term to describe the measure of damages for a breach of fiduciary duty by the controlling stockholder and its representatives on subsidiary board). *See generally Orchard Enters.*, 88 A.3d at 42–48.

122

information, stockholders could have voted down the transaction and retained their proportionate share of the equity in the corporation as a going concern.[573]

When seeking post-closing damages for a breach of fiduciary duty in a sale process, the measure of damages logically depends on what the plaintiffs contend would have happened absent the breach. If the plaintiffs prove that the defendants could have sold the corporation to the same or to a different acquirer for a higher price, then the measure of damages should be based on the lost transaction price.[574] In this case, the plaintiffs assert that the Company should not have been sold at all and should have continued to operate as an independent going concern. The logical measure of damages is therefore the same as

---

[573] *See Arnold*, 1995 WL 376919, at *6; *Wacht v. Continental Hosts, Ltd.*, 1994 WL 525222, at *1–2 (Del. Ch. Sept. 16, 1994); *see also Turner v. Bernstein*, 768 A.2d 24, 39 (Del. Ch. 2000) (Strine, V.C.) (recognizing that either a quasi-appraisal or rescissory measure of damages could be awarded for a breach the duty of disclosure in a post-closing damages action). *Cf. In re Ocean Drilling & Exploration Co. S'holders Litig.*, 1991 WL 70028, at *7 (Del. Ch. Apr. 30, 1991) (holding that alleged breaches of fiduciary duty did not threaten irreparable harm because the class could be awarded a quasi-appraisal remedy); *Steiner v. Sizzler Rests. Int'l, Inc.*, 1991 WL 40872, at *2 (Del. Ch. Mar. 19, 1991) (Allen, C.) (same).

[574] *See Dole*, 2015 WL 5052214, at *46 (awarding damages of $2.74 per share, which suggested that "Murdock and Carter's pre-proposal efforts to drive down the market price and their fraud during the negotiations reduced the ultimate deal price by 16.9%"); *HMG/Courtland Properties, Inc. v. Gray*, 749 A.2d 94, 116 (Del. Ch. 1999) (Strine, V.C.) (finding that although price fell within lower range of fairness, "The defendants have failed to persuade me that HMG would not have gotten a materially higher value for Wallingford and the Grossman's Portfolio had Gray and Fieber come clean about Gray's interest. That is, they have not convinced me that their misconduct did not taint the price to HMG's disadvantage."); *see also Bomarko, Inc. v. Int'l Telecharge Inc.*, 794 A.2d 1161, 1184 (Del. Ch. 1999) (holding that although the "uncertainty [about] whether or not ITI could secure financing and restructure" lowered the value of the plaintiffs' shares, the plaintiffs were entitled to a damages award that reflected the possibility that the company might have succeeded absent the fiduciary's disloyal acts), *aff'd*, 766 A.2d 437 (Del. 2000).

the traditional measure for a breach of the duty of disclosure: quasi-appraisal.

The plaintiffs sought to prove that the standalone value of the Company was $9.86 per share. To support this request, the plaintiffs relied on a discounted cash flow analysis prepared by their valuation expert, Ronald Quintero.[575] Given that the deal price was $6.50 per share, Quintero's valuation posited that the Company was worth 52% more than what the Board obtained from a third-party acquirer in a synergistic transaction. In a deal involving a financial buyer that could be expected to generate few if any combinatorial synergies, the Delaware Supreme Court recently emphasized the lack of reliability of a discounted cash flow analysis that yielded a result that was 40% over the deal price.[576]

"Although widely considered the best tool for valuing companies when there is no credible market information and no market check, [discounted cash flow] valuations involve many inputs—all subject to disagreement by well-compensated and highly credentialed experts—and even slight differences in these inputs can produce large valuation gaps."[577] Quintero's discounted cash flow valuation is not sufficiently persuasive to undergird a damages award exceeding half of the deal price.

[575] JX 570 ¶ 7.

[576] *DFC Glob. Corp. v. Muirfield Value P'rs.*, 172 A.3d 346, 362 (Del. 2017). *Cf. Merion Capital L.P. v. Lender Processing Servs., Inc.*, 2016 WL 7324170, at *33 (Del. Ch. Dec. 16, 2016) ("The proximity between [the discounted cash flow] outcome and the result of the sale process is comforting."); *In re Appraisal of Ancestry.com, Inc.*, 2015 WL 399726, at *23 ("The DCF valuation I have described is close to the market, and gives me comfort that no undetected factor skewed the sales process.").

[577] *Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd.*, 177 A.3d 1, 37–38 (Del. 2017).

The principal inputs in Quintero's valuation came from the December 2013 Projections. They were prepared in the ordinary course of business, adopted by the Board, and used to structure compensation plans and when applying for D&O insurance.[578] Potomac accurately observes that a sentence in the midst of a paragraph about the assumptions on which they were based described the projections as "aggressive," the defense witnesses' coordinated testimony placed excessive emphasis on that qualification. I believe that management thought the projections were a stretch, but that they were attainable. But that does not mean that the December 2013 Projections were sufficiently reliable to serve as the basis for a nine-figure damages award.

To reach the results projected for the later years in the projection period, the December 2013 Projections identified three principal layers of revenue.[579] The first layer contemplated continued growth in PLX's existing "inside the box" switches, which used a technology called PCI Express to facilitate ultra-fast data transfers between components "inside the box" of a single computer.[580] PLX dominated this market, and I would have no difficulty basing a damages award on this aspect of the projections. The second layer contemplated updating PLX's "inside the box" switches to use a new technology called PCI ExpressFabric.[581] This layer was a variant on PLX's existing business, and here too I

---

[578] *See* JX 385 at 20; JX 383 at 32.

[579] *See* JX 1000 at 5 (depicting three layers of initiatives in varying shades of red).

[580] Whipple Dep. 91–92.

[581] *Id.*

would have no difficulty using these figures for purposes of a damages award. Together, these two layers drove compound annual growth rates of 25%, consistent with PLX's historical growth rates.[582]

To achieve even higher growth rates, particularly in 2017 and 2018, the December 2013 Projections contemplated a third layer of future revenue. It depended on PLX introducing a new line of "outside the box" products that would use the ExpressFabric technology to connect components located in different computers, such as the multiple servers in a server rack.[583] To succeed with this line of business, PLX would have to enter the hardware market and compete with incumbent players like Cisco.[584] This layer of revenue effectively contemplated a new line of business involving a new set of customers with a new set of requirements.[585] The evidence at trial did not give me sufficient confidence to base a damages award on this element of the projections.[586]

Potomac's expert, Neil Beaton, conducted a discounted cash flow methodology that

---

[582] *See* JX 429 at 6.

[583] *See* Whipple Dep. 91–94.

[584] *See Id.* at 93, 101–03.

[585] *See* Salameh Dep. 163–64, 175–77.

[586] *See OptimisCorp v. Waite*, 2015 WL 5147038, at *81 (Del. Ch. Aug. 26, 2015) ("There is ample support in Delaware precedent for rejecting damages claims based on speculative evidence.") (citing *In re Mobilactive Media, LLC*, 2013 WL 297950, at *24 (Del. Ch. Jan. 25, 2013)); *see also Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, 2015 WL 6611601, at *24 (Del. Ch. Oct. 30, 2015) ("Delaware courts have held that 'measuring money damages for an unproven technology' is a 'nearly impossible task' because 'such damages are likely to be merely speculative.'" (quoting *Amaysing Techs. Corp. v. Cyberair Commc'ns, Inc.*, 2004 WL 1192602, at *5 (Del. Ch. May 28, 2004))).

reduced the extent of the third layer of revenue.[587] His valuation did not exceed the deal price of $6.50 per share.[588] Lacking confidence in the third layer of revenue, I likewise cannot award damages that exceed the Merger price.

A second problem for the plaintiffs is that PLX management had a track record of missing its projections.[589] The Delaware Supreme Court has cautioned that "[m]anagement's history of missing its forecasts should . . . give[] the Court of Chancery pause."[590] PLX management missed its 2012 revenue target by approximately $21.7 million and its 2013 revenue target by approximately $15.0 million.[591] PLX missed its FY 2014 first quarter target by $1.4 million, then missed its second quarter as well.[592] By the second quarter, PLX management had reported lower demand for PCI Express switches.[593] Moreover, PMC-Sierra Inc., a well-funded competitor that had paid $100 million to acquire IDT's PCI Express business, was planning to enter the market for next-generation

---

[587] *See* JX 572 ¶¶ 64–83.

[588] *Id.* ¶ 3.

[589] *See* JX 571 ¶¶ 51–55.

[590] *Dell*, 177 A.3d at 27 n.129; *see Nine Sys.*, 2014 WL 4383127, at *42 ("The Court cannot accept that the same people who missed projections three-months out in September 2001 by a factor of three (where there was no intervening change to the Company's business) would have been able to produce reliable projections in January 2002 for an entire year.").

[591] JX 571 ¶ 54 ("exclud[ing] ethernet and satellite sales").

[592] *See* JX 319 at 9; Raun Dep. 164.

[593] *See* JX 491 at 1.

circuits.[594] The arrival of a new market entrant would make it more difficult for PLX to achieve its projections.

A third problem for the plaintiffs is that bidders do not appear to have fully credited the December 2013 Projections, or at least not to have believed that they supported valuations in the range that Quintero posited.

> [S]elf-interest concentrates the mind, and people who must back their beliefs with their purses are more likely to assess the value of the judgment accurately than are people who simply seek to make an argument. Astute investors survive in competition; those who do not understand the value of assets are pushed aside. There is no similar process of natural selection among expert witnesses and . . . judges.[595]

During its pre-signing market check in fall 2013, PLX provided an earlier and somewhat rosier set of projections to bidders. During the early months of 2014, PLX provided the December 2013 Projections to bidders like Cypress, Inphi, and Semtech. The management team presented the projections as its best estimate of the Company's future, without the "Upside Case" gloss that Deutsche Bank later put on them. If the projections were sufficiently reliable to support a credible valuation of $9.82 per share, then it seems likely that another buyer would have competed with Avago. The fact that no other bidder made

---

[594] *See* JX 394; Singer Tr. 64–66.

[595] *Matter of Cent. Ice Cream Co.*, 836 F.2d 1068, 1072 n.3 (7th Cir. 1987) (Easterbrook, J.); *see Union Ill. 1995 Inv. Ltd. v. Union Fin. Gp.*, 847 A.2d 340, 359 (Del. Ch. 2004) (Strine, V.C.) ("The benefit of the active market for UFG as an entity that the sales process generated is that several buyers with a profit motive were able to assess these factors for themselves and to use those assessments to make bids with actual money behind them. For me (as a law-trained judge) to second-guess the price that resulted from that process involves an exercise in hubris and, at best, reasoned guess-work.").

a proposal, either before or after the Merger was announced, is strong evidence that the December 2013 Projections would not support a valuation in the range that Quintero claims.[596]

In addition to giving full credit for the third layer of revenue in December 2013 Projections, Quintero calculated a beta of 0.985 by using daily observations during the one-year period preceding June 20, 2014.[597] His beta of less than one implied that a small technology company operating in the cyclical semiconductor industry exhibited less volatility than the market as a whole.[598] That was not credible and seems to have resulted from two factors.

First, Quintero selected a period of time when PLX was experiencing relatively low volatility because Potomac's activist campaign had driven its stock price "up pretty much to the ceiling."[599] This period of time was not representative of how PLX's stock would perform based on PLX's fundamentals.

---

[596] *See Dell,* 177 A.3d at 37 ("When an asset has few, or *no*, buyers at the price selected, that is not a sign that the asset is stronger than believed—it is a sign that it is weaker. This fact should give pause to law-trained judges who might attempt to outguess all of these interested economic players with an actual stake in a company's future.").

[597] JX 570 Ex. 56.

[598] Quinter Tr. 608–09; *see also* Shannon P. Pratt & Alina V. Niculita, *Valuing a Business* 194 (5th ed. 2008) ("Many high-tech companies are good examples of stocks with high betas. . . . The classic example of a low-beta stock would be a utility that has not diversified into riskier activities.").

[599] Quintero Tr. 777; *see* JX 570 Ex. 56.

Second, Quintero used daily returns, rather than a more standard interval of weekly or monthly returns.

> [W]hen the return interval is shortened, the following occurs: Securities with a smaller market value than the average of all securities outstanding (the market) will generally have a decreasing beta, whereas securities with a larger market value than the average of all securities outstanding will generally have an increasing beta.[600]

This happens because a smaller return interval tends to incorporate instances of nontrading, biasing beta estimates towards one.[601] Beaton derived a more credible beta of 1.72 through a comparable companies analysis.[602] When Beaton replicated Quintero's beta using monthly returns, the beta increased to 1.458.[603]

Quintero's math supports his valuation conclusion, but the inputs driving that math were not sufficiently convincing. "Although valuation exercises are highly dependent on mathematics, the use of math should not obscure the necessarily more subjective exercise

---

[600] Gabriel Hawawini, *Why Beta Shifts as the Return Interval Changes*, Fin. Analysts J., May–June 1983, at 73, 73.

[601] *See* Thomas H. McInish and Robert A. Wood, *Adjusting for Beta Bias: An Assessment of Alternative Techniques: A Note*, 41 J. Fin. 277, 277 (1986) (citing Myron Scholes and Joseph Williams, *Estimating Betas from Nonsynchronous Data*, 5 J. Fin. ECON. 309 (1977)); *see also* Aswath Damodaran, *Estimating Risk Parameters* 10 (2002), http://pages.stern.nyu.edu/~adamodar/ (unpublished manuscript) ("Betas estimated using daily or even weekly returns are likely to have a significant bias due to the non-trading problem."); Robert W. Holthausen & Mark E. Zmijewski, *Corporation Valuation Theory, Evidence & Practice* 300–01 (2014) ("The shorter the periodicity we choose to measure each return, the more likely that we will encounter statistical issues when we estimate the market model.").

[602] *Compare* JX 570 Ex. 56 *with* JX 572 ¶ 75.

[603] JX 571 ¶ 71.

in judgment that a valuation exercise requires."[604] After considering the components of the December 2013 Projections and some of the judgments that Quintero made, I am not persuaded that the plaintiffs carried their burden of proof on damages.

A far more persuasive source of valuation evidence is the deal price that resulted from the Company's sale process. The Delaware Supreme Court has explained that when a widely held, publicly traded company has been sold in an arm's-length transaction, the deal price has "heavy, if not overriding, probative value."[605] Although this decision has found that the sale process was flawed, largely because of Singer and Deutsche Bank's failure to disclose Avago's tip to the rest of the Board, I believe the sale process was sufficiently reliable to exclude the plaintiffs' damages contention.

The Delaware Supreme Court has observed that as a matter of "economic reality . . . the sale value resulting from a robust market check will often be the most reliable evidence of fair value, and that second-guessing the value arrived upon by the collective views of many sophisticated parties with a real stake in the matter is hazardous."[606] The Delaware Supreme Court has also commented that a deal price "deserved heavy, if not dispositive weight"[607] when it resulted from a sale process that involved "fair play, low barriers to

---

[604] *Agranoff v. Miller*, 791 A.2d 880, 896 (Del. Ch. 2001) (Strine, V.C.).

[605] *Dell*, 177 A.3d at 30.

[606] *DFC*, 172 A.3d at 366 (Del. 2017); *see id.* ("[W]e have little quibble with the economic argument that the price of a merger that results from a robust market check, against the back drop of a rich information base and a welcoming environment for potential buyers, is probative of the company's fair value.").

[607] *Dell*, 177 A.3d at 23.

entry, outreach to all logical buyers, and the chance for any topping bidder to have the support of [the largest stockholder's] votes . . . ."[608]

In this case, PLX conducted a quiet outreach campaign during the second half of 2013. By the end of September, Deutsche Bank had contacted fifteen potential bidders, executed nine non-disclosure agreements with companies expressing significant interest, and arranged three meetings.[609] In October, Cypress submitted an indication of interest, and Deutsche Bank believed that Inphi, LSI, and Avago were seriously interested. Ultimately, none of the companies made a formal bid, but this process provided the Board with important information about how potential acquirers regarded PLX.[610]

In early 2014, PLX engaged in a quieter market exploration. In February, Raun reported to the Special Committee that he met with Cypress, but that they were "too leveraged" to complete a transaction.[611] The Special Committee instructed Raun to continue to reach out to other companies, but "not to take any action with respect to

---

[608] *Id.* at 35.

[609] JX 217 at 1; *see* JX 208 at 1; PTO ¶ 78; JX 215 at 5–6; JX 217 at 1; Cho Dep. 195–96.

[610] In evaluating the sale process, I have not given meaningful weight to the go-shop process in 2012 that followed the signing of the IDT transaction. Enough time passed between 2012 and the Avago deal in 2014 to regard those contacts as stale.

[611] JX 374 at 1; *see* PTO ¶ 97; JX 372 at 2; JX 395 at 14.

132

Avago."[612] Raun engaged further with Cypress and also spoke with Inphi, Exar, and Semtech.[613]

After Avago made its offer of $6.25 per share on May 22, 2014, Deutsche Bank spoke again with Inphi, Semtech, and Cypress.[614] Broadcom independently expressed interest,[615] but the Company wanted to move quickly to capitalize on the Avago offer, and Broadcom was unable to present a bid within that time frame.[616]

Although this pre-signing process was not extensive, the contacts provide some support for the reliability of the deal price. In my view, the pre-signing process was not so thorough that PLX could have entered into a fully locked-up deal with Avago (or the functional equivalent), but it gave the Board some information about the level of third-party interest in the Company.

More important than the pre-signing process was the post-signing market check. As this decision has explained, the structure of the Merger Agreement satisfied the Delaware Supreme Court's standard for a passive, post-signing market check. No topping bid emerged during that process.

Another relevant consideration is that the Merger involved a combination between

---

[612] JX 374 at 2.

[613] JX 380 at 2.

[614] JX 459 at 3.

[615] *See* JX 460 at 2.

[616] *See* JX 473.

two companies operating in the same industry. As a result, the price likely included synergies.[617] The record supports this inference and indicates that Avago anticipated achieving significant synergies from combining the businesses of LSI and PLX.[618] An analysis of the deal that Barclay's prepared contemplated revenue synergies of $3 million and cost synergies of $19.6 million.[619] The existence of synergies indicates that the deal price likely exceeded the standalone value of the Company.

Although flawed from a fiduciary standpoint, the details of the sale process that the Board conducted and the nature of the synergistic deal with Avago that it generated means that the plaintiffs received consideration that exceeded the value of the Company on a

---

[617] *See DFC*, 172 A.3d at 371 ("[I]t is widely assumed that the sales price in many M & A deals includes a portion of the buyer's expected synergy gains, which is part of the premium the winning buyer must pay to prevail and obtain control."); *Lender Processing*, 2016 WL 7324170, at *11, *26 (noting that evidence supported the view that the merger consideration "included a portion of the value that [the acquirers] expected to generate from synergies" and that "[t]he existence of combinatorial synergies provides an additional reason to think that" the merger consideration "exceeded the fair value of the Company"); *see also Olson v. Ev3, Inc.*, 2011 WL 704409, at *10 (Del. Ch. Feb. 21, 2011) ("In an arm's-length, synergistic transaction, the deal price generally will exceed fair value because target fiduciaries bargain for a premium that includes . . . a share of the anticipated synergies . . . ."); *Union Ill.*, 847 A.2d at 356 ("[A]cquirers typically share a portion of synergies with sellers in sales transactions and that . . . portion is value that would be left wholly in the hands of the selling company's stockholders, as a price that the buyer was willing to pay to capture the selling company and the rest of the synergies.").

[618] *See* JX 1032 at 1–2 (Howell describing a conversation with Krause in which Krause indicated "PCI fits in well with LSIs [*sic*] storage products, so the rationale is at least as good for Avago to acquire PLX now, if not slightly improved"); Krause Dep. 28–29; ("Q. And were you—were you modeling synergies with LSI at this point? Is that part of your—your analysis in this transaction? A. Well, yeah. . . .").

[619] *See* JX 526 at 21.

stand-alone basis. The real-world market evidence from the sale process provides another reason to reject the plaintiffs' damages case. The plaintiffs failed to show causally related damages, and their claim for aiding and abetting therefore fails.

### III. CONCLUSION

The plaintiffs asserted that Potomac aided and abetting the Board's breaches of fiduciary duty. The plaintiffs proved that the Board breached its duty of disclosure and that the directors' actions during the sale process fell outside the range of reasonableness. The plaintiffs also proved that Potomac knowingly participated in those breaches of duty, but they were unable to prove that the breaches resulted in damages. Judgment is entered for Potomac.

| Case | Time Between Announcement of Deal and Commencement of Tender Offer | Time from Commencement of Tender Offer to Closing | Total Time for Purposes of Court Decision | Termination Fee | Other Deal Protection Measures |
|---|---|---|---|---|---|
| *In re Fort Howard Corp. S'holders Litig.*, 1988 WL 83147 (Del. Ch. Aug. 8, 1988) (Allen, C.) | 4 business days, 4 calendar days | 25 business days, 38 calendar days | 29 business days, 42 calendar days | $67.8 million; 1.9% of equity | No-shop permitting target to provide information and negotiate (i.e., a window-shop). |
| *Yanow v. Scientific Leasing, Inc.*, 1988 WL 8772 (Del. Ch. Feb. 5, 1988) | 4 business days, 4 calendar days | 19 business days, 28 calendar days | 23 business days, 32 calendar days | Expense reimbursement | Window-shop, 16.6% stock option lock-up |
| *In re KDI S'holders Litig.*, 1988 WL 116448 (Del. Ch. Nov. 1, 1988) | 4 business days, 6 calendar days | 24 business days, 35 calendar days | 28 business days, 41 calendar days | $8 million; 4.3% of equity | Window-shop |
| *Braunschweiger v. American Home Shield Corp.*, 1989 WL 128571 (Del. Ch. Oct. 26, 1989) (Allen, C.) | 3 business days, 3 calendar days | 30 business days, 43 calendar days | 33 business days, 46 calendar days | Graduated fee capped at 1.9% equity | Strict no-shop |
| *In re Formica Corp. S'holders Litig.*, 1989 WL 25812 (Del. Ch. Mar. 22, 1989) | Single-step merger. No tender offer. 143 business days, 205 calendar days, between announcement of merger and stockholder vote approving deal. | | | 4.5% of equity | None |
| *Roberts v. General Instr. Corp.*, 1990 WL 118356 (Del. Ch. Aug. 13, 1990) (Allen, C.) | 5 business days, 7 calendar days | 25 business days, 35 calendar days | 30 business days, 42 calendar days | $33 million; 2% of equity | Window-shop |
| *McMillan v. Intercargo Corp.*, 768 A.2d 492 (2000) (Strine, V.C.) | Single-step merger. No tender offer. 102 business days, 148 calendar days between announcement of merger and stockholder vote approving deal. | | | $3.1 million; 3.5% of equity | Window-shop |
| *In re Pennaco S'holders Litig.*, 787 A.2d 691 (Del. Ch. 2001) (Strine, V.C.) | 9 business days, 17 calendar days | 20 business days, 28 calendar days | 29 business days, 45 calendar days | $15 million; 3% of equity | Window-shop |
| *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531 (Del. Ch. 2003) (Strine, V.C.) | Single-step merger. No tender offer. 45 business days, 63 calendar days between announcement of merger and stockholder vote approving deal. | | | Expenses up to $1.65 million; up to 1.7% of deal value | Window-shop with matching rights |

| | | | |
|---|---|---|---|
| *In re MONY Gp. Inc. S'holders Litig.*, 852 A.2d 9 (Del. Ch. 2004) | Single-step merger. No tender offer. 82 business days, 121 calendar days between announcement of merger and stockholder vote approving deal. | $50 million; 3.3% of equity; 2.4% of deal value | Window-shop |
| *In re Dollar Thrifty S'holder Litig.* 14 A.3d 573 (Del. Ch. 2010) (Strine, V.C.) | Single-step merger. No tender offer. 100 business days, 144 calendar days between announcement of merger and stockholder vote approving deal. | $44.6 million with up to additional $5 million in expenses; 4.3% of deal value after accounting for options, RSUs and performance units. | Window-shop with matching rights |
| *In re Smurfit-Stone Container Corp. S'holder Litig.*, 2011 WL 2028076 (Del. Ch. May 20, 2011) | Single-step merger. No tender offer. 89 business days, 123 calendar days between announcement of merger and stockholder vote approving deal. | $120 million;3.4% of equity | Window-shop with matching rights |
| *In re El Paso Corp. S'holder Litig.*, 41 A.3d 432 (Del. Ch. 2012) (Strine, C.) | Single-step merger. No tender offer. 51 business days, 75 calendar days between announcement of merger and stockholder vote approving deal. | $650 million; 3.1% of equity | Window-shop with matching rights |
| *In re Plains Expl. & Prod. Co. S'holder Litig.*, 2013 WL 1909124 (Del. Ch. May 9, 2013) | Single-step merger. No tender offer. 79 business days, 117 calendar days between announcement of merger and stockholder vote approving deal. | $207 million; 3% of deal value | Window-shop with matching rights |
| *C & J Energy Servs., Inc. v. City of Miami Gen. Empls.' and Sanitation Empls.' Ret. Tr.*, 107 A.3d 1049 (Del. 2014) | Single-step merger. No tender offer. 130 business days, 189 calendar days between announcement of merger and stockholder vote approving deal. | $65 million; 2.27% of deal value | Window-shop |